## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| WILDERNESS WATCH, | Case No. <u>23</u>-CV-<u>00284</u> |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| TOM HALL, Forest Supervisor of the Superior National Forest; and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

1.      The Boundary Waters Canoe Area Wilderness is an immense, wild, and unique place. Combined with expansive Quetico Provincial Park across the international boundary between Minnesota and Ontario, this rugged landscape spans nearly two million acres and contains thousands of pristine lakes and a vast network of streams, wetlands, forests, and undisturbed nature. The Boundary Waters were among the original Wilderness areas designated by the 1964 Wilderness Act, and Congress has recognized the importance of "protecting the special qualities of this area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation." *See* Pub. L. 95-495, 92 Stat. 1649, § 1 (1978).

2.      The Superior National Forest has the statutory duty to administer the Boundary Waters to preserve and protect its wilderness character. Among other facets of the wilderness character mandate—such as maintaining "untrammeled" nature, with

"man's work substantially unnoticeable"—the Wilderness Act expressly prohibits the use of motors and other machines. The Superior National Forest is tasked to "protect and enhance the natural values and environmental quality" of the wilderness, to "prevent further road and commercial development," and to "provide for the orderly and equitable transition from motorized recreational uses to nonmotorized recreational uses." *Id.* § 2.

3.     That last directive, provided in a 1978 Boundary Waters-specific statute, regards a few areas in the Boundary Waters where motors would linger post-designation. The Boundary Waters received a statutory compromise in which "established" motorboat uses were permitted to "continue," but this initial, open-ended provision proved so unworkable and degrading to the Wilderness that Congress soon acted again. In 1978, Congress sharply narrowed the exception grandfathering in the use of motorboats, limiting such use to certain specific lakes and requiring a phase-out of motor use on others. Furthermore, to better further Wilderness protection, Congress required the Forest Service to quantify the average level of motorboat use on each of the exempted lakes in the years 1976 to 1978 and cap all future motorboat use on each lake at no more than that level. *Id.* § 4(f).

4.     This lawsuit addresses the Superior National Forest's long-term and utter failure to comply with its statutory wilderness protection mandates.

5.     To briefly introduce the problem, consider a chain of lakes known as the "Moose Chain." From an entry point outside the Wilderness on Moose Lake, routes north on this waterway bisect the Wilderness into roughly two halves. Unfortunately, this lacustrine collar has become a motorboat freeway, interrupting any semblance of

contiguity across the wild landscape with a ceaseless parade of commercial and private engine traffic.

6.      Following the 1978 Act, the Forest Service in 1981 quantified the legally permissible level of motorboat use in the Moose Chain at a quota of 3,380 motorboat entries per year. However, for Knife Lake, a remote lake to the northeast reached through the Moose Lake entry point, the law required that motor use be phased out by 1984. Thus, with the Knife Lake figures removed since 1984, the statutory Moose Lake entry cap has been **2,612**: 558 entries for overnight use, 695 for day use on the Moose Chain, and 1,359 for day use on Basswood Lake, which can be reached by a portage from the northern terminus of the Moose Chain.

7.      According to the Forest Service's documentation, in 2018—the most recent year for which the Forest Service records Wilderness Watch has obtained detail entry-point-specific monitoring totals—the agency allowed commercial towboats to make no less than 3,367 trips from the Moose Lake entry point. On top of this, the agency made available through its private entry quota another 2,369 motorboat permits through this corridor. Added together, these authorizations amount to **5,736** motorboat entries, *more than double* the statutory cap.

8.      The commercial towboats, it should be emphasized, are of a different character than the motorboats entering under general permits. The "towboat" moniker is, in fact, a bit misleading. The motorized towboats do not *tow* human-powered canoes at canoe-safe speeds. They carry multiple canoes and multiple paying clients together on a larger vessel, which noisily motors long distances into the Wilderness simply to cover

3

distance more conveniently. The towboats are not "towing" passengers who are otherwise incapable of reaching the area via non-motorized craft; they are like shuttle buses driving canoe-capable clients further afield, where they will engage in more wilderness-compatible travel after first shrinking some of the vast country that makes the wilderness what it is. Ironically, much of the towboat demand is induced by canoers' desire to reach distant areas where they can avoid the excessive motor traffic on the towboat-heavy lakes.

9.     As detailed below, parties have litigated the Superior National Forest's excessive authorization of motorboat use numerous times in the past. In one of the latest, Wilderness Watch sued over this issue in 2015, ultimately dismissing the case under a settlement agreement whereby the Forest Service would assess—and consequently correct—the commercial towboat problem within two years. It has been over five years, and the agency has yet to even fully satisfy the assessment task agreed to in the settlement. In the meantime, the wilderness-degrading motorboat activity has only intensified, with each subsequent year bringing new actionable violations of the statutory quotas and wilderness management mandates.

10.    Plaintiff Wilderness Watch brings this lawsuit to seek a declaration that the Forest Service's authorization of excessive commercial towboat use and other motorboat use in the Boundary Waters violates the law. Wilderness Watch seeks to enjoin the agency from permitting any motorized use beyond the statutory cap and the quotas set out in the Forest Service's wilderness management planning provisions. Wilderness Watch requests that this Court enjoin the Forest Service from authorizing any commercial

4

towboat entries until the agency can demonstrate full compliance with the Wilderness

Act, the Boundary Waters Canoe Area Wilderness Act, the National Forest Management

Act (which mandates compliance with Forest Plans), and the Administrative Procedure

Act ("APA").

11.    Wilderness Watch also requests an order requiring the Forest Service to

create and implement a permitting process for commercial towboat operations that will

ensure clarity, accountability, and compliance with the law. Wilderness Watch

specifically requests the opportunity for separate remedy briefing to fully address

commercial towboat permitting details, such as reporting and administration

requirements, the insufficiency of which have led to the metastasized problem the agency

now faces.

12.    Wilderness Watch seeks the award of costs of suit, including attorney and

any expert witness fees pursuant to the Equal Access to Justice Act, and such other relief

as this Court deems just and proper.

