**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| WILDERNESS WATCH, | Civil No. 23-cv-00284 (NEB/LIB) |
| Plaintiff, | |
| v. | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT [ECF No. 77] and RESPONSE IN OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT [ECF No. 83]** |
| TOM HALL, Forest Supervisor of the Superior National Forest; and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

I.    ARGUMENT .................................................................................................... 1

    A.    The Court has jurisdiction to decide Wilderness Watch's claims................. 1

    B.    Violations of the Wilderness Act: Unlawful authorization of
        commercial enterprise and failure to preserve wilderness character. .......... 4

        1.    The BWCAW Act does not exempt commercial enterprise
            from the Wilderness Act's restrictive provisions. .............................. 4

        2.    The Wilderness Act's ban on commercial enterprise applies
            to the BWCAW, and the Forest Service is required to make a
            specialized finding of necessity before authorizing
            commercial services in the Wilderness. ............................................. 7

        3.    Nothing in the record demonstrates the Forest Service
            analyzed relevant factors or made a specialized finding of
            necessity for commercial tow services............................................. 12

    C.    Violations of the BWCAW Act and the BWCAW Management Plan
        (excessive and unlawful authorization of motorized use) and
        resulting failure to preserve wilderness character pursuant to the
        Wilderness Act................................................................................... 22

II.   REMEDY ..................................................................................................... 28

III.  CONCLUSION ............................................................................................. 32

I.    **ARGUMENT**

A.    <u>**The Court has jurisdiction to decide Wilderness Watch's claims.**</u>

For the third time, the Forest Service argues the Court lacks subject matter jurisdiction over Wilderness Watch's claims. This Court has twice upheld subject matter jurisdiction, affirming that the issuance of special use permits (SUPs) constitutes final agency action under the APA, s*ee* ECF No. 46 at 15-17, ECF No. 55 at 8-9, and that Wilderness Watch's claims directly challenge these permits, *see* ECF No. 46 at 16-17 (Counts 4 and 5), ECF No. 55 at 10 (all claims).

In its latest challenge, the Forest Service quotes an Eighth Circuit case stating, "A party's burden to demonstrate jurisdiction is thus higher, for example, at the summary-judgment phase of a case—when the party has "ask[ed] the Court to enter final judgment in its favor (as opposed to, say, denying a motion to dismiss a complaint.)" FS Br. at 26 (citing *Owner-Operator Indep. Drivers Assoc. v. U.S. Dep't of Transp.*, 878 F.3d 1099, 1101 (8th Cir. 2018)). However, the quoted passage does not appear in *Owner-Operator. Owner-Operator* simply stands for the proposition that "[d]irect appellate review of administrative action … does not alter the requirements of standing" that would otherwise apply at a district court level. *Id.* at 1101. "Just like at the summary judgment stage, [the court] look[s] for specific facts supported by affidavit or other evidence." *Id.* Wilderness Watch satisfied these requirements in its opening summary judgment brief. WW Br. at 37-38 (demonstrating an actual, concrete and particularized injury, stemming from the Forest Service's issuance of commercial towboat SUPs, that could be remedied by a favorable ruling); *see also* ECF Nos. 14, 15 (Wilderness Watch declarations). Forest Service

issuance and amendment of specific SUPs for towboat operations in the BWCAW within the statute of limitations is undisputed.  *See* FS Br. at 19 (listing permits issued).[1]

The Forest Service also recycles arguments that Plaintiff is attempting to "bait-and-switch" the Court into believing it is challenging discrete SUPs when it is really bringing a programmatic challenge.  FS Br. at 24, 25.  It argues "Wilderness Watch wants the Court to revisit Forest-Plan provisions issued decades ago, recalculate statutory caps, and reset motorized use quotas," and "Wilderness Watch brings these arguments to a head by sketching out what exactly a 'new Forest Plan' would need to include," FS Br. at 27, 29 (citing ECF No. 79 at 59-60).  This is a mischaracterization.  Wilderness Watch maintains that the Forest Service's special use permitting for commercial towboat services is unlawful because the Forest Service is not complying with mandatory statutory and Plan provisions. It raised the option of a Forest Plan amendment *because* the Forest Service cannot comply with its 1993 Management Plan provision limiting towboat use to the 1992 levels for numbers of trips, and it is not at liberty to simply ignore mandatory provisions.  *See* WW Br. at 59-60; *see also* USA-8333 ("there is little to no data to support any trip numbers" and "[t]he number cannot be verified."); USA-7900-02 (information on use from 1992 "can be read in a variety of ways, isn't consistent, and can't be verified [because the Forest Service] didn't direct how [operators] needed to report their use.").

_____

[1] SUPs include annual agency review and reauthorization of the scope of permitted activity, as well as provisions allowing the agency to modify permitted activity as necessary.  *See* WW Br. at 28-29.

Finally, the Forest Service rehashes arguments that Wilderness Watch's suit is unlawful under *Lujan*.  *See* FS Br. at 28-29 ("*Lujan* and its progeny bar such programmatic challenges that are not directed at specific agency actions.").  This Court has already correctly distinguished this case from *Lujan* and *Robertson*.  ECF No. 55 at 7-12.  The Forest Service also quotes *Neighbors of Cuddy Mountain v. Alexander*, which stated, "[I]n order to win scrutiny of the Forest Service's forest-wide management practices, [plaintiffs] must challenge a specific, final agency action, the lawfulness of which hinges on these practices."  303 F.3d 1059, 1067 (9th Cir. 2002).  But that case supports Wilderness Watch's jurisdictional position.  The Ninth Circuit noted, "Forest-wide monitoring and reporting duties, even when required by a Forest Plan, are not 'final agency actions' under the APA and therefore cannot be challenged on their own."  *Id*.  However, "[w]here the Forest Service generally fails to comply with NFMA and the governing Forest Plan, and where that failure renders an approval of a [site specific authorization] unlawful, this Court has power, under the APA, to review the [site-specific authorization] and to conclude that its approval was unlawful — even if doing so would, as a practical matter, require us to consider forest-wide management decisions."  *Id*.  Such a finding "may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns."  *Id*. (citation omitted).