13.    In connection with these claims, Wilderness Watch states and alleges as

follows.

## I.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over the claims specified in this

complaint because it presents an actual case or controversy arising under federal law. As

Plaintiff will make clear below, the Forest Service has authorized motorboat use through

final agency actions, and/or agency action unlawfully withheld or unreasonably delayed,

that are subject to this Court's review under the APA, 5 U.S.C. §§ 553-559 and §§ 701-

706. These actions violate the Wilderness Act of 1964, 16 U.S.C. §§ 1131-1136; the

Boundary Waters Canoe Area Wilderness Act, Pub. L. 95-495, 92 Stat. 1649 (1978); and

the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687, as well as

implementing regulations.

15.    Rule 65 of the Federal Rules of Civil Procedure empowers this Court to

grant Plaintiff's requested injunctive relief, and the Declaratory Judgment Act, 28 U.S.C.

§ 2201, authorizes declaratory relief.

16.    Venue in this case is proper in the United States District Court for the

District of Minnesota under 28 U.S.C. § 1391(e). Defendant Tom Hall, the Forest

Supervisor for the Superior National Forest, has his office in Duluth. Furthermore, all the

events giving rise to the claims in this action occurred in this district.

## II.    PARTIES

17.    Plaintiff Wilderness Watch is a non-profit conservation organization whose

sole mission is the preservation and proper stewardship of lands and rivers in the National

Wilderness Preservation System and the National Wild and Scenic Rivers System. To

that end, since 1989, Wilderness Watch has engaged in public policy advocacy,

congressional and agency oversight, public education, and litigation to promote sound

stewardship of federal Wilderness areas and Wild and Scenic River corridors. Wilderness

Watch is headquartered in Missoula, Montana, and has offices in Idaho, Minnesota, and

Vermont. Wilderness Watch has a long history of advocacy to preserve the wilderness

character of the Boundary Waters.

18.     The staff, members, and supporters of Wilderness Watch have longstanding interests in preserving the wilderness character of federally designated Wilderness, especially including the unrivaled original Wilderness areas like the Boundary Waters, first designated in 1964. Members of Wilderness Watch value Wilderness and have interests in protecting Wilderness whether or not they ever set foot inside its boundaries. They value Wilderness for its own sake, for the sake of wildlife who find increasingly scarce refuge there, and for the sake of current and future generations who rely on the preservation of Wilderness for a multitude of personal, spiritual, societal, and ecological reasons. Members of Wilderness Watch visit and enjoy the Boundary Waters for wilderness-based recreational pursuits such as hiking, camping, canoeing, cross-country skiing, photography, solitude, and engaging in other vocational, scientific, spiritual, and recreational activities. Members of Wilderness Watch seek out the Boundary Waters for these activities because of the area's incomparably remote, quiet, and untrammeled qualities and the opportunities for exceptional solitude and reflection that its character as Wilderness provides. Members of Wilderness Watch also work in fields like tourism, research, and academia that depend upon the wilderness character and minimally disturbed ecosystem of the Boundary Waters; they depend upon the integrity of its wildlife, its expansive and unfragmented natural landscape, and the immeasurable environmental benefits that stem from leaving the area as unmolested by people as possible—and as minimally disturbed as the law requires.

19.     The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, wildlife and wilderness

preservation interests of Wilderness Watch, which brings this action on behalf of the organization and its members. These are actual, concrete injuries traceable to defendants' conduct and would be redressed by the relief requested.

20.     Defendant Tom Hall is the Forest Supervisor for the Superior National Forest. In that capacity, he is the official representative for the Superior National Forest, and he has the ultimate responsibility to ensure that decisions made at the Forest Service level are lawful and comply with regulatory, policy, and procedural requirements. This suit raises claims against Supervisor Hall in his official capacity.

21.      Defendant United States Forest Service is an administrative agency within the United States Department of Agriculture. The Forest Service is entrusted with the management of our National Forests and designated Wilderness areas within National Forest Boundaries, including the Boundary Waters Canoe Area Wilderness ("BWCAW") within the Superior National Forest.

22.     This complaint will refer to Defendants collectively as the "Forest Service."

### III.   LEGAL CONTEXT

#### The Wilderness Act and Designation of the Boundary Waters

23.     Congress provided the Boundary Waters the protected status of designated Wilderness in 1964 through the landmark passage of the Wilderness Act. *See* 16 U.S.C. §§ 1131-1136. Prior to Wilderness designation, the Boundary Waters also had a long administrative history including recognition of the area's wild character and importance as wildlife habitat. The Boundary Waters are unique in providing a vast, undisturbed waterway network that can be traveled and experienced by canoe in the same manner as

8

in the centuries prior to the combustive explosion of industrial technology. It was exactly to ensure that "expanding settlement and growing mechanization" would not "occupy and modify all areas within the United States" that Congress passed the Wilderness Act. 16 U.S.C. § 1131(a). In defining Wilderness and the requirements of federal land managers to preserve and protect these areas, the Wilderness Act expressly prohibits—with only narrow exceptions—motorized and mechanized activities within Wilderness boundaries. 16 U.S.C. § 1133(c).

24.     However, in response to pressure from various motorized use interests and lake residents, Congress first attempted to allow what was perceived as sufficiently minimal "established" motorboat use to "continue" in the Boundary Waters. The provision was premised on such use "not undermining the ability to maintain the 'primitive character of the area.'" *Friends of the Boundary Waters v. Bosworth*, 437 F.3d 815, 818 (8th Cir. 2006) (citing 16 U.S.C. § 1133(d)(5) (1976)). When motorboat use expanded nonetheless and degraded the Wilderness, Congress had to act again to limit the exception.

### The 1978 Boundary Waters Canoe Area Wilderness Act

25.     With the Boundary Waters Canoe Area Wilderness Act of 1978, Pub. L. No. 95-495, 92 Stat. 1649 (1978) ("BWCAW Act"), Congress prohibited all motorboat use within the Wilderness except on specifically named lakes. On those specifically named lakes, the BWCAW Act imposed a "statutory cap" on motorboat use and directed the Secretary of Agriculture (who oversees the Forest Service) to develop and implement entry point quotas to restrict motorboat use.