Here, the lawfulness of each SUP authorizing motorized and commercial uses in the BWCAW hinges on, and is inextricably tied to, compliance with these Management Plan provisions as well as the BWCAW Act, the 1981 Implementation Plan, and the Wilderness

Act.  Individual permits must be viewed in light of the aggregate to ensure that motorized

use caps are not exceeded (monitoring of such use must be sufficient to ensure the same)

and to ensure commercial use is necessary and proper and not exceeding the "extent

necessary."  The Forest Service may tier its SUP authorizations to a programmatic

document (e.g. a management plan) to satisfy its legal requirements, *assuming* there is a

programmatic document that itself contains the requisite analyses and findings.  *See High

Sierra Hikers Ass'n v. U.S. Dep't of the Interior*, 848 F. Supp. 2d 1036, 1046-48 (N.D. Cal.

2012) (noting individual commercial packstock permits were not tied to a programmatic

Management Plan or Wilderness Stewardship Plan that contained "the requisite specialized

necessity findings").

The information the Court needs to ensure individual permits comply with the law

cannot be gleaned from the four corners of a single SUP authorization.  This is why the

Courts in the *High Sierra Hikers* line of cases did not focus their Wilderness Act

compliance discussion on the details of an individual SUP.  The individual SUPs must be

viewed in light of the entire regulatory scheme.  Otherwise, the Forest Service's motorized

and commercial use authorizations would forever evade review.

     **B.**    **<u>Violations of the Wilderness Act: Unlawful authorization of commercial
enterprise and failure to preserve wilderness character.</u>**

       **1.**    **The BWCAW Act does not exempt commercial enterprise from
the Wilderness Act's restrictive provisions.**

The Forest Service argues "Congress stated in 1978 that towboats 'shall be

permitted' on motorized lakes in the Boundary Waters," FS Br. at 34, but the Act does not

say this.  Section 4(c)(1) of the BWCAW Act describes one grouping of 11 lakes where

the narrow carve-out for motorboats prescribes a 25-horsepower limit. BWCAW Act § 4(c), 92 Stat. 1650-51. The final clause in Section 4(c)(1) adds: on only four of those 11 lakes and only until January 1, 1984: "the horsepower limitations described in this paragraph shall not apply to towboats registered with the Secretary." *Id*. This is the Act's only mention of towboats.

The Forest Service also argues this lone towboat mention constitutes a repeal of the Wilderness Act's commercial enterprise provisions. FS Br. at 32. This is not accurate for several reasons. First, evidence indicates Congress understood horsepower restrictions would ultimately phase-out towboat use. *See* WW Br. at 44. The Forest Service refutes this by arguing that some, but not all, commercial towboat operators were using motors of at least 25 horsepower at the time, but the citation offered points to the 1981 Implementation Plan, which merely reiterates that horsepower limitations begin after 1983. *See* FS Br. at 31 (citing USA-2086). Further, Forest Service statements in the record contradict its position in briefing.

An internal Forest Service report from 2015 states,

> Towboat use has been occurring on the Forest since the 1950s, prior to wilderness designation in 1964.[2] In the past, towboats often used motors larger than 40 horse power …. The 1978 Wilderness Act limited motors to specific lakes and reduced motor size to 10 or 25 horse power. Many thought that towboat use would end or at a minimum decrease, because 25 horse power motors would not be large enough to tow canoes,

---

[2] The Forest Service also argues that 16 U.S.C. § 1133(d)(1) exempts commercial towboats from restriction. FS Br. at 33, n.13. However, Congress clearly sought to restrict motorboat use in the BWCAW even though it occurred before Wilderness designation, *see Dombeck*, 164 F.3d at 1124, and Section 1133(d)(1) does not exempt the Wilderness Act's express provisions regarding commercial enterprise and commercial services.

> people, and gear. Towboat operators adapted, finding that 25
> horse power motors were large enough to tow. Towboat use
> was not specifically addressed in the 78 Act. Although the
> Forest has managed towboat use, there are some internal and
> external concerns about lack of consistency, unclear Forest
> Plan direction, and overall management and accountability.

USA-7510; *see also* USA-7695 (2007 report detailing the same).

Second, the Eighth Circuit did not address this issue. *Friends of the Boundary Waters Wilderness v. Dombeck* narrowly addressed whether a separate SUP system for towboats can ensure that towboat use levels combined with private motorboat use levels remain below the total motorized use statutory cap. *See* 164 F.3d 1115, 1121-1122 (8th Cir. 1999). The *Dombeck* panel did not address what the 1978 BWCAW Act said or intended with regard to towboats nor did it address the Wilderness Act's restrictions on commercial enterprise. The *Bosworth* panel briefly reiterated the *Dombeck* holding and noted "[t]he record is not clear as to whether towboats were included in the original base period use." *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 828 (8th Cir. 2006). Both cases addressed motorized use caps, which provide the ceiling under which commercial towboats may operate so long as such use meets the Wilderness Act's requirements for commercial services.

Third, the lone reference to towboats in the Act, couched in provisions discussing motorized use, does not have the specificity required to repeal the Wilderness Act's provisions regarding commercial enterprise. Congress knew there was a motorized use prohibition in the Wilderness Act and expressly addressed it. Congress knew there was a commercial enterprise prohibition in the Wilderness Act and did not address it. As the

Forest Service admits, repeal by implication is not favored, FS Br. at 34, n.14 (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 646 (2007)). Additionally, the Forest Service may not imply exceptions where none exist. *See United States v. Smith*, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

Accordingly, the Forest Service's towboat authorizations are subject to the Wilderness Act's commercial enterprise provisions. With both commercial and motorized use, the Forest Service has an obligation to "[m]inimize the impact of those kinds of uses and activities generally prohibited by the Wilderness Act, but specifically excepted by the Act or subsequent legislation." Forest Serv. Manual 2320.2.

      **2.**    **The Wilderness Act's ban on commercial enterprise applies to the BWCAW, and the Forest Service is required to make a specialized finding of necessity before authorizing commercial services in the Wilderness.**

Likely realizing it has not made a specialized finding of necessity for commercial towboats under 16 U.S.C. § 1133(d)(5), the Forest Service argues that "[t]he Wilderness Act does not require specialized extent-necessary findings." FS Br. at 38. This position is directly at odds with the plain text of the statute, rules of statutory construction, and uniform and persuasive case law from District and Circuit courts in the Ninth Circuit.