26.    The statutory cap from the Act is "the average actual annual motorboat use of the calendar years 1976, 1977, and 1978 for each lake." BWCAW Act § 4(f), 92 Stat. at 1651.

27.    The Act also required that motorboats be phased out on a subset of the specifically named lakes, which means that the entry point caps today are diminished by whatever contribution the phase-out lakes would have provided to the original figure. *See* BWCAW Act § 4(c)(3)-(4), 92 Stat. at 1650-51.

28.    The Forest Service completed its evaluation of the "average actual annual motorboat use" called for by the Act, and it published the following table in its 1981 BWCAW Act Final Implementation Plan:

The quotas for each entry point are listed below:

These quotas are the maximum amount of motorboat use allowable under the Act. They will be adjusted when certain lakes are closed to motorboat use, as directed by the Act.

| Entry Point | Type of Motorboat Use | Annual Quota [1] |
|---|---|---|
| Trout Lake | All | 1738 |
| Fall Lake | Overnight | 658 |
| | Day Use on Fall Lk. only | 1457 |
| | Day Use on Basswood Lake | 1206 |
| Fourmile Portage | Overnight | 129 |
| | Day Use | 993 |
| Moose Lake | Overnight | 730 |
| | Day Use on Moose Chain only | 837 |
| | Day Use on Basswood and Knife Lakes | 1813 |
| Snowbank Lake | Overnight | 81 |
| | Day Use | 610 |
| South Farm Lk. | Overnight | 10 |
| | Day Use | 345 |
| Brule Lake | Overnight | 266 |
| | Day Use | 226 |
| Seagull Lake | Overnight | 134 |
| | Day Use | 594 |
| Saganaga Lake | Overnight | 388 |
| | Day Use | 2023 |
| Clearwater Lake | Overnight | 42 |
| | Day Use | 246 |
| E. Bearskin Lake | Overnight | 30 |
| | Day use on E. Bearskin Lake only | 227 |
| | Day use on Alder Lake | 142 |
| | | 14,925 |

[1] All quotas are in numbers of permits.

29.    The figures in the above table are out of date. As noted by the 1981 Plan shown above (footnote 1, right column), the phase-out of motorized use on numerous lakes would require subsequent adjustment of the quota.

10

30.    In a less-often-cited table, the Forest Service reflected these post-phase-out

changes:

| Entry Point | Type of Motorboat Use | Annual Quota (Number of Permits) 1982-83 | Annual Quota (Number of Permits) 1984-98 | Annual Quota (Number of Permits) 1999+ [1] |
|---|---|---|---|---|
| Trout Lake | All | 1738 | 1738 | 1738 |
| Fall Lake | Overnight | 658 | 291 | 291 |
| | Day Use on Fall Lk. only | 1457 | 1457 | 1457 |
| | Day Use on Basswood Lake | 1206 | 932 | 932 |
| Fourmile Portage | Overnight | 129 | 97 | 97 |
| | Day Use | 993 | 773 | 773 |
| Moose Lake | Overnight | 730 | 558 | 558 |
| | Day Use on Moose Chain only | 837 | 695 | 695 |
| | Day Use on Basswood Lake | 1813 | 1359 | 1359 |
| Snowbank Lake | Overnight | 81 | 81 | 81 |
| | Day Use | 610 | 610 | 610 |
| Farm Lake | Overnight | 10 | 10 | 10 |
| | Day Use | 345 | 345 | 345 |
| Brule Lake | Overnight | 266 | 266 [2] | 0 [2] |
| | Day Use | 226 | 226 [2] | 0 [2] |
| Seagull Lake | Overnight | 134 | 133 | 38 |
| | Day Use | 594 | 594 | 137 |
| Saganaga Lake | Overnight | 388 | 370 | 370 |
| | Day Use | 2023 | 2023 | 2023 |
| Clearwater Lake | Overnight | 42 | 42 | 42 |
| | Day Use | 246 | 246 | 246 |
| E. Bearskin Lake | Overnight | 30 | 30 | 30 |
| | Day Use on E. Bearskin Lake Only | 227 | 227 | 227 |
| | Day Use on Alder Lake | 142 | 142 | 142 |

MOTORBOAT QUOTAS
(Maximum Use Allowed by Public Law 95-495)

31.    Subsequent agency decision-making materials have often referred to the

*total* motorboat quota calculated—often citing the 14,925 figure at the bottom of the first

table.

32.    While sometimes a helpful benchmark, however, 14,925 is *not* the relevant

basis for compliance with the BWCAW Act. For one thing, the more accurate

contemporary total would be 12,201, from the second table. But more importantly, the

Act calls for quotas that "shall not exceed" the established average "**for each lake**."

BWCAW Act § 4(f), 92 Stat. at 1651 (emphasis added).

33.     Thus, sensibly, the Forest Service may not, for example, curtail motorboat use in some exempted lakes in order to allow it to intensify in others. Nor may the Forest Service rely upon any diminishing popularity of motors in one area to authorize or turn a blind eye to illegal levels of use in another.

34.     To illustrate the statutory caps in action, recall the number cited in the introduction to describe the annual cap at the Moose Lake entry point: 2,612. This number derives from the combination of overnight use and day use for that entry point listed in the second table above. This figure is the quantitative limit with the force of law.

## The National Forest Management Act

35.     The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1687, governs Forest Service management of national forest lands. It provides a statutory framework for forest management planning that requires the agency to develop, maintain, and revise Land and Resource Management Plans ("forest plans") for individual national forests. 16 U.S.C. § 1604(a). After agency managers adopt a forest plan, all their site-specific actions and decisions must be made consistent with that plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

36.     The Superior National Forest adopted a forest plan in 1986 that provided for motorboat use up to the maximum level of the statutory cap. It soon became clear, however, that use at this level was "'strain[ing] the wilderness environment and [was] tending to degrade the intended primitive and unconfined recreation experience' of the BWCAW." *Bosworth*, 437 F.3d at 820 (quoting agency language).