The Wilderness Act prohibits commercial enterprise in Wilderness, 16 U.S.C. § 1133(c), with one exception: Commercial services may be authorized "to the extent necessary for activities which are proper for realizing the recreational or other wilderness

purposes of the areas," 16 U.S.C. § 1133(d)(5).  A court must "give effect, if possible, to every clause and word of a statute. . . . [T]hus[, the Court is] reluctant to treat statutory terms as surplusage . . . ." *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see also United States v. Nordic Village*, 503 U.S. 30, 36 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect.").  Further, the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

The Circuit and District Court rulings from the Ninth Circuit comport with these rules and are well-reasoned.  An *en banc* panel addressed the Act's commercial enterprise prohibition in light of the rules of statutory construction and found:

> The Wilderness Act's opening section first sets forth the Act's broad mandate to protect the forests, waters and creatures of the wilderness in their natural, untrammeled state. 16 U.S.C. § 1131. Section 1133, devoted to the use of wilderness areas, contains a subsection entitled "[p]rohibition provisions." *Id.* § 1133(c). Among these provisions is a broad prohibition on the operation of all commercial enterprise within a designated wilderness, except as "specifically provided for in this Act." *Id.* The following subsection of the Act enumerates "special provisions," including exceptions to this prohibition. *Id.* § 1133(d). This statutory structure, with prohibitions including an express bar on commercial enterprise within wilderness, limited by specific and express exceptions, shows a clear congressional intent generally to enforce the prohibition against "commercial enterprise" when the specified exceptions are not present. [. . .].

> The language, purpose and structure of the Wilderness Act support the conclusion that Congress spoke clearly to preclude commercial enterprise in the designated wilderness, regardless of the form of commercial activity, and regardless of whether it is aimed at assisting the economy with minimal intrusion on wilderness values.

*Wilderness Soc'y v. U.S. Fish and Wildlife Serv*., 353 F.3d 1051, 1061-62 (9th Cir. 2003).

Other courts in the Ninth Circuit have analyzed Section 1133(d)(5) and construed it narrowly, holding "the statutory scheme requires, among other things, that the assigned agency make a finding of 'necessity' before authorizing commercial activities in wilderness areas." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004). However, "a finding of necessity is a necessary, but not sufficient, ground for permitting commercial activity in a wilderness area." *Id.* at 647. The finding must be "specialized," and "[t]he Forest Service may authorize commercial services only 'to the *extent* necessary.'" *Id*. (citing 16 U.S.C. § 1133(d)(5)) (emphasis in original). "The limitation on the Forest Service's discretion to authorize commercial services only to 'the extent necessary' flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." *Id.* at 647. Thus, "if an agency determines that a commercial use should trump the Act's general policy of wilderness preservation, it has the burden of showing the court that, in balancing competing interests, it prepared the 'requisite findings' of necessity." *High Sierra Hikers Ass'n*, 848 F. Supp. 2d at 1046 (citing *Californians for Alternatives to Toxics v. U.S. Fish & Wildlife Serv.*, 814 F. Supp. 2d 992, 1017 (E.D. Cal. 2011)); *see also High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117, 1131 (E.D. Cal. 2006).

The Ninth Circuit's holdings are consistent with principles expressed by the Eighth Circuit. While the Forest Service wishes to portray the legal scheme regarding motorized and commercial uses in the BWCAW as permissive, the Eighth Circuit has said that "[l]imiting motorboat use is integral to preserving the wilderness values and primitive character of the area." *Bosworth*, 437 F.3d at 819 (citing *U.S. v. Gotchnik*, 57 F. Supp. 2d 798, 804 (D. Minn. 1999), *aff'd*, 222 F.3d 506 (8th Cir. 2000)); *see also Friends of the Boundary Waters Wilderness v. Robertson*, 978 F.2d 1484, 1487 (8th Cir. 1992) (finding "congressional intent was to discourage motorized use."); *Minnesota v. Block*, 660 F.2d 1240, 1251 (8th Cir. 1981) ("use of motorboats … must be limited in order to preserve the area as a wilderness."). "The premise of the BWCA Wilderness Act of 1978 is that motorboat use is prohibited in the wilderness area, except to the extent that Congress specifically authorized motorboat use on specifically designated lakes, portions of lakes, and rivers." *Dombeck*, 164 F.3d at 1124.

The Forest Service also cites various cases to argue that the Court cannot compel it to make specialized "extent necessary" findings because such a finding is not legally required. FS Br. at 38-39 (discussing failure to act claims). *Norton v. Southern Utah Wilderness Alliance* is distinguishable because it analyzed failure to act claims in the context of statutory objectives and land use plan (e.g. management plan) provisions without discrete, site-specific agency actions. *See* 542 U.S. 55, 65-66 (2004). The Court noted that "[g]eneral deficiencies in compliance [with statutes and plans] . . . lack the specificity requisite for agency action. *Id*. at 66. A "land use plan is generally a statement of priorities; it guides and constrains actions, but does not … prescribe them." *Id.* at 71. Accordingly,

"[a] statement by [an agency] about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1)." *Id.* This is far different from the situation here where the Forest Service has issued SUPs for commercial enterprise in wilderness without making the requisite finding regarding whether and the extent to which commercial towboats are necessary.

In *Citizens to Preserve Overton Park v. Volpe*, the Supreme Court did not require a highway administrator to make "formal findings" in any particular way. 401 U.S. 402, 417 (1971). The Court noted, "Undoubtedly, review of the Secretary's action is hampered by his failure to make such findings, but the absence of formal findings does not necessarily require that the case be remanded to the Secretary" for further explanation. *Id.* Instead, "there is an administrative record that allows the full, prompt review of the Secretary's action that is sought without additional delay which would result from having a remand to the Secretary." *Id.* at 419. Accordingly, the Court remanded to the District Court for review "based on the full administrative record."[3] In other words, the rationale, while not required in any particular format, still had to be discernable. *See also Blackwell*, 390 F.3d at 646-647.