37.    On top of that, the Forest Service discovered that commercial towboat outfitters had been operating—using motorboats—in the BWCAW without obtaining permits.

38.    Objectors appealed the Forest Service's 1986 plan and raised issues with excess motorboat and towboat use, and following an administrative settlement, the Forest Service crafted a new Boundary Waters Canoe Area Wilderness Management Plan in 1993.

39.     The 1993 Plan established a stricter motorboat use quota at 75% of the full statutory cap.

40.    Furthermore, to address the problem of the unaccountable commercial towboat use, the 1993 Plan required "all towboat operators [to] be authorized by a special use permit," and it restricted commercial "[t]owboat use [] to the 1992 levels for numbers of boats, trips, current operators, and specific lakes." The 1993 Plan is clear that commercial towboat "growth will not be permitted beyond these limits."

41.    The Forest Service has since defined a towboat "trip" as indicated in the 1993 plan to mean a single out-and-back journey by an individual towboat. In an October 16, 2017 email exchange on this question among Forest Service staff, one employee wrote the following: "I spoke to [the Forest Supervisor] about this. A 'trip' is one out and back. Out to drop-off, back to base or landing."

42.    The 1993 BWCAW Management Plan, in conjunction with the Superior National Forest's Land and Resource Management Plan, now governs the agency's

administrative decisions and actions. Under NFMA, the Forest Service must comply with its plan provisions.

### The Wilderness Act's Management Directive and Commercial Enterprise Restriction

43.     Importantly, the Wilderness Act directs that federal land management agencies "shall be responsible for preserving the wilderness character" of designated Wilderness areas like the Boundary Waters. 16 U.S.C. § 1133(b). The Act expounds on this mandate by describing a Wilderness as "managed so as to preserve its natural conditions and which [] generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable," and as having "outstanding opportunities for solitude or a primitive or unconfined type of recreation," among other characteristics. 16 U.S.C. § 1131(c). The agency thus has a statutory duty to minimize human impacts to prevent them from damaging wilderness character.

44.     It was to comply with this mandate that the Forest Service curtailed motorboats, beginning in 1993, to a level 25% lower than the full statutory cap. The language in the 1978 Act required quotas that "shall not exceed" the statutory cap but left room for greater restrictions where necessary. The agency's planning history makes clear that motorboat entry at full statutory cap levels was degrading the Wilderness to below legal standards.

45.     In addition to generally prohibiting motors, the Wilderness Act expressly prohibits commercial enterprise in Wilderness areas. 16 U.S.C. § 1133(c). This prohibition is only subject to a narrow exception in a subsequent provision: Land

management agencies may only permit commercial services "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5). Federal case law has made clear that to permit a commercial service in any wilderness under § 1133(d)(5), "the statutory scheme requires, among other things, that the assigned agency make a finding of 'necessity' before authorizing commercial activities in wilderness areas." *High Sierra Hikers Association v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004). "The finding of necessity required by the Act is a specialized one," and it "must show that the number of permits granted was no more than was necessary to achieve the goals of the Act." *Blackwell*, 390 F.3d at 647.

46.     While the Forest Service's 1993 provision on towboats attempted to benchmark them at 1992 levels and prevent further increases, the permissibility of that level of towboat entry was not backed by any "extent necessary" determination.

## Summary

47.     The legal context governing the Forest Service's motorboat (including towboat) authorization in the Boundary Waters can be summarized as follows:

a.  First, above all, the agency has a statutory duty to preserve wilderness character.

b.  Second, to comply with the 1978 BWCAW Act, the agency may not authorize motorboat use beyond the levels for each lake specified above in the second table's "1999+" column.

c. Third, to comply with NFMA, the agency must act pursuant to its management plans, which further curtailed those quota figures by 25% and which also separately prohibited towboat expansion beyond 1992 levels.

d. Fourth, the agency may not permit commercial enterprise in the Wilderness at all except only "to the extent necessary" if it finds towboats are "proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5).

48. The Forest Service has satisfied none of these four legal standards.

## IV.    FACTUAL AND PROCEDURAL BACKGROUND

49. An initial problem with the Forest Service's management approach in light of the above legal context should be immediately apparent: the statutory quota and the planning provisions needlessly diverge. The Forest Service's plans apply the quota to general motorboat use and then apply other, disconnected provisions to towboats.

50. The BWCAW Act did not make any distinction between towboats and other motorboats; it simply limited *all* motorboat entries to no more than average 1976-1978 levels at each lake.

51. The commercial towboats are themselves motorboats and contribute to the motorized use, but the Forest Service's planning provisions did not treat them with a process tied to the quota and instead (and only when confronted with the problem) merely benchmarked towboats against themselves, purporting to limit towboat use to 1992 levels.

## The *Dombeck* Litigation

52.     This disconnect among the statutory limit, the planning, and the reality of

motor use became one issue in litigation resolved by the Eighth Circuit in 1999.[1] *See*

*Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115 (8th Cir. 1999).

In *Dombeck*, the Eighth Circuit did not require the Forest Service to modify its quota

permit system to include towboats, but only because "the specific means of implementing

motorboat use quotas is left to the discretion of the Secretary." *Dombeck*, 164 F.3d at

1121. The Eighth Circuit saw no issue with an "independent means of monitoring

commercial towboats" as long as the approach "has not exempted commercial towboats

from the overall motorboat use restrictions set forth in the BWCA Wilderness Act." *Id.* at

1121-22.[2]

53.     Thus, the *Dombeck* court went on to consider whether the 1993 Plan's

decision to cap towboats separately at 1992 levels would keep it within the statutory

---

[1] One of the other issues involved an additional way that the Forest Service stretched its policies to allow expanding motorized use. The agency interpreted a part of BWCAW Act § 4(f), which permitted private landowners to continue to operate motorboats only on "that particular lake" on which they resided, to permit use on the nearby *chain of lakes.* The Eighth Circuit found this interpretation "contrary to the clearly expressed intent of Congress." *Dombeck*, 164 F.3d at 1124-25.