---

[3] While not challenged in this suit, the Forest Service also has analysis and disclosure requirements under the National Environmental Policy Act (NEPA). *See Blackwell*, 390 F.3d at 640 ("[t]he issuance of multi-year special-use permits to the commercial [operators] constitutes major federal action that significantly affects the environment and requires the agency to prepare a detailed EIS [Environmental Impact Statement].").

      **3.**    **Nothing in the record demonstrates the Forest Service analyzed relevant factors or made a specialized finding of necessity for commercial tow services.**

There is no programmatic document satisfying the Forest Service's obligations under 16 U.S.C. § 1133(d)(5), and the individual SUPs do not contain the requisite analysis, so the Forest Service's SUPs for commercial towboat services are unlawful. Likely because the 2019 Needs Assessment does not contain the requisite extent necessary analysis, the Forest Service disregards the Assessment and its subsequent analyses as discretionary exercises that carry no legal bearing. It instead argues that it satisfied its duties through the 1993 Management Plan, and any legal claims regarding ongoing commercial towboat permitting in the Wilderness extinguished in 1999 and may never again be raised.

The Forest Service never addressed, through form or substance, Section 1133(d)(5) of the Wilderness Act in its 1993 planning documents. Its analysis was focused on motorized use authorizations under motorized use caps and ensuring outfitters and guides were operating under SUPs according to National Forest Service policy. Those issues are entirely separate from the requirements of Section 1133(d)(5).

In fact, commercial towboats get only brief mention in the Record of Decision and the Final Environmental Impact Statement (FEIS) for the 1993 Plan. An extent necessary analysis for commercial services is not mentioned in the purpose and need statement, the index, or the list of decisions to be made. The Record of Decision simply contains the following:

- USA-2164: "Appropriate commercial activities will only be permitted under the terms of special use permits."

- USA-2171 (emphasis added): "By October 1, 1995, all outfitter and guide operations that meet the requirements in FS Manual 2700, will be required to have a special use permit. . . . The following types of commercial uses are approved in the BWCAW: guided canoe trips, fishing and hunting guides, tent camps [], towboats, guided photography, dog sledding, X-country skiing, and snow-shoeing. **Applications will be reviewed on a case-by-case basis. New uses are subject to an assessment**."[4]

- USA-2172: "A towboat is a commercial enterprise that takes people and equipment from a starting point to a drop-off point. Beginning in 1995, all towboat operations must be authorized by a special use permit. Towboat use will be limited to the 1992 levels for numbers of boats, trips, current operators, and specific lakes. Growth will not be permitted beyond these limits. If an operator terminates his/her special use permit, an assessment will be completed to determine if a permit should be issued to another individual or business."

The Forest Service argues the FEIS included a "searching analysis of the extent to which towboat services were necessary," FS Br. at 9, but a review of the citations, and the full FEIS, tell a different story. The Forest Service cites USA-2151-2476 and USA-9474-9513, FS Br. at 8, which merely point to the full 1993 Management Plan Record of Decision and FEIS and the full 2004 Forest Plan. It then cites USA-2254-62, FS Br. at 8, 9, but

---

[4] The Forest Service made the same mistake here as in *High Sierra Hikers Ass'n*, 848 F. Supp. 2d at 1047-48. It assumed it could continue to permit existing commercial uses without undertaking a proper necessity assessment while subjecting new uses (or operators) to such an assessment.

those pages merely list the alternatives considered for all activities falling under the Plan's purview, with only a sentence or two stating what the ultimate management standard would be for towboats. *See also* USA-2323-2343 ("Effects of Each Alternative" repeating a similar sentence or two). There is no analysis detailing the factors considered for those standards, nor is there any analysis tethering these considerations to the amount of commercial enterprise necessary in the Wilderness.

The Forest Service also cites USA-2388-90, FS Br. at 8-9, which points to an appendix to the FEIS summarizing public comments. The Forest Service's response to comments addressing towboats totaled eight sentences and demonstrated it was not assessing the extent to which commercial services were necessary under Section 1133(d)(5) of the Wilderness Act:

> **FOREST SERVICE RESPONSE:** As with tent camps, a majority of the respondents were against the operation of towboats in the BWCAW[.]
>
> The Forest Service Interprets towboat operation as an established use in the BWCAW at the time of the 1978 Act, and as such, may continue.
>
> Establishment of use levels has been difficult since the only record available is 39 registered boats during the 1980 season. It was decided that the 1992 season would be used to set a cap on towboat operations. Informal canvassing of operators indicated approximately 70 towboats were in use in 1992. To qualify for a special use permit to provide this service, an applicant will have to provide proof of his/her operation during the 1992 season.
>
> Growth of the towboat industry will not be permitted in the BWCAW. If an operator terminates his/her special use permit, an assessment will be completed to determine if a new permit should be issued to another individual.

14

> Alternatives ranged from banning towboats entirely to unlimited towboat operation, letting the market set the use cap.

USA-2390.

Beyond the citations offered by the Forest Service, there are few other mentions of towboats and commercial services. The "Development of Alternatives" section explains, "Other items affecting or affected by visitor use levels are commercial uses (guides and towboats), number and miles of trails and portages, etc. These other items are components of the alternatives but were not used to develop the alternatives." USA-2251. The term "commercial use" is used as a heading in a table at USA-2262, but it merely lists towboats and guides under that heading. At USA-2294, the FEIS notes that "resort and outfitter industries are physically and economically integrated into the use of the BWCAW," and "businesses associated with the towboat industry are generally concentrated in the Ely, Lac La Croix, and Gunflint Trail areas." Beyond merely stating this fact, which is irrelevant to the Section 1133(d)(5) inquiry, there is no discussion or analysis of the extent of commercial necessity.

Realizing this problem, the Forest Service qualifies the lacking analysis by stating, "To be clear: the 1993 Wilderness Plan and its supporting EIS were performed prior to the adoption of the protocols that the Forest Service uses today when making extent necessary findings," FS Br. at 42, and that the 1993 Plan "complied with legal requirements of the time," FS Br. at 9, 42. But the law has not changed since 1993. The Forest Service can only authorize commercial services to the extent they are necessary. There is nothing in the 1993 Record of Decision or FEIS approaching such a discussion, let alone a quantitative

and qualitative analysis where relevant factors are weighed in relation to one another. *See High Sierra Hikers Ass'n*, 848 F. Supp. 2d at 1047.