[2] Note that the plaintiffs in *Dombeck* did not raise any claims invoking the Wilderness Act's commercial enterprise restriction. The *Dombeck* plaintiffs did argue that the Forest Service lacked authority under the BWCAW Act to issue the relevant special use permits to towboat operators, but the *Dombeck* court noted that that Act did not prescribe or restrict the agency's implementation approach as long as it stayed within quota limits. Other laws and regulations govern the agency's general ability to grant special use permits to commercial operators, although the Wilderness Act sharply limits such operations within Wilderness areas—an issue that the *Dombeck* litigants did not raise.

quota boundaries. The Forest Service had asserted that these 1992 levels amounted to 1,342 towboat trips. The Eighth Circuit reasoned that since the total of 1,342 trips plus the reduced, 75% quota for other permits did not exceed the total statutory cap, the approach was a "permissible construction of the statute." *Dombeck*, 164 F.3d at 1122.

54.    But the Forest Service's subsequent response to *Dombeck* was to accept its logic yet eschew the numbers underpinning it. The agency decided to recalculate the statutory cap figures to account for what it perceived as increased demand for motorized use. The Forest Service soon created new figures of 1976-1978 use based on estimations untethered to the raw data (which were apparently lost) and reliant on surveys of resort owners. The end result was amendments to the BWCAW Management Plan that would increase the quota caps by 290%.

### The *Bosworth* Litigation

55.    This move also faced litigation. In *Bosworth*, the Eighth Circuit determined that the Forest Service's approach and new numbers were "so unreliable or inadequately explained as to make reliance on them arbitrary and capricious." *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 824 (8th Cir. 2006). The *Bosworth* court reiterated that "towboats are allowed to the extent their use, when added to the homeowner, resort, and guest use, does not exceed the base period use [the statutory cap]." *Id.* at 828. "Limiting motorboat use is integral to preserving the wilderness values and primitive character of the area," the court emphasized. *Id.* at 819.

56.    Thus, the original statutory cap figures remain in place, including statutory phaseouts, as do the 25% quota reduction and towboat use provisions from the 1993 Plan.

## The Current Situation

57.     Despite the Forest Service's assertions in *Dombeck* that towboat use would be capped at **1,324** trips—the level in 1992—monitoring data show that the agency has allowed towboat use to balloon well beyond this limit. The Forest Service's records show that 2020 saw **3,865** towboat trips, the highest point yet in an ever-increasing trend.[3] This level of use is just under *three times* the limit the Forest Service's planning documents created.

58.     The towboat and motorboat use is also heavily concentrated in several areas where it therefore well exceeds the statutory cap. As noted above, the Moose Lake entry point has a statutory cap of 2,612 entries. In 2018, towboats alone entered at Moose Lake to take at least 3,367 trips. Combined with the other general motorboat quota permits (over 2,000), this adds up to motorized use on the Moose Chain at more than double the statutory cap.

59.     Another location, Saganaga Lake, also suffers illegal levels of motorboat activity. As the agency's table above shows, the statutory cap at this entry point is 2,393. In 2018, the monitored towboat entry point total at Saganaga Lake was 993. On top of this, the Forest Service's motor quota permit system makes 1,855 additional motor use

---

[3] Wilderness Watch has reviewed the agency's towboat monitoring data received in response to Freedom of Information Act requests. Based on those documents, 2020 appears to be the most recent year for which the agency has estimated a quantitative total (3,865 total trips), and 2018 is the most recent year for which the agency appears to have calculated the more salient entry-point-specific totals.

permits available, for a total of 2,848 agency-authorized trips. Thus, the agency is allowing motor use at Saganaga lake to approach 120% of the statutory cap.

### Wilderness Watch's 2015 Litigation

60.    Wilderness Watch raised issues with the Superior National Forest's towboat and motorboat management in a lawsuit filed in this Court in 2015. Wilderness Watch cited the agency's own data and reports showing its unlawful authorization of excessive motorboat use and the consequent degradation of wilderness character. Furthermore, in reviewing the Forest Service's materials, Wilderness Watch discovered deep flaws in the commercial towboat use permitting, monitoring, and reporting process, meaning that the available numbers are likely severe undercounts of actual motorboat use.

61.    For example, the bulk of the data on actual towboat use comes from self-reporting forms submitted by the commercial operators. Wilderness Watch discovered that these forms are unreliable and inconsistent. Several operators have failed to provide use reports at all in many years during which they appeared to in fact be operating in the wilderness, and others have failed to provide reports that include sufficient detail to determine the number of trips made, the number of boats used, or the destinations reached. One operator entirely excluded from its reporting, without explanation, its trips to a certain destination on the Moose Chain. Another reported single "trips" that included up to eighteen boats and seventy-two clients, and which would have counted as at least 18 trips under the Forest Service's definition of "trip." In other places, operators counted itineraries that spanned different entry days and different destinations as one "trip."

20

62.    The Forest Service is also well aware that towboat operators attempt to skirt the rules and prevent the agency from collecting accurate data on their levels of use. In a May 2022 email, for example, the Forest Service's Program Manager discussed how best to respond to a news reporter's inquiry related to towboats and monitoring. She cautioned against discussing monitoring dates and practices "because last time we said that years ago, they [the towboat operators] were on the lookout for monitoring and changed their travel patterns/behavior in the moose chain. There are only 2 good spots to sit [to count boats] and they know them…"

63.    Wilderness Watch and the Forest Service settled the 2015 lawsuit in May 2017. Under the settlement agreement, the Forest Service promised to "prepare a recreational commercial services needs assessment" and to "determine whether commercial services are necessary in the Boundary Waters Canoe Area Wilderness" and "the extent to which they are necessary." "Specifically," the settlement agreement made clear, "the needs assessment will address whether and, if so, to what extent, commercial towboats are needed for activities that are proper for realizing the recreational and other wilderness purposes of the BWCAW." The settlement agreement specified that the determination would "include, among other things, ascertaining the current amount of actual towboat use in the BWCAW, and considering whether other opportunities for Wilderness access are sufficient in light of the potential impact of towboat use on Wilderness character." The Forest Service agreed to complete its assessment by no later than 30 months from the effective date of the settlement.