Likewise, the 2019 Needs Assessment and subsequent Capacity Analysis lack the requisite analysis for commercial towboat services. Instead, the Needs Assessment focuses on Forest Service Handbook guidance for conducting "needs assessments" forest wide. *See* FS Br. at 17 (citing FSH 2709.15, 53.1 e-f). The standards for authorizing commercial services in Wilderness are, *statutorily*, different and more restrictive.

The difference between the Wilderness Act's Section 1133(d)(5) "extent necessary" standard and factors more broadly considered for commercial services across the Forest are illustrated in the 2019 Needs Assessment introduction:

> "Public and agency need takes into consideration the range of recreation opportunities for the area based on recreation supply and demand, current outfitting and guiding activities, agency objectives that a recreational commercial service can assist in achieving, congressionally designated area management objectives, and current non-commercial opportunities."

USA-2917; *see also* USA-2927 ("The Forest has chosen to allow outfitter-guides to determine the amount of visitors they can serve rather than limiting this use through an allocation. While actual use numbers are not the sole basis for determining need, they can show public demand[.]"); *see also id.* ("An indication of need can be determined from a review of the number of people these services accommodate each year [and] what types of activities are more popular"); USA-2466 (1993 Management Plan stating commercial party size was increased "in response to the economic impacts of smaller party sizes."). Supply and demand, recreation desires, and economic interests are impermissible considerations

under Section 1133(d)(5) and thus reliance on them is arbitrary and capricious.  *See, e.g.*, *High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1075-1084 (N.D. Cal. 2007); *Firearms Reg. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 519 (8th Cir. 2024) (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Many of the Forest Service's citations simply point to generalized and conclusory statements of public preference and the broad roles of outfitters and guides.  The Forest Service points to USA-2957 to argue that it "determined the public need for [towboats] is high," FS Br. at 17, but that citation *expressly* demonstrates the Forest Service's conflation of "need" with "desire."  USA-2957 (stating that "[p]ublic need indicates desire on the part of the public"); *see also* USA-2931.  The Forest Service also points to USA-2919-20, 2931, 2937, and 2950 to argue it completed an extent necessary analysis, but those pages merely explain the general role of commercial outfitters and guides on National Forests across the Nation.[5]

While the need for services to "assist disabled or elderly visitors" is a relevant factor to consider, FS Br. at 18 (citing USA-2931), that need is not analyzed in any qualitative or quantitative fashion for towboat services in the BWCAW or weighed against other relevant factors.  Nowhere has the agency presented evidence of whether or how many elderly or disabled people hire towboats, whether towboat operations are in fact accessible to these customers, why non-motorized commercial services (e.g., canoe guides) could not meet

---

[5] The Assessment did list factors that it would, at some point, consider for assessing the need for commercial services in Wilderness, USA-2951-52, but nowhere did it analyze those factors for commercial towboat services.

some or all of those needs, or why opportunities for scenic recreation, including motorized services, outside of wilderness cannot suffice in whole or in part. *See Weingardt*, 521 F. Supp. 2d at 1076-77 ("[S]weeping statements about need based on an aging [or disabled] population . . . based on only limited anecdotal evidence and certain very general trends" does not suffice, and opportunities for recreation outside of Wilderness must be considered). Similarly, there is no discussion on the proportion of towboat services being used by able-bodied canoers for no reason other than convenience or the paid-for privilege of a head-start on other canoers. The Forest Service itself has admitted that towboats "are not typically considered by visitors or the forest to be a guided or outfitted experience, but more of a water shuttle for convenience or ease." USA-9770.[6]

In its brief, the Forest Service responds to factors Wilderness Watch raised in its 2019 Draft Needs Assessment comments by citing 1993 planning documents. As discussed above, the 1993 planning documents do not address these issues. Neither does the 2019 Needs Assessment. The Forest Service explained that its "Needs Assessment is a technical analysis that describes the types and levels of Recreational Commercial Services *currently offered* to the public on the Forest by commercial enterprises [and] is based on the existing condition (services currently offered)." USA-9741. The Needs Assessment merely catalogued all existing commercial activity across the National Forest, including outside the Wilderness, made conclusory statements about need based on a summary of supply and

---

[6] This factor distinguishes commercial towboat shuttle services from guiding services offered by typical backcountry guides and packers.

demand and the general roles of outfitters and guides, and indicated it is likely to continue

authorizing commercial services on these impermissible bases.

Rather than engaging a substantive analysis on the extent of commercial towboat

services necessary in the Wilderness, the Needs Assessment kicks the can down the road:

- "The public comments indicated a difference in opinion over towboats in the BWCAW. While many respondents indicated that these are important services, others disagreed. A capacity analysis or an environmental analysis could assist in balancing opposing viewpoints with wilderness considerations." USA-2937.

- "This extent necessary determination does not specify individual service day numbers for specific activities for two reasons: Normally a determination is prepared in conjunction with a capacity analysis, and key information is needed in order to assess and define these numbers. A capacity analysis identifies additional resource recommendations gathered from resource specialists, wilderness character monitoring and public input." USA-2938.

- "The extent necessary determination showed the following:

    Activities that could be authorized at a higher level than present should a need arise/have been identified in the needs assessment: **Winter camping, Snowshoeing/XC skiing, Education, Backpacking, Dog Sledding**

    Activities that could remain at existing levels: **Canoe-based camping, Overnight Motorized Fishing, Day Canoe, Day Fishing, Hunting, Rock Climbing, Day Hiking**

    Activities that should be further considered and analyzed in a capacity analysis and environmental (NEPA) analysis: **Towboats, Short Stop Tours, Tent "glamping" camps (summer, motorized routes)"** USA-2938-39 (emphasis in original).