64.     The obvious intent of the settlement agreement considering the 2015 litigation was for the Forest Service to meaningfully take stock of the motorboat overuse problem and the role that commercial towboat expansion was playing. The Forest Service needed to consider and address—substantively—the actual extent of towboat use; how it comported with or violated statutory and planning standards; and whether the practice is even necessary and, if so, to what extent it is necessary and could lawfully be authorized. Wilderness Watch assumed at the very least that such a meaningful assessment would lead the Forest Service to confront the obvious excess use that violated statutory requirements.

## 2017-2022: Analyses fall short, motorboat entries increase, and new violations accrue.

65.     The Superior National Forest completed a document entitled "Recreational Commercial Services Needs Assessment" in 2019, which addressed all commercial service offerings Forest-wide. But regarding towboats in the Wilderness area, what the agency produced fell far short of what the law requires and what the Forest Service agreed to in the settlement. At the outset, the 2019 assessment made clear that it was not making any determinations about commercial use capacity—that would have to come later in a "capacity analysis and/or in NEPA analysis." Instead, the Forest Service wrote, its 2019 "needs assessment provides a framework for managers to **prioritize expansion and authorization of recreational commercial services** where there is competitive interest and high demand" (emphasis added).

66.    On towboats specifically, the agency made minimal findings. It noted that the wide majority of public comments on the issue in 1993 favored eliminating towboats. It also noted that a vast majority of respondents in a 2007 visitor survey reacted negatively to the use of motorboats in the Wilderness. Other than reciting the applicable statutory and management plan provisions, that was about it. Nevertheless, the assessment went on, with but perfunctory explanation, to list towboats in Wilderness under "activities for which there is a moderate need for recreational commercial services."

67.    In the assessment's conclusion section, it asserted that "an additional step was performed to determine the *extent necessary* for commercial services in the BWCAW." Such an "extent necessary determination" is in fact legally essential to permitting commercial services in Wilderness. *See* 16 U.S.C. § 1133(d)(5). But the assessment expressly stated that it did not make such a determination for towboats; it instead punted the issue and placed towboats in a category of "activities that should be further considered and analyzed in a capacity analysis and environmental (NEPA) analysis."

68.    Thus, the 2019 needs assessment did not make the requisite legal findings to permit commercial towboat services in the Boundary Waters, and it did little to satisfy the terms of the settlement with Wilderness Watch. It *described* the analytical steps that would be necessary, but it did not substantively take them. The Forest Service purportedly planned to do so in future steps, which Wilderness Watch has awaited expectantly.

69.    In 2020, the Superior National Forest completed a capacity analysis like the one mentioned in the assessment's language punting towboats to "be further considered." The capacity analysis was completed with no public process and only became known to Wilderness Watch after a 2022 Freedom of Information Act (FOIA) request. The FOIA response materials show agency staff discussing the desire "to keep it internal as a reference document . . . consider how to write it with the thought of someone requesting a FOIA. There are certain data pieces we don't want to share (like the spreadsheets we used to rate activities in the [Needs Assessment], extent necessary, etc.)[.]"

70.    Regardless, the 2020 capacity analysis omitted all consideration of commercial towboat use. "Commercial towboats are not included in this Capacity Analysis," it reads. Determining that towboat use "affects capacity in a different way than other recreational commercial services," the Forest Service decided that "[t]owboat use will be studied in a separate analysis under NEPA."

71.    This separate analysis—or anything approaching the analysis and findings required by law and agreed to in the settlement—has yet to arrive. It has now been over three years since the settlement's hard-and-fast deadline.

72.    Meanwhile, new legal violations accumulate. The towboat problem and the Forest Service's authorization of illegal levels of motorized use have only gotten worse. At the beginning of the earlier lawsuit in 2015, the agency's data (which, as noted above, represent a likely undercount) showed at least 2,550 towboat trips, almost double the 1992 trip limit that the Forest Service's Plan says "growth will not be permitted beyond." Now, the agency's records show at least 3,865 towboat trips in 2020—a 50% increase

over the level five years earlier and over 2.8 times the Plan's limit. And as noted above, the concentration of towboats also occurs in areas where it places the total motorboat use well beyond the statutory caps.

73.    Throughout this time, the Forest Service has known that it continues to violate statutory requirements and that it has not fulfilled the terms of the settlement with Wilderness Watch. Consider the following communications:

a.    Addressing a process that still has not begun, in 2020, the Forest Supervisor said—as related in an email among colleagues—that "NEPA addressing towboat use in the BWCAW is what we intended to do in the first place and what I believe Wilderness Watch thought we had agreed to."

b.    The same message noted that a "draft Capacity Analysis clearly demonstrates that commercial towboat trips have nearly doubled in the past six years."

c.    In a briefing paper the Forest Supervisor prepared in June 2022, the Supervisor noted that "[m]onitoring shows that the overall motorized use cap is being exceeded in some areas. . . The Forest recognizes that it is exceeding group encounter and natural resource standards, along with a lack of campsite availability, all leading to wilderness character degradation."

d.    When the Forest Supervisor wrote in the 2022 briefing paper that "Wilderness Watch ultimately would like the [Recreational Commercial Services Analysis] to include towboat management and NEPA to be

conducted so that towboat use is regulated per Forest Plan direction," the
Supervisor made two implicit admissions. First, the analysis thus far has
*not* adequately included towboat management. And second, current towboat
use is inconsistent with Forest Plan direction.

74.    But despite this numerically obvious and acknowledged problem, the Forest
Service's ever-delayed reassessment of towboats has yet to arrive, and over the past five
years, it has continued to violate the applicable statutes anew. Every year that the
agency's authorizations or inactions permit continued expansion of use, the wilderness
character of the Boundary Waters is further degraded, and the magnitude of the problem
and the challenges of corrective action grow.