While the Forest Service prepared a subsequent capacity analysis in 2020, it stated on the first page that "[c]commercial towboats are not included in this Capacity Analysis. This recreational commercial service will be analyzed in a separate analysis under NEPA in 2021." USA-2964; *see also* USA-2984. To date, that NEPA analysis has not occurred, and the Forest Service now indicates it anticipates a completion date of 2027. FS Br. at 20.[7]

In its comments on the Draft Needs Assessment, WW raised multiple relevant issues that the Forest Service failed to address and provided evidentiary support for those issues as attachments to its comment letter. *See* WW Br. at 46-49; USA-9731-9754. The Forest Service concerningly characterizes WW citations to its public comments as demonstrating a "sense of entitlement." FS Br. at 43, n.18. Wilderness Watch cites to those comments because they raised relevant factors, identified as such by courts analyzing Section 1133(d)(5) compliance, that Wilderness Watch presented to the agency for consideration in the Final Needs Assessment, and the agency failed to address those factors.[8]

---

[7] While the Forest Service references public comment periods for a NEPA process, those opportunities have been informal and a precursor to a formal NEPA proposal for a Forest Plan amendment. *See* "Public Invitation for Developing Forest Plan Amendment," U.S. Forest Serv., https://www.fs.usda.gov/detail/superior/news-events/?cid=FSEPRD1169933 (last visited Nov. 19, 2024). Towboat management will be one component of several. *Id.* Given that a formal NEPA process is not projected to begin until 2025 and will likely require several public comment and review phases, *id.*, a completion date of 2027 is likely optimistic.

[8] The Forest Service did not make comments available to the public, and the record here is limited to five form worksheets it asked the public to use. *See* USA-9700-9730. A Girl Scout operator notes excess crowding and campsite challenges on Moose Chain and that it's "[r]idiculous to have [canoeists] take towboats to get off the motor route" and away from towboats). USA-9713-14.

The Forest Service dismisses these factors arguing "it is the agency's job to identify and determine both the relevant factors and the 'important aspects of the problem,'" and argues Wilderness Watch is attempting "to usurp that role" with its own "preferred factors." FS Br. at 43. While the agency certainly enjoys a deferential standard under the APA, that deference is neither unfettered nor immune to judicial review. *See Citizens to Preserve Overton Park*, 401 U.S. at 410. And where, as here, questions of law are entangled with the determination of relevant factors, a court may not afford deference to the agency's interpretation of the law. Instead, the "reviewing court must decide all relevant questions of law, interpret … statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Union Pac. RR Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024).

Further, the Forest Service must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal punctuation and citation omitted). An agency's action is "arbitrary and capricious" under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* A court must ensure that "the agency has acted within a zone of reasonableness, and in particular, has reasonably

considered the relevant issues and reasonably explained the decision." *Firearms Reg. Accountability Coal., Inc.*, 112 F.4th at 519.

Here, as justification for its continued issuance of towboat SUPs in Wilderness, the Forest Service (1) relies on the BWCAW Act as an exception to the Wilderness Act's prohibition on commercial enterprise, even though no such language is found within the BWCAW Act; (2) argues that, in any event, it has undertaken the necessary inquiry and findings under the Wilderness Act to authorize commercial services in Wilderness, even though the record and the Forest Service's own admissions demonstrate it has not; and (3) historically relied on, and continues to rely on, erroneous and irrelevant factors such as economic interests, commercial supply and demand, and recreational popularity and preferences. This is agency conduct that is arbitrary, capricious, and not in accordance with the mandates of the Wilderness Act. *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *Wilderness Society*, 353 F.3d at 1069. Further, such conduct violates the Forest Service's overriding statutory duty to preserve wilderness character of the BWCAW. 16 U.S.C. § 1133(b); *see also* WW Br. at 36-37 (listing record evidence indicating wilderness character is suffering).

### C. Violations of the BWCAW Act and the BWCAW Management Plan (excessive and unlawful authorization of motorized use) and resulting failure to preserve wilderness character pursuant to the Wilderness Act.

Compounding these issues, the Forest Service has historically failed to consistently monitor towboat trips as required under the 1993 Plan, and it has accordingly failed to ensure that motorized use does not exceed the limits of that Plan or the BWCAW Act and Implementation Plan. The 1993 Management Plan requires, among other things, that

towboat trips be limited to 1992 levels.  USA-2172.  The Forest Service has repeatedly disavowed this obligation, *see, e.g*., USA-8333, USA-7900-02, USA-8139 (letter to towboat operators noting use will be limited to number of boats and use on specific lakes), USA-8288-8293 (permit application requesting use info but excluding trip data); USA-8076-8135 (permits form addressing lakes and numbers of boats but not trips), and it has failed to grapple with its limitations in knowledge and its inability to meet its administration requirements in a manner that provides transparency and accountability.

In recent years, the Forest Service has attempted to get a handle on the amount of actual use occurring, noting such use in "boat days", USA-7653 ("a single day that a boat is used for towing, whether it is used once or several times during that same day"), *see also* USA-6811 ("Combined"), USA-7677, 7687, 7803, and from 2015 on, in "trips," USA-7504-7505 (a single out-and-back journey by an individual towboat, which may include both a drop-off and pick-up of separate parties in one trip).[9]  Now, in briefing, the Forest Service argues that neither of those metrics make sense, and the real measure should be "permit-equivalents," which it says should not restrict the number of towboats operating under a single permit or the number of times those towboats could exit and re-enter the Wilderness.  *See* FS Br. at 13, 14.  So, rather than allowing one towboat to make multiple out and back trips in one day (a "boat day"), or one towboat to make one out and back journey (a "trip"), the Forest Service now makes the *post hoc* argument that a commercial

---

[9] The Forest Service also notes a separate metric, a "tow" ("a towboat operator taking one Boundary Waters paddle visitor group into, and back out of, the Wilderness"), FS Br. at 12, n.7, but does not provide a citation.

towboat company could enter and leave the Wilderness multiple times a day with any number of towboats serving multiple parties consisting of any number of persons going to different locations in the Wilderness, all under one single permit.

The Forest Service submits this argument now because this is the only metric that can result in a number below the 1,342 "trip" cap from the *Dombeck* opinion. But, "courts may not accept … counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 (citations omitted); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.")