75.    Wilderness Watch therefore raises the following claims for relief pertaining
to the recent and ongoing failure of the Superior National Forest to lawfully manage
motorboat use in the Boundary Waters Canoe Area Wilderness.

## V.    LEGAL CLAIMS

### Claim One: Violation of the National Forest Management Act and the Boundary Waters Canoe Area Management Plan

76.    Plaintiff hereby realleges and reincorporates all above paragraphs.

77.    NFMA requires each National Forest to develop a Forest Plan. *See* 16
U.S.C. § 1604(d). The Forest Service's failure to comply with the provisions of a Forest
Plan is a violation of NFMA.

78.    The Forest Service manages the Boundary Waters pursuant to the Superior
National Forest Plan (last updated in 2004) as amended by the Boundary Waters Canoe

Area Wilderness Management Plan (reincorporated in 2004 with minor corrections but last substantively revised in 1993).

79.     The Boundary Waters Canoe Area Wilderness Management Plan limits the amount of commercial towboat use to "1992 levels for numbers of boats, trips, current operators, and specific lakes."

80.     The Forest Service represented to this Court during the *Dombeck* litigation that the 1992 level for the number of commercial trips was 1,342.

81.     The Forest Service is authorizing commercial towboat use—or failing to limit and monitor such use—in excess of 1,342 trips per year and/or in excess of the number in 1992. This constitutes a violation of the BWCAW Management Plan, the Forest Plan, and NFMA.

82.     The Forest Service's commercial towboat use authorizations are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA, 5 U.S.C. § 706(2)(a). To the extent the illegal levels of motorboat use are attributable to the Forest Service's inadequate permitting, tracking or reporting management mechanisms, the failure constitutes agency action unreasonably withheld or delayed in violation of the APA.

### Claim Two: Violation of the Boundary Waters Canoe Area Wilderness Act

83.     All above paragraphs are incorporated by reference.

84.     The BWCAW Act imposes a statutory cap for motorboat use at "the average actual annual motorboat use of the calendar years 1976, 1977, and 1978 for each lake." BWCAW Act § 4(f), Pub. L. 95-495, 92 Stat. 1649 (1978).

85.    The Forest Service calculated the statutory cap as established for various entry points and lakes in 1981. Following motorboat phase-outs after 1999, the contemporary statutory cap totals no more than 12,201 motorboat entries per year. The BWCAW Act's statutory cap provision applies specifically and independently to each lake or entry point, amounting to, among other figures, 2,612 at Moose Lake and 2,393 at Saganaga Lake.

86.    The combined commercial towboat use and general motorboat use must be kept at or below the statutory caps, both in the aggregate and at each lake.

87.    The Forest Service continues to authorize increasing levels of motorized use—through a combination of towboat and general permit use—far beyond the statutory caps in violation of the Boundary Waters Canoe Area Wilderness Act.

88.    The Forest Service's commercial towboat and motorized use authorizations are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA, 5 U.S.C. § 706(2)(a). To the extent the illegal levels of motorboat use are attributable to the Forest Service's inadequate permitting, tracking or reporting management mechanisms, the failure constitutes agency action unreasonably withheld or delayed in violation of the APA.

**Claim Three: Violation of the Wilderness Act—Wilderness Character Mandate**

89.    All above paragraphs are incorporated by reference.

90.    "In order to ensure that an increasing population, accompanied by expanding settlement and mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and

protection in their natural condition," Congress created the National Wilderness Preservation System. 16 U.S.C. § 1131(a).

91.    Wilderness, "in contrast with those areas where man and his works dominate the landscape, is […] an area where the earth and its community of life are untrammeled by man," where the land "retain[s] its primeval character and influence, . . . is protected and managed so as to preserve its natural conditions," and "has outstanding opportunities for solitude or a primitive and unconfined type of recreation." 16 U.S.C. § 1131(c).

92.    The Wilderness Act requires public lands agencies such as the Forest Service to administer designated wilderness in a manner that preserves its wilderness character. 16 U.S.C. § 1133(b).

93.    The Wilderness Act prohibits uses of wilderness that are not consistent with this mandate and specifically provides that "there shall be no [. . .] use of motor vehicles, motorized equipment or motorboats" within designated wilderness." 16 U.S.C. § 1133(c).

94.    While motorboat use is generally prohibited within designated wilderness areas, the BWCAW Act allows motorboat use within the Boundary Waters subject to specific restrictions (the statutory cap) designed to minimize impacts to wilderness character from excessive motorized use. *See* BWCAW Act § 4(c), (f), 92 Stat. at 1650-51; *see also Bosworth*, 437 F.3d at 819 ("The BWCAW Act was passed to ensure the BWCAW's wilderness character would be preserved" and "[l]imiting motorboat use is integral to preserving wilderness values and primitive character of the area.") (internal punctuation and citations omitted)).

95.     The Forest Service recognized early on that that motorboat use at the full statutory cap level was "strain[ing] the wilderness environment and [was] tending to degrade the intended primitive and unconfined recreation experience." *Bosworth*, 437 F.3d at 820. Consequently, the Forest Service bound itself to Forest Plan provisions that further restrict motorboat use to 75% of the statutory cap.

96.     The Forest Service is allowing motorboat use at levels beyond the plan provisions and beyond the statutory cap, degrading the wilderness character of the Boundary Waters. The Forest Service's authorization of motorboat use at such levels violates the Wilderness Act.

97.     The Forest Service's motorboat use authorizations are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA. To the extent the illegal levels of motorboat use are attributable to the Forest Service's inadequate permitting, tracking or reporting management mechanisms, the failure constitutes agency action unreasonably withheld or delayed in violation of the APA, 5 U.S.C. § 706(2)(a).