The Forest Service argues this is an appropriate metric because "towboats in 1992 competed for day-use motor permits that did not limit the number of boats per permit, and that did not prohibit exiting and re-entering the Wilderness." FS Br. at 13. But the Forest Service fails to mention that it issued only one permit per "party" or "group" in 1992. USA-2173 (permits issued by group); USA-2357 (defining group size). Prior to 1993 Management Plan reductions, it also limited group size to 10 persons, USA-2254, and at least two-thirds of parties entering the BWCAW had a party size of four or fewer, *see* USA-2289. Limiting group size "will tend to reduce visual impact of crowding [… and] keep motor traffic in check (motor quotas are based on parties rather than watercraft)." USA-2382.

The Forest Service admits that "[r]ecreational motorboats and commercial towboats are used very differently" and that, for purposes of understanding towboat trips, it "makes sense to consider how recreational day-use motor permits were defined at the time." FS Br. at 13. Yet, the Forest Service fails to grapple with the biggest limiting factors from pre-1993 motorized use permitting: one permit per group / party, and no more than 10 persons in a group. Thus, the Forest Service's attempts to compare apples to apples falls woefully short. Indeed, the Forest Service admits that towboat operators have taken single "trips" that include up to 18 boats and 72 clients. *See* USA-6756 (18 boats and 72 clients in one trip, 4 boats and 60 clients in another trip); *see also* USA-6747 (10 boats and 42 clients in one trip). It also notes that in 2018, some actual use reports "reported large numbers of visitors under one tow trip," USA-2477 ("Data Information"), so the Forest Service "broke [those] out in additional trips to document the maximum number of visitors a boat can handle so the proper number of trips is documented," *id*. Under the Forest Service's latest metric, excessive group size would not be considered.

When use is understood through the "group" lens, which is more akin to how private boats and permits operate, it makes the most sense to do exactly what the Forest Service has been doing since 2015: defining a towboat "trip" to mean a single out-and-back journey by an individual towboat. USA-7504-7505 (this individual towboat may drop off a party and also pick up a separate party in a single trip).

A 2007 internal Forest Service Report section entitled "Ongoing Problems" details other ways commercial towboats operate differently from private motorboat users:

- Excessive towboat use. There is the perception among those who have worked Sag that there is too much towboat activity; that at times a constant stream of towboats travels certain areas, when that didn't used to be the case. We have heard complaints about the volume of commercial motor traffic not only from paddlers but also from people in motorboats who say tow traffic has become excessive. Towboat use has a different quality from the normal recreational uses—a constant droning along the same routes, over and over; not the go and stop to fish, more random normal boat use - so it has more of a negative Impact.

  […]

- Towing for campsite selection. Based on incidents like the following, we know that towboats have taken campers on site finding jaunts. A wilderness ranger was told by a visitor camped on Saganaga "Our towboat operator was so patient! He took us around until we found a site we liked." This certainly adds to the total volume of motor use. Is it OK?

USA-7687-7688. These factors must also be considered if the Forest Service wishes to expand the way it measures actual towboat use.

Additionally, the Forest Service fails to address use and associated impacts at an entry-point specific scale. Lake-specific entry point quotas are required by both the BWCAW Act and the 1981 Implementation Plan—the specific quotas are not discretionary. *See* USA-5693 (BWCAW Act requiring entry quotas for specific lakes and noting quotas may not exceed the base period use *for each lake*); USA-2086 (1981 Implementation Plan allocating annual quotas for eleven different entry points). Towboat impacts are concentrated in certain high-use areas, including the Moose Chain entry points, and the Forest Service is silent on this issue. *See* WW Br. at 53-54.

26

While the Forest Service argues that "[t]he various indirect means of limiting the number of towboat trips have been effective," FS Br. at 51, the record indicates otherwise. In February 2020, the Forest Supervisor observed that "the draft Capacity Analysis clearly demonstrates that commercial towboat trips have nearly doubled in the past six years." USA-9633. The Forest Service recently concluded that "[d]ecades of research, monitoring, and surveys show gradual physical and social resource degradation of the [Boundary Waters]," USA-9630, and the Supervisor has acknowledged growing public discontent with the degradation of the Boundary Waters' wilderness character due to recreation impacts, particularly from motorboats, *see* USA-9630-9631; USA-3025-3026. As recently as 2022, the Supervisor admitted that "[m]onitoring shows that the overall motorized use cap is being exceeded in some areas . . . The Forest recognizes that it is exceeding group encounter and natural resource standards, along with a lack of campsite availability, all leading to wilderness character degradation." USA-3026.

The Forest Service, for decades, has not formally grappled with these issues to develop a coherent regulatory scheme for managing and tracking towboat use. Instead, the agency continues a shell game that avoids transparency and accountability, fails to ensure motorized use stays within the limits set by the BWCAW Act and Management Plan, and fails to ensure commercial use stays within the bounds of the Wilderness Act's Section 1133(d)(5) exception. These are not mere paperwork hurdles. Its duty to limit motorized and commercial use "flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." *Blackwell*, 390 F.3d at 647. The Forest Service's failure to consider these important aspects of the problem is sufficient grounds

27

for this Court to hold the Forest Service's SUP authorizations arbitrary and capricious and not in accordance with the Wilderness Act.  *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *Wilderness Society*, 353 F.3d at 1069.

## II.    REMEDY

Wilderness Watch reasonably requests an order requiring the parties to submit a schedule for separate remedy briefing within 14 days of the Court's determination of this case on the merits.  *See* WW Br. at 59; *see also Weingardt*, 521 F. Supp. 2d at 1093 (setting status conference to discuss separate remedy briefing); Remedy Order, *High Sierra Hikers Ass'n v. U.S. Dep't of the Interior,* 848 F. Supp. 2d 1036 (N.D. Cal. 2012) (separate Remedy Order ordering partial vacatur and injunctive measures).  A summary judgment opinion would assist the parties in conferring on appropriate remedies, and if resolution cannot be wholly settled, in briefing unresolved remedial issues for the Court's consideration.