**Claim Four: Violation of the Wilderness Act—Commercial Enterprise Prohibition Authorizing Commercial Services without Extent Necessary Determination**

98.     All above paragraphs are incorporated by reference.

99.     In addition to the general prohibition on motorized use, the Wilderness Act prohibits commercial enterprise in designated wilderness areas "[e]xcept as specifically provided for in [the Wilderness Act]." 16 U.S.C. § 1133(c). The Wilderness Act specially provides for commercial services only "to the extent necessary for activities which are

proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5).

100.    The Forest Service has interpreted this provision to mean "public services generally offered by packers, outfitters, and guides." 36 C.F.R. § 293.8. The Forest Service's Manual provides further guidance and requires all outfitting and guiding services to operate through special use authorizations. FSM § 2721.53. The Manual also provides that Forest Plans must address "the need and role of outfitters" and "the type, number, and amount of recreation use that is to be allocated to outfitters." FSM § 2323.13g.

101.    Federal case law has made clear that to permit commercial services in wilderness under § 1133(d)(5), "the statutory scheme requires, among other things, that the assigned agency make a finding of 'necessity' before authorizing commercial activities in wilderness areas." *Blackwell*, 390 F.3d at 646. "The finding of necessity required by the Act is a specialized one," and it "must show that the number of permits granted was no more than was necessary to achieve the goals of the Act." *Blackwell*, 390 F.3d at 647.

102.    The Forest Service has never made a specialized finding of the necessity for commercial towboat operations in the Boundary Waters, nor has it determined the extent to which such services are necessary if they are necessary at all.

103.    The Forest Service continues to authorize commercial towboat use beyond "the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes" of the Boundary Waters in violation of the Wilderness Act.

104.    None of the agency's documentation since 2017, including the 2019 Recreational Commercial Services Needs Assessment and the 2020 Capacity Analysis, contained an extent necessary determination regarding commercial motorized towboat services in the Boundary Waters.

105.    The Forest Service's commercial enterprise authorizations are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA, 5 U.S.C. § 706(2)(a). To the extent the illegal levels of commercial towboat use are attributable to the Forest Service's inadequate permitting, tracking or reporting management mechanisms, the failure constitutes agency action unreasonably withheld or delayed in violation of the APA.

**Claim Five: Violation of the Wilderness Act—Commercial Enterprise Prohibition Authorizing Commercial Services based on Inadequate Extent Necessary Determination**

(in the alternative to Claim Four)

106.    All above paragraphs are incorporated by reference.

107.    The Wilderness Act prohibits commercial enterprise in Wilderness areas, and the Act's narrow exception to this rule only authorizes the Forest Service to permit commercial services "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. §§ 1133(c), 1133(d)(5). The Forest Service must first "make a finding of 'necessity' before authorizing commercial activities in wilderness areas." *Blackwell*, 390 F.3d at 646. "The finding of necessity required by the Act is a specialized one," and it "must show that the

number of permits granted was no more than was necessary to achieve the goals of the Act." *Blackwell*, 390 F.3d at 647.

108.    In the alternative to Count Four, if the Forest Service purports that its documentation in recent years, including the 2019 forest-wide Recreational Commercial Services Needs Assessment and the 2020 Capacity Analysis, contains an extent necessary determination, then that determination is insufficient to meet the requirements of law.

109.    Nothing in the agency's discussion or documentation demonstrates a specialized finding of the necessity of commercial motorized towboat services and a determination of the *extent* of that necessity, including a determination of the limits of allowable activity and an allocation of no more activity than necessary to achieve the goals of the Wilderness Act.

110.    The Forest Service's authorization of commercial motorized towboat enterprise in the Boundary Waters in the absence of such an adequate extent necessary determination constitutes agency action that is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA, 5 U.S.C. § 706(2)(a). To the extent the illegal levels of commercial towboat use are attributable to the Forest Service's inadequate permitting, tracking or reporting management mechanisms, the failure constitutes agency action unreasonably withheld or delayed in violation of the APA.

## VI.    REQUESTS FOR RELIEF

111.    For all the above-stated reasons, Wilderness Watch respectfully requests that this Court grant relief as follows:

a.   Declare that the Forest Service has violated the law by authorizing (1) excessive commercial towboat operations within the Boundary Waters Canoe Area Wilderness; (2) motorboat use, including commercial towboat and other general motorboat use, that exceeds the statutory cap imposed by the BWCAW Act; (3) motorboat and commercial towboat use that exceeds the levels provided for in Forest Plan provisions; and (4) motorboat use and commercial towboat use within the Boundary Waters at levels that degrade wilderness character beyond the amount allowed by law.

b.   Order the Forest Service to create and implement a permitting process for commercial towboat operations that will ensure clarity, accountability, and compliance with the law. Plaintiff specifically requests the opportunity for separate remedy briefing to fully address this issue.

c.   Enjoin further issuance of special use permits for commercial towboat operations until the Forest Service demonstrates compliance with the law.

d.   Award Plaintiff its costs, expenses, expert witness fees, and reasonable attorney fees under the EAJA; and

e.   Grant Plaintiff such further relief as may be just, proper and equitable.

Date: February 3, 2023                    **s/ Kristen G. Marttila**
                                          Kristen G. Marttila (MN #0346007)
                                          Rachel A. Kitze Collins (MN #0396555)
                                          Laura M. Matson (MN #0396598)
                                          **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                          100 Washington Avenue South, Suite
                                          2200
                                          Minneapolis, MN 55401
                                          Tel: (612) 339-6900
                                          kgmarttila@locklaw.com
                                          rakitzecollins@locklaw.com
                                          lmmatson@locklaw.com

                                          Dana M. Johnson, *pro hac vice* pending
                                          **WILDERNESS WATCH**
                                          P.O. Box 9765
                                          Moscow, Idaho 83843
                                          Tel: (208) 310-7003
                                          danajohnson@wildernesswatch.org

                                          Andrew Hursh, *pro hac vice* pending
                                          **WILDERNESS WATCH**
                                          PO Box 9175
                                          Missoula, Montana 59807
                                          Tel: (913) 660-6034
                                          andrewhursh@wildernesswatch.org

                                          **ATTORNEYS FOR PLAINTIFF**