The Forest Service argues remand is the appropriate relief for procedural violations of law.  FS Br. at 52.  However, the Forest Service's violations are not procedural.  *See Blackwell*, 390 F.3d at 649 (affirming injunctive relief and stating the "requirements of NEPA are procedural . . . whereas the Wilderness Act sets forth substantive requirements to protect the wilderness").  And, vacatur is the presumptive remedy for unlawful agency action under the APA unless extraordinary circumstances justify otherwise.  The APA directs courts to "hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A) (emphasis added); *see also Nat'l Wildlife Fed. v. Lohr*, No. 19-cv-2416 (TSC) (D.D.C. 2024).

Injunctive relief is proper. While the Court declined to issue a preliminary injunction, the record and summary judgment briefing now before the Court reveal systemic and ongoing violations that threaten the integrity of the BWCAW. The issues presented in this case have been ongoing for decades. Wilderness Watch settled its last lawsuit under an agreement that the Forest Service would finally undertake a proper extent necessary analysis that would result in the required specialized finding of necessity. *See* ECF No. 16-2; USA-9632. That has not happened. The agency has continued to evade its obligations with no substantive changes to the administration of motorized and commercial towboat uses in the Wilderness. And while a new NEPA proposal for a Forest Plan amendment is pending, the process could take years with no guarantee against further evasion and no protective measures in place to address compounding violations in the interim.

Without appropriate injunctive remedies, *see, e.g.*, ECF No. 1 at 34, this status quo could continue indefinitely, which would cause immediate and ongoing irreparable harm to Plaintiff's and the public's interests in protecting the wilderness character of the BWCAW from the Forest Service's excessive authorizations of commercial enterprise and motorized use. *See* ECF Nos. 14, 15 (declarations demonstrating harm and requesting relief). The ongoing degradation of wilderness character and the diminished ability to experience the BWCAW in its intended natural state constitute irreparable harm that cannot be undone through monetary or other compensatory remedies, and no countervailing

interests outweigh this congressionally protected interest in preserving wilderness character. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *see also Blackwell*, 390 F.3d at 649 (affirming injunctive relief and detailing injunctive measures).

Vacatur is the proper and "ordinary practice." *Nat'l Wildlife Fed. v. Lohr*, No. 19-cv-2416 (TSC) (D.D.C. 2024) (citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021); *accord Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (citation omitted) (vacatur is the "normal remedy"). Vacatur is warranted here because agency violations undermine fundamental statutory purposes and those violations are unlikely to be remedied on remand without substantive changes. *See Standing Rock Sioux*, 985 F.3d at 1050-52. The Forest Service's failure to comply with the Wilderness Act's extent-necessary requirement and its disregard for statutory motorized-use caps and Plan provisions are serious substantive violations undermining Congress's intent, and the agency's mandate, to prioritize wilderness preservation over commercial and recreational interests.

In *Nat'l Parks Conservation Ass'n v. Semonite*, the court emphasized that the burden to justify remand without vacatur falls on the party seeking this relief through the presentation of extraordinary facts supporting exception. 916 F.3d 1075, 1082 (D.C. Cir. 2019); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-

151 (D.C. Cir. 1993) (Vacatur is favored for significant legal violations, while remand may suffice for certain minor, easily-remedied procedural issues or where vacatur would cause undue harm.). The Forest Service has failed to meet its burden to show extraordinary circumstances exist and that any temporary disruption in economic activity would not be outweighed by the public interest in ensuring agency compliance with statutory obligations to protect the wilderness character of the Boundary Waters, one of the most unique wilderness areas in the country.

This Court has many options with vacatur and injunctive relief. It can order partial vacatur of agency action. *See* Remedy Order, *High Sierra Hikers Ass'n v. U.S. Dep't of the Interior*, 848 F. Supp. 2d 1036 (N.D. Cal. 2012) (ordering vacatur of portions of Management Plan and ROD addressing commercial packstock use). It could order deadlines for agency action with interim injunctive measures. *See id.* (ordering completion of Wilderness Stewardship Plan and specialized finding of necessity no later than January 31, 2015, giving direction for the content of that analysis, and ordering reductions in and terms for commercial packstock use in the interim); *Blackwell*, 390 F.3d at 649 (detailing action deadline and interim injunctive measures at n.6). Vacatur can be temporally applied. *See, e.g.*, *Ctr. for Envtl. Health v. Vilsack*, No. 15-CV-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) (vacating agency action but making vacatur effective 90 days after judgment). The Court could also order remand without vacatur but with deadlines for agency action and automatic vacatur if the Forest Service does not meet those deadlines.

Given the individual SUPs at issue, the likely continued (re)issuance of SUPs going forward—each of which would constitute separate violations of law, and the complexities

of the factual and regulatory environment and potential remedies addressing them, a more fulsome discussion on potential remedies, and if necessary, briefing to the Court, is appropriate.  In the alternative, the Court should set aside the SUPs and order the relief requested in Wilderness Watch's Complaint.  ECF Nos. 1, 34.

## III.    CONCLUSION

The Forest Service's SUPs for towboat operations violate the Wilderness Act, the BWCAW Act and Implementation Plan, and the 1993 Management Plan by exceeding motorized use caps and Plan provisions and failing to conduct the required extent-necessary analysis.  These violations undermine Congress's intent to prioritize preservation of wilderness character and ensure commercial enterprise and motorized use are strictly limited in the Boundary Waters.

Wilderness Watch requests that this Court grant summary judgment in its favor and order relief as described above to safeguard the Boundary Waters as a wild and untrammeled place—one that serves as a sanctuary for countless species and natural processes while offering humans a rare space for solitude, recreation, and introspection, embodying the wilderness values Congress sought to protect.

Dated:  November 19, 2024                    Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN PLLP**

s/Rachel A. Kitze Collins
Rachel A. Kitze Collins (MN #0396555)
Laura M. Matson (MN #0396598)
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
rakitzecollins@locklaw.com
lmmatson@locklaw.com

Dana M. Johnson, *pro hac vice*
**WILDERNESS WATCH**
P.O. Box 9765
Moscow, Idaho 83843
(208) 310-7003
danajohnson@wildernesswatch.org

Daniel M. Brister, *pro hac vice*
**WILDERNESS WATCH**
P.O. Box 9175
Missoula, MT 59807
(406) 542-2048
danb@wildernesswatch.org

**ATTORNEYS FOR PLAINTIFF**