UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 23-cv-00284 (NEB/LIB)


WILDERNESS WATCH,

       Plaintiff,

   v.

TOM HALL, FOREST SUPERVISOR
OF THE SUPERIOR NATIONAL
FOREST, AND UNITED STATES
FOREST SERVICE, AN AGENCY OF
THE U.S. DEPARTMENT OF
AGRICULTURE,

    Defendants.


**REPLY IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 2

I.    The Court lacks subject-matter jurisdiction. ............................................. 2

II.   Wilderness Watch continues to misapprehend the interrelationship between the Wilderness Act of 1964 and the BWCAW Act of 1978. ................................................ 4

III.  Wilderness Watch's extent-necessary arguments fail. ............................... 5
   A.    Specialized findings are not required. ................................................ 5
   B.    The Forest Service conducted an extent-necessary analysis. ................. 9

IV.   Wilderness Watch has rightly abandoned its efforts to show excessive towboat use levels. ........................................................................................................ 17
   A.    Base-Period Use Levels ..................................................................... 18
   B.    1992 Use Levels ............................................................................... 25

V.    No need exists for separate remedy briefing. .......................................... 27

CONCLUSION ................................................................................................... 30

## INTRODUCTION

Wilderness Watch has little new to say in its latest brief. Rather than hone in on any particular Special-Use Permits, the organization simply restates its broad attack on the Forest Service's towboat program. That approach fails to demonstrate that Wilderness Watch is entitled to relief under the Administrative Procedure Act. First, Wilderness Watch confirms that it is presenting a programmatic (and untimely) challenge to 1993 planning documents, and the Court lacks jurisdiction over that challenge. Second, Wilderness Watch contorts both the law and the record in an effort to show the Forest Service never conducted the sort of "extent-necessary analysis" the law supposedly requires. But a careful look of the pertinent documents shows the agency plainly did what the law required—and then some—decades ago. Third, in a welcome development, Wilderness Watch backs off its unsupported assertions about numerical violations. That retreat finally acknowledges what the Forest Service has been saying since the beginning of this case: towboat use in the Boundary Waters does not exceed the limits established by Congress or the Forest Service's 1993 Wilderness Plan.

In short, Wilderness Watch's reply brief underscores the absence of any arbitrary and capricious agency action. The Court should grant the Forest Service's cross-motion for summary judgment, deny Wilderness Watch's motion, and dismiss this case in its entirety.

**ARGUMENT**

**I.    The Court lacks subject-matter jurisdiction.**

Wilderness Watch continues to stumble over the basic requirement of identifying a final agency action subject to review under the APA.  The reply brief fails to address (much less correct) the fact that Wilderness Watch is challenging towboat management in the Boundary Waters generally, untethered to any specific SUP.  It would have been one thing for Wilderness Watch to confess the error and re-focus its reply brief on the SUPs supposedly at issue in this case.  But Wilderness Watch instead doubles down, asking the Court to revisit "the entire regulatory scheme" set out in the 1993 Wilderness Management Plan.  Dkt. 92, at 6.  There is simply no longer any doubt that Wilderness Watch is improperly pursuing a programmatic challenge over which this Court lacks subject matter jurisdiction.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

The Forest Service's opening brief raised serious concerns about the breadth of Wilderness Watch's claims in this case and the relief the organization seeks.  Those concerns came directly from statements and arguments in Wilderness Watch's summary judgment brief, many of which the Forest Service quoted verbatim and none of which Wilderness Watch rescinds in its reply.  *See* Dkt. 54, at 29-30.  If anything, the reply brief amplifies those concerns because Wilderness Watch unabashedly asks the Court to review "the Forest Service's special use permitting for commercial towboat services" that was established in 1993 "because the Forest Service is not complying with mandatory statutory and Plan provisions."  Dkt. 92, at 4.  As the Fifth Circuit correctly held in *Sierra Club v. Peterson*, these are the hallmarks of a "challenge [that] is precisely the type of

programmatic challenge that the Supreme Court struck down in *Lujan*." 228 F.3d 559, 556 (5th Cir. 2000). In *Peterson* it was the authorization of timber sales rather than towboat operations, but the nature of the challenge was the same:

> the environmental groups challenged past, ongoing, and future timber sales approved by the Forest Service, and they argued that the Forest Service failed to monitor and inventory properly in conducting these sales. This challenge sought "wholesale improvement" of the Forest Service's "program" of timber management in the Texas forests, objecting to Forest Service practices throughout the four National Forests in Texas and covering harvesting from the 1970s to timber sales which have not yet occurred.

*Id.* (citations omitted).

Wilderness Watch has no answer for *Peterson*. Nor does its reply brief respond to the argument that the Court should revisit *Peterson*'s applicability now that Wilderness Watch is not entitled to the generous construction of its pleadings that initially saved the Complaint from dismissal. *See* Dkt. 84, at 32. The most Wilderness Watch can muster is a retreat to *Blackwell* and its progeny, without explaining how those decisions are still persuasive given the scope of the claims and requested relief Wilderness Watch pursues at summary judgment. For the reasons discussed in the Forest Service's opening brief, Wilderness Watch's programmatic challenge to the towboat provisions of the 1993 Wilderness Plan fails as a matter of law even under *Blackwell*. *See* Dkt. 84, at 31.

Wilderness Watch raises the specter of "commercial use authorizations [that] would forever evade review." Dkt. 92, at 6. That is mistaken, for two reasons. First, groups like Wilderness Watch had a six-year window to challenge those provisions under the APA. *See* 28 U.S.C. § 2401(a). And in fact, *Wilderness Watch brought such a challenge*—the organization was one of the plaintiffs in *Friends of the Boundary Waters Wilderness v.*

*Dombeck*, 164 F.3d 1115 (8th Cir. 1999). Wilderness Watch's decision to leave out extent-necessary arguments from its then-timely challenge does not mean towboat management provisions will "forever evade review."

Second, and related, Wilderness Watch has not missed its one-and-only shot. The Forest Service is currently engaged in an in-depth process of reviewing all aspects of Boundary Waters management, including towboats. *See* Dkt. 84, at 22. Wilderness Watch knows this and is participating as a public commentor. Once the amendments to the current Forest Plan are released, Wilderness Watch will have yet another opportunity to complain about towboat use in the Boundary Waters. But for now, in this case, the Court cannot entertain Wilderness Watch's broad programmatic challenge to a management approach that has been in effect since the 1993 Wilderness Plan.

## II. Wilderness Watch continues to misapprehend the interrelationship between the Wilderness Act of 1964 and the BWCAW Act of 1978.

The BWCAW Act is a later, more specific statute that constitutes an amendment to the earlier Wilderness Act. *See* Dkt. 84, at 33-36. Therefore, whatever the "commercial services" provision may mean in other contexts, in the Boundary Waters as applied to towboats the provision must be read against the backdrop of the indisputable fact that Congress has already authorized this commercial activity on a small number of enumerated lakes. *Id.* Wilderness Watch fails to grapple with this statutory reality.[1]

---

[1] Wilderness Watch mischaracterizes the Forest Service's position as suggesting the 1978 BWCAW Act "constitutes a repeal of the Wilderness Act's commercial enterprise provisions." Dkt. 92, at 7. The Forest Service does not suggest reading the later statute as a repeal, but suggests the Wilderness Act of 1964 must be read as a whole, to include the amendment recognizing preexisting use of commercial towboats in the Boundary Waters.

Rather, in its reply, Wilderness Watch persists in its view that (1) the BWCAW Act's "lone towboat mention" does not actually authorize commercial towboats (even though both the Eighth Circuit and this Court have recognized that it does); and (2) "evidence" supposedly "indicates Congress understood" the BWCAW Act actually *prohibits* towboats (even though the statute nowhere says this). Dkt. 92, at 6-9. The reply also misrepresents the Forest Service's position as suggesting the BWCAW Act "exempts commercial towboats *from restriction*," Dkt. 92, at 7 n.2 (emphasis added), but the Forest Service has said no such thing. The agency has always done its best to manage commercial towboats in accordance with the various and sometimes-competing values reflected in the full panoply of statutes (the Wilderness Act, BWCAW Act, NFMA, etc.) to which this use is subject—and will take all these requirements into account in the ongoing NEPA process by which all aspects of Boundary Waters management are currently being revisited.

## III.    Wilderness Watch's extent-necessary arguments fail.

### A.    Specialized findings are not required.

The Wilderness Act does not require the standalone and specialized "extent-necessary" findings Wilderness Watch continues to demand. Although the organization offers a brief—and unpersuasive—textual argument for reading this requirement into 16 U.S.C. § 1133(d)(5), Wilderness Watch's main point seems to be that the Ninth Circuit requires specialized findings. But we are in the Eighth Circuit, and this Court should decline Wilderness Watch's invitation to contort § 1133(d)(5) into an affirmative mandate that the Forest Service make specialized findings in a rigid format designed for a different factual scenario.

Beginning with the text of § 1133(d)(5), Wilderness Watch fails to confront the most basic principle of statutory construction: "the starting point in every case involving construction of a statute is the language itself." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985) (cleaned up); *see also Carton v. GMAC*, 611 F.3d 451, 458 (8th Cir. 2010) ("The rules of statutory construction mandate, when a statute's language is plain, the sole function of the courts is to enforce it according to its terms.  Likewise, where the plain meaning of a statute is clear, we are not free to replace it with an unenacted legislative intent." (cleaned up)).  This rule immediately puts Wilderness Watch's extent-necessary arguments on dubious footing.  Section 1133(d)(5) says *nothing* about making findings, let alone specialized ones.  The statute is permissive, allowing commercial services in Wilderness areas rather than dictating what the Forest Service must or must not do.  In its entirety, the provision reads as follows:

> Commercial services may be performed within the wilderness areas designated by this chapter to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas.

16 U.S.C. § 1133(d)(5).

Resorting to other methods of statutory construction does not help Wilderness Watch.  The Court is not dealing with "surplusage" terms, and the plain meaning of the statute is clear enough without needing to look to its "structure and purpose." *See* Dkt. 92, at 10.  Even if the Court indulges Wilderness Watch, nothing else in § 1133 requires the Forest Service to make specialized findings or take any specific action before authorizing towboats in the Boundary Waters.  If anything, the rest of § 1133 only further proves Wilderness Watch is trying to read-in requirements that do not exist.  The Forest Service

6

made this point in its opening brief, noting another provision in subsection (d) that actually does specifically impose an obligation on the agency to make a "determination." *See* Dkt. 84, at 40-41. Wilderness Watch's reply tellingly offers no response. Based on the plain text of § 1133(d)(5), the Court should reject Wilderness Watch's extent-necessary arguments because the statute does not impose any requirement to make specialized findings.

Caselaw supports this conclusion. The Supreme Court has repeatedly cautioned against reading agency-action mandates into statutes that merely set out Congress's desired outcome. *See, e.g. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971). The Forest Service cited this authority in its opening brief, Dkt. 84, at 24, 40-42, and Wilderness Watch does not convincingly distinguish it. Take *Norton*, which Wilderness Watch tries to brush aside as a case that analyzed APA claims "in the context of statutory objectives and [a] land use plan." Dkt. 92, at 12. That is exactly what Wilderness Watch is doing in this case—the Complaint expressly challenges the 1993 Wilderness Plan and its approach to authorizing towboats in the Boundary Waters at a specific level. *See* Dkt. 1, ¶ 46 ("While the Forest Service's 1993 provision on towboats attempted to benchmark them at 1992 levels and prevent further increases, the permissibility of that level of towboat entry was not backed by any 'extent necessary' determination."). *Norton* is on-point and forecloses Wilderness Watch's pursuit of APA relief premised on obligations that simply do not exist in § 1133(d)(5).

Nor does Wilderness Watch correctly read *Overton Park*, making much of the fact that the case was ultimately remanded for further proceedings.  Dkt. 92, at 13.  The only reason *Overton Park* was remanded was so that the district court could review an administrative record rather than litigation affidavits.  401 U.S. at 419-20.  That problem is not present here because the Court has a complete administrative record.  Furthermore, the Eighth Circuit has relied on *Overton Park* to reject similar APA challenges brought by plaintiffs who demand specialized findings that are not required by law.  In *Madison County Building & Loan Association v. Federal Home Loan Bank Board*, the court refused to set aside an agency's approval of a new bank branch.  622 F.2d 393 (8th Cir. 1980).  The regulation governing these approvals set out three showings the agency had to determine were met before it could authorize a new branch.  *Id.* at 395 (quoting since-removed 12 C.F.R. § 545.14(c)).  As the Eighth Circuit observed, "the Board's decision merely state[d] that the regulatory criteria were met"—there were no particularized findings for the specific showings listed in the regulation.  *Id.* at 396.  The court nevertheless affirmed summary judgment for the agency, holding that no further explanation of the Board's findings was required.  *Id.* at 398; *see also First Nat'l Bank v. Sav. & Loan Ass'n.*, 670 F.2d 796 (8th Cir. 1982).

The only answer Wilderness Watch has for all this is *Blackwell*.  Dkt. 92, at 10-11.  But Ninth Circuit precedent does not control here, especially when it conflicts with the Eighth Circuit decisions cited above.  And, respectfully, the Ninth Circuit's reasoning for requiring specialized extent-necessary findings is not persuasive given the plain language of § 1133(d)(5) and the Supreme Court's interpretation of the APA.  This is especially the

case in the context of towboats, which Congress itself already acknowledged and authorized in the Boundary Waters. It makes little sense to read § 1133(d)(5) as requiring the Forest Service to re-do Congress's work and spell out the extent to which towboats are necessary to achieve Wilderness purposes. For this reason alone, the Court should grant summary judgment to the Forest Service on each of Wilderness Watch's claims that are premised on a missing or inadequate extent-necessary analysis.

### B.     The Forest Service conducted an extent-necessary analysis.

In the 1993 Wilderness Plan and its supporting documents, the Forest Service evaluated the need for commercial operations (including towboats) to provide recreational opportunities in the Boundary Waters. The same planning documents determined the levels at which those commercial operations (including towboats) would be authorized so that visitors would have adequate recreational opportunities. The Forest Service: (1) identified the Wilderness purpose of providing recreational opportunities to visitors; (2) determined that towboats were necessary to achieve that purpose; and (3) concluded that holding towboat activity to 1992 levels was the appropriate extent for achieving the purpose. Wilderness Watch may disagree with the analysis or wish it had brought a timely challenge to the Forest Service's extent-necessary findings,[2] but that does not mean the

---

[2]   Wilderness Watch once again cries foul that its challenge to the towboat provisions in the 1993 Wilderness Plan was "extinguished in 1999 and may never again be raised." Dkt. 92, at 14. As noted above, Wilderness Watch *did* challenge the 1993 Wilderness Plan and chose to leave out arguments about an extent-necessary analysis. The point of a statute of limitations is to set an end-date for legal claims. There is nothing wrong or unfair about holding Wilderness Watch to the same six-year limitations period under the APA that applies to everyone else.

analysis itself was inadequate. The 1993 planning documents satisfied any obligation the agency may have had to make extent-necessary findings under 16 U.S.C. § 1133(d)(5). Wilderness Watch gives that discussion and the documents themselves short shrift and cannot show that the Forest Service's 1993 Wilderness Plan provisions authorizing towboats were arbitrary, capricious, or contrary to law—or that a challenge to them today would be timely in any event.

Starting at the beginning, the Forest Service expressly identified "outfitter and guide operations, including tent camps and towboats" as one of 34 separate items to be addressed in the 1993 Wilderness Plan. USA_00002405-18 (see specifically item #13, on USA_00002411). The Forest Service combined these 34 items "into four major issues" for organizational and analytical reasons, USA_00002246, and towboats intersected with all four of them:

1. What is the appropriate level of human use in the Boundary Waters, including the type of recreational experience and the amount of use;

2. What kind of management is appropriate for Boundary Waters ecosystems;

3. What facilities and uses are appropriate in the Boundary Waters; and

4. What are the costs and benefits associated with Boundary Waters management.

USA_00002246-47. Wilderness Watch's complaint that "towboats get only brief mention" in the planning documents, Dkt. 92, at 14, thus rings hollow because it overlooks how the Forest Service set up these documents. Indeed, the Final Environmental Impact Statement (FEIS) was a "programmatic" document, spanning more than 200 pages and designed to address multiple issues. USA_00002243. It was perfectly appropriate for the Forest Service to categorize individual items into larger Wilderness-wide issues, and Wilderness

Watch is wrong to suggest that towboats were not part of the comprehensive analysis leading up to the 1993 Wilderness Plan.

Moving into the analysis itself, the FEIS proposed ten alternatives for managing visitor use levels in the Boundary Waters.  USA_00002243-44.  The Forest Service discussed all ten alternatives in detail, including the differing approaches to managing towboats.  USA_00002254-58.  Those approaches ranged from continuing to have towboats compete for day-use motor permits, to limiting towboats to 39 or 29 boats, to eliminating towboats altogether, or holding towboat activity to 1992 levels. USA_00002254-58.  Public comments offered additional suggestions, such as "letting the market set the use cap," reducing towboat use by 67%, or using towboats only as rescue vehicles.  USA_00002390.  Putting this discussion in terms of § 1133(d)(5), the Forest Service devoted considerable time and energy to studying the "extent" to which towboats should be authorized.

The Forest Service ultimately selected "Alternative 6A," and the management direction embodied in this approach was incorporated into the 1993 Wilderness Plan and carried forward into the 2004 Forest Plan.  USA_00002240.  As the Forest Service concluded, Alternative 6A met the interests described in the Wilderness Act, including by protecting the Boundary Waters from degradation while also allowing the American people to use and enjoy the Wilderness.  USA-00002244.

Of note, the Forest Service determined that Alternative 6A would result in a lower number of campsites and available visitor permits, a lower maximum party size, and less authorized motor use in the Boundary Waters compared to the then-current state.  USA-

00002262.  Those reductions resulted, *inter alia*, from findings the Forest Service made regarding "User Preferences and Expectations," USA-00002285-86, "User Perceptions," USA-00002286-88, and "Campsite Selection," USA-00002288-89.  Again, putting this discussion in terms of § 1133(d)(5), the Forest Service identified the recreational purposes for which towboats were "necessary" and the "extent" to which towboats should be authorized to serve those purposes.

Wilderness Watch quibbles that the FEIS did not use the specific phrase "extent necessary." Dkt. 92, at 14.  But that elevates form over substance.  The Forest Service found that

> [o]ne of the most significant factors affecting wilderness recreation opportunities is the amount of land dedicated to various management areas. . . .  Since the quality of most users' wilderness experience is, in part, related to the number of other parties encountered (Lime/Lewis, 1991), regulation of the number of users will have a direct impact on visitor's [sic] satisfaction.

USA_00002302.  This finding led the Forest Service to create four management areas in the Boundary Waters, each with "a characteristic expectancy of encounters with other users."  USA_00002302; USA_00002244.  From there, the FEIS recognized an inherent tension:

> [t]he higher the acreage dedicated to the lower encounters (5.1 and 5.2a), the fewer total users allowed.  Wilderness users who do not rate solitude as a priority wilderness value will be negatively affected by this direction.  Conversely, strategies which will favor the higher use classes (5.3 and 5 2b) will disappoint solitude seekers.

USA_00002302.

In other words, the Forest Service identified a need to balance providing opportunities for solitude, freedom, risk, and challenge—which would require more acreage for management areas that would in turn limit the total visitors to the Boundary Waters—against ensuring there were recreational opportunities for all visitors who wanted to experience the Boundary Waters. Part of the Forest Service's balancing solution was to provide different directives for motor use (including towboats) in each management area based on the recreational opportunities that area was designed to offer. USA_00002301-03; *see also* USA_00002159-63. This focus on the issue of group encounter rates was especially pertinent to towboat use, given the role quota systems play in helping disperse visitor groups further throughout the Wilderness. *See, e.g.*, USA_00002173 ("The purpose of quotas is to distribute visitors and use in a manner that protects the natural resources and wilderness values, and limits the social encounters to that which is appropriate for each management area.").

The FEIS's balancing solution was put into action through the Record of Decision ("ROD") and 1993 Wilderness Plan itself. Both documents implemented the agency's approach to managing recreational opportunities in the Boundary Waters, including how motor use and towboats fit into that approach. Take the opening pages of the ROD, which recounted that the Boundary Waters was one of the most popular Wilderness areas in the country. USA_00002461. The Forest Service therefore committed to "a strategy that provides appropriate protection of the resources within the BWCAW, while balancing the needs and desires of people to use this one-of-a-kind resource." USA_00002461.

Consistent with the FEIS, the ROD announced a land-allocation strategy that "incorporates attention to legislation and policy. It recognizes the information available via research efforts and inventories. It gives careful consideration to the experience expected or anticipated from a wilderness visit. It recognizes the economic factors and their implications on management, communities, and businesses. It considers the input from interested publics." USA_00002467. With regard to commercial services, the ROD acknowledged the 1978 BWCAW Act's requirement for "the orderly management of public use and enjoyment of [the Boundary Waters]." USA_00002466. And to meet this requirement, the ROD noted that *commercial services were necessary "at approximately current levels*" given that visitor use was expected to "remain relatively constant." USA_00002466 (emphasis added).

The 1993 Wilderness Plan also put the Forest Service's approach into action. Among the Forest Service's goals was ensuring that the Boundary Waters could "provide for unconfined primitive recreation opportunities," part of which meant authorizing commercial services by Special-Use Permit to ensure those services were "in keeping with wilderness values." USA_00002158. Based on the extensive analysis in the FEIS and ROD regarding the importance of providing recreational opportunities for all skill levels, the 1993 Wilderness Plan provided specific management direction for towboats. USA_00002172. That direction set forth the extent to which the Forest Service concluded towboat services were necessary for providing such opportunities: "1992 levels for numbers of boats, trips, current operators, and specific lakes." USA_00002172.

Rather than acknowledge the breadth of the Forest Service's analysis, Wilderness Watch repeats variations of the same bald conclusion over and over: "[t]he Forest Service never addressed through form or substance, Section 1133(d)(5)." Dkt. 92, at 14; *see also id.* at 15 n.4, 16, 17. The 1993 planning documents lay that assertion bare. What Wilderness Watch seems to be complaining about in this case is that the Forest Service never wrote the sentence "Towboats are necessary for these specific wilderness purposes and to this specific extent." But the Wilderness Act today does not require the Forest Service to use such magic words, and the law certainly did not require it in 1993.[3]

The rest of Wilderness Watch's reply focuses on the 2019 Needs Assessment and 2020 Capacity Analysis. Dkt. 92, at 18-24. The Forest Service's position, however, is that the 1993 Wilderness Plan and accompanying documents provided any required extent-necessary analysis. Still, emphasizing the 2019 and 2020 documents gives Wilderness Watch a chance to reiterate its substantive disagreement with how the Forest Service has managed towboats for the last 30 years. And it allows Wilderness Watch to take yet another shot at the Forest Service for not affording more weight to the organization's comments or undertaking a NEPA analysis quickly enough.[4]

---

[3]  Wilderness Watch incorrectly suggests the law has not changed since 1993. Dkt. 92, at 17. The Ninth Circuit announced its unique interpretation of § 1133(d)(5) in 2004. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004). Before then, neither Wilderness Watch nor the Eighth Circuit had any qualms about the Forest Service's extent-necessary findings. *See, e.g.*, *Dombeck*, 164 F.3d 1115.

[4]  Wilderness Watch's discussion of the Needs Assessment pulls quotes from sections discussing Forest-wide matters (i.e. discussions including non-Wilderness areas) and complains that inapposite Wilderness Act requirements were not followed. *See, e.g.*, Dkt. 92, at 18-19. However, Wilderness Watch fails to acknowledge or grapple with the

These arguments really amount to requests for the Court to replace the Forest Service's reasoned decision-making with Wilderness Watch's preferred policy choices. That is not how judicial review under the APA works. *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) ("If an agency's determination is supportable on any rational basis, we must uphold it. This is especially true when an agency is acting within its own sphere of expertise." (citations omitted)). Wilderness Watch is not the federal agency tasked with managing the Boundary Waters, nor is the organization's view of how towboats should be managed entitled to more weight than that of any other member of the public who has opinions on the subject.

In sum, the Forest Service has complied with any obligations under § 1133(d)(5). First, the agency identified towboats as an item to be examined and addressed in the 1993 Wilderness Plan. Second, the agency analyzed the necessity of towboats—and a wide range of other items—by studying four "major issues" common to the entire Boundary Waters, paying particular attention to the question of how best to provide recreational opportunities for all types of visitors. Third, the agency determined the extent to which towboats should be authorized so as to serve the recreational needs of visitors, ultimately limiting use to 1992 levels and implementing a special-use permitting system. Wilderness Watch's disagreement with the choices the Forest Service made fails to demonstrate that the agency acted arbitrarily, capriciously, or contrary to law in 1993 when authorizing

---

fact that the Needs Assessment also separately analyzed Wilderness-specific issues. *See, e.g.*, USA_00002918 (listing objectives specific to Wilderness); USA_00002921-23 (discussing Boundary Waters, Wilderness character direction in the Wilderness Act, and noting limited approved guiding activities within the Boundary Waters).

towboats.  Nor does it mean the Forest Service unreasonably delayed or unlawfully withheld any action it was required to take.  The Court should enter summary judgment in favor of the Forest Service.

## IV.    Wilderness Watch has rightly abandoned its efforts to show excessive towboat use levels.

From its reply brief, it appears Wilderness Watch has given up its quest to prove a violation of numerical use restrictions.  Until now, this case (and its 2015 predecessor) turned largely on allegations that the Forest Service allowed "ever-increasing" towboat "trip" levels supposedly exceeding allowable limits.  In response, the Forest Service consistently explained that the data does not remotely show what Wilderness Watch claimed.  Wilderness Watch's reply now makes no attempt to engage in adding exercises or point to particular numbers in the record as supposed evidence of arbitrary and capricious agency conduct.

Wilderness Watch's change of approach makes sense because no violation can be shown from the record.  In fact, the record shows a *lack* of any violation.  To reiterate: for 2017—the year with the most towboat trips to date—total recreational day-use motorboat permits and towboat permit-equivalents amounted to only 5,734.  That is well below the statutory limit of 12,059.  Dkt. 84, at 8 & n.4, 16-17, 48-49.[5]  Wilderness Watch accuses the Forest Service of engaging in "post hoc rationalization" by choosing an approach to permit-equivalents that illustrates compliance, but that is far from the case.  Even using Wilderness Watch's alternative counting methods, no violation occurred.

---

[5]    Including overnight motor permits does not change the result.  *See* USA_00009641.

A.    **Base-Period Use Levels**

The approach to permit-equivalents the Forest Service initially proposed continues to be the most reasonable way, for reasons previously explained. *See* Dkt. 84, at 15.[6] Wilderness Watch now suggests two other ways—accounting for the fact that permits have always been issued on a group basis, and/or simply measuring towboat use by the metric of trips as currently understood. Dkt. 92, at 26-27. While each of Wilderness Watch's approaches is problematic at the conceptual level, neither presents evidence of a violation.

Wilderness Watch's methodological critique misses the point of towboat permit-equivalents and their function. Wilderness Watch emphasizes its understanding of what the Forest Service has and has not measured over the decades when it comes to commercial towboats in the Boundary Waters. Dkt. 92, at 24-28. That has changed greatly over time, and the agency today monitors and records towboat use levels in much more depth and detail than it did before 2015. *See, e.g.*, USA_00007504-7505 (letter to outfitters); Dkt. 84, at 17-18. In all this, the critical question is always "for what purpose"? Yet Wilderness Watch fails to ask this question.

Consider, for example, Wilderness Watch's assertion that the Forest Service has abandoned previous methodologies and supposedly now "argues that neither of [the prior] metrics *make sense*, and the *real measure* should be 'permit-equivalents.'" Dkt. 92, at 25 (emphasis added). This is inaccurate. Each of the metrics noted—boat days and trips—

---

[6]    The Forest Service, however, never suggested this is necessarily the only way to look at the "apples to oranges" issue. *See* Dkt. 84, at 49 n.19 (noting "there is likely more than one reasonable way to define a towboat permit-equivalent").

continues to make sense in its own right, yet none is the one and only "real measure" of anything.  Each has validity for certain purposes, and trip levels in particular have become a key data point informing the agency's overall assessment of towboat use, including for purposes of the full-fledged reconsideration of the Wilderness Plan under NEPA that is currently underway.  That does not mean, though, that either metric is the best way to approach the *Dombeck* decision's task of adding towboat "trips" (really permits) to recreational motorboat permits in order to see whether the Base-Period Use has been exceeded.

As previously explained, the most logical way to approach that task is to determine towboat permit-equivalents using rules that characterized the recreational day-use motor permits for which towboats were required to compete in 1992: the permits did not limit the number of boats per permit, and allowed permit-holders to exit and re-enter the Wilderness repeatedly.  USA_00002173; USA_00002254; USA_00002262; USA_00007480-86; Dkt. 84, at 8, 15.  Applying that methodology to all years within the statute-of-limitations period for which data is available yields the following results:

**Table 1 (Forest Service approach)**

| Year | Day-use motor permits (USA_00009641) | Towboat permit-equivalents (USA_2477, filtered per Dkt. 84, at 16 n.9) | Total |
|------|------|------|------|
| 2017 | 4475 | 1259 | 5734 |
| 2018 | 4569 | 1291 | 5860 |
| 2019 | 4132 | 1266 | 5398 |
| 2020 | 4940 | 1147 | 6087 |
| 2021 | 4364 | 1009 | 5373 |

Obviously, these totals are well below the maximum allowable Base-Level Use of 12,059 for each year. *See* Dkt. 84, at 8 & n.4. And that would remain the case if the permit-equivalent numbers were doubled, or even tripled.[7]

Wilderness Watch sharply criticizes this approach to permit-equivalents, suggesting in particular that it fails to account for the fact that recreational motorboat permits are (and were) issued per group. According to Wilderness Watch, taking the group limitation of motorboat permits seriously requires nothing less than reverting to "trips" (as currently understood) as the only proper measure of towboat permit-equivalents. *See* Dkt. 92, at 24-27.

There are many problems with this. For one thing, it is quite unlikely that towboat operators in 1992 obtained a permit for each group. *See, e.g.*, USA_00007653 (2001 agency letter to outfitters requesting "boat day" data without reference to number of groups

---

[7]    The bottom-line result does not change for any year if overnight motor permits are also included. *See* USA_00009641 (noting 1229 such permits in 2017, 1138 in 2018, 1078 in 2019, 1218 in 2020, and 1259 in 2021).

served); USA_00007900 (2013 internal draft agency memo to file: "A boat day was supposed to be synonymous with the number of day use motor permits an operator would have obtained if that requirement were still in effect.").  And again, this really does amount to adding apples and oranges.  Nonetheless, as a matter of pure math, adding towboat trips to motorboat permits yields the following results:

**Table 2 (Wilderness Watch approach)**

| Year | Day-use motor permits (USA_00009641) | Towboat trips (Dkt. 79, at 35) | Total |
|------|--------------------------------------|--------------------------------|-------|
| 2017 | 4475 | 4295 | 8770 |
| 2018 | 4569 | 4011 | 8580 |
| 2019 | 4132 | 4164 | 8296 |
| 2020 | 4940 | 3425 | 8365 |
| 2021 | 4364 | 3556 | 7920 |

These totals, too, are well below the maximum allowable Base-Level Use of 12,059 for each year.[8]

Other approaches, which might arguably account for Wilderness Watch's concerns, would yield results falling in between the two approaches depicted in the tables above.  The "boat days" concept, for example, essentially reflects an earlier method by which Forest Service staff tried to arrive at towboat permit-equivalents—i.e., approximating the number of recreational motorboat permits a towboat operator would have obtained under the

---

[8]    Again, these results do not change for any year if overnight motor permits are also included.  *See supra* n. 5.

"competition" regime that the 1993 Wilderness Plan replaced with SUPs. *See, e.g.*, USA_00007653 (2001 agency letter to outfitters); USA_00007900 (2013 internal draft agency memo to file).[9] Boat days, however, failed to capture key features of motorboat permits as defined in 1992—namely that a single permit could cover an unlimited number of boats that could enter and exit the Wilderness an unlimited number of times. USA_00002254; USA_00002262; USA_00007480-86; Dkt. 84, at 8, 15.[10]

Yet another approach accounting for a concern Wilderness Watch notes could perhaps be constructed by focusing on the number of paddle visitor groups relying on towing services during a given season. An approach of this sort would likely require

---

[9] The 12-page, June 2013 working draft memorandum by Ann Schwaller, a Wilderness Specialist who was later promoted to Wilderness Program Manager, is informative as to the Forest Service's approach to Boundary Waters towboat management over time, and particularly illustrates the heightened attention given to the issue starting just over a decade ago, culminating in the full-fledged NEPA review now underway. *See* USA_00007899-7910. Like the Duffy memo two years later (USA_00003039-3048; see Dkt. 84, at 38 n.15, the document has a brainstorming, problem-solving character, and should not be taken as setting forth definitive Forest Service positions.

[10] To determine "boat days" for 2017, apply the following steps to the towboat use data contained at USA_00002477:

1. Filter Column A to include only 2017 (result 4,347).
2. Filter Column D to exclude January, April, and October (result 4,290).
3. Use Remove Duplicates and check only "Date" and "Towboat Sticker Number."
4. The result is 2,579 – representing the number of times that year any towboat made any number of trips in a day.

The same steps can be replicated for any year in the spreadsheet by modifying the first step. The results each year will be in between the Forest Service's approach to permit-equivalents (Table 1 above) and Wilderness Watch's preferred method of simply using trips as the metric (Table 2 above).

reviewing raw data from completed reporting forms that underlie the master towboat-use spreadsheet (USA_00002477).[11]  Such an approach—akin to the concept of "tows"— would also yield results somewhere between permit-equivalents as initially proposed (Table 1 above) and trips (Table 2 above).

In sum, Wilderness Watch has not shown that the Forest Service's approach to towboat permit-equivalents amounts to a "post hoc rationalization" unsupported by the record, nor that any of its suggested alternative approaches to the "apples and oranges" problem (i.e. the *Dombeck* adding exercise) make better sense.  And all these approaches lead in any event to the same conclusion: the Base-Level Use limit leaves ample room for much more commercial-towboat activity than is currently occurring within the Boundary Waters.[12]

---

[11]  Such underlying reporting forms appear in the record at USA_00003105-3117; USA_00003692; USA_00003921-4007; USA_00004150-4281; USA_00004533-4558; USA_00004706-4719; USA_00004825-4829; USA_00004832-4859; USA_00005032-5058; USA_00005150-5158; USA_00005423-5444; and USA_00005563-5574.

[12]  Wilderness Watch cites 2009-2010 records from a single outfitter to suggest "the Forest Service's attempts to compare apples to apples falls woefully short." Dkt. 92, at 27.  Those anomalous reports contain stray numbers that cannot mean what Wilderness Watch suggests—for example, that outfitter (Williams & Hall) only ever had seven towboats— and in any event the reporting protocols became much more thorough and consistent starting in 2015.  *See* USA_00007504-7505 (letter sent to all outfitters providing new forms and instructions).  Tellingly, that outfitter is not even among those having SUPs issued or renewed during the 6-year statute-of-limitations period.  *See* Dkt. 84, at 21 (listing all SUPs potentially at issue in this lawsuit).  That Wilderness Watch was only able to locate this small handful of abnormal reports in the voluminous administrative record is a testament to the strength of the overall data.

Just as Wilderness Watch fails to perform calculations or show any numerical violations based on its alternative approaches to permit-equivalents, so it fails in its reply to demonstrate any violation on a per-lake basis. *See* Dkt. 92, at 28-29. Rather, everything Wilderness Watch points to on this score amounts to anecdotal evidence—including quoting observations by Forest Service staff with respect to Saganaga Lake and Moose Lake—that then led certain non-attorney members of Superior National Forest leadership to surmise that legal violations must have occurred. *Id.* But their statements to this effect, which Wilderness Watch is fond of quoting, are not binding on the agency or the Court.[13]

For that matter, the statements also underscore the deep concern for Wilderness values shared by Forest Service staff and leadership alike. They do not prove the agency has acted arbitrarily and capriciously, should not be held against the Forest Service, and indeed ought to heighten confidence that the Forest Service will give utmost consideration to the importance of avoiding Wilderness degradation in its current review of Boundary Waters management issues. *See Earth Protector v. Jacobs*, 993 F. Supp. 701, 708 (D. Minn. 1998) (noting self-critical Forest Service "internal memoranda show an agency that encourages debate and carefully reviews questions raised by employees who might disagree with proposed actions").

---

[13]    Interestingly, Wilderness Watch also cites a 2009 letter submitted by the Izaak Walton League and signed by Kevin Proescholdt, then serving as a Director of that organization and now serving as Conservation Director of Wilderness Watch. *See* Dkt. 15 (Proescholdt declaration). While it appears in the record, such an advocacy letter is of little value in understanding the issues in this case.

Far from improper post-hoc rationalization, the transparent and straightforward permit-equivalent calculations provided in the Forest Service's briefing simply arise from a data review that was required in order to address the issues Wilderness Watch has raised in this case. The calculations, and the conceptual approach to permit-equivalents discussed here and in earlier briefs, are fully supported by the existing administrative record. No violation can be shown.

### B.    1992 Use Levels

The question of whether the number of towboat "trips" has exceeded 1992 levels is also answered by the record. While the Forest Service did not measure "trips" at the time in the way it does today, towboat use since 1992 has *decreased* in terms of the numbers of operators, boats, and lakes. USA_00003025-27; USA_00003044. The use is also inherently constrained by the number of potential towboat clients—paddle visitor groups—allowed entry on the motorized lakes in question (which quotas have likewise been *reduced* over time, USA_00004263-64; USA_00007483-85), and by the configuration of the lakes themselves, which take time to cross especially with engines of no more than 25 horsepower. USA_00002390; USA_00002464. It is therefore eminently reasonable to believe the number of trips has not exceeded 1992 levels

There are other reasons, too, why the absence of 1992 trips data does not itself prove a violation: the 1993 Wilderness Plan did not define "trips," and certainly could not have meant the term in the way Wilderness Watch now proposes. As previously explained, a "trips" limitation was not included in the FEIS or ROD, but appeared only at the last minute in the 1993 Wilderness Plan itself under opaque circumstances. Dkt. 84, at 53. Be that as

it may, the best understanding of the meaning of "trips" in the early 1990s is that it was used interchangeably with "permits"—as confirmed by the inclusion in the government's *Dombeck* briefing of both "1,342 trips" and "1,342 permits." Dkt. 84, at 50. This situation has been explored at length by agency staff and was explained in earlier briefing. *Id.*; *see also* USA_00007900-7902 (2013 internal draft Schwaller memo addressing issue).

Contrary to Wilderness Watch's allegation (Dkt. 92, at 25), the Forest Service has not "repeatedly disavowed" its obligation to manage towboat use in accordance with the 1993 Wilderness Plan. The documents Wilderness Watch cites for this statement are generally old (many from 1995), irrelevant to this case, and essentially reflect the acknowledged realities described above. *See id.* The documents do not show the agency acted arbitrarily and capriciously.[14] Nonetheless, as Wilderness Watch would have it, the Forest Service's inability to point to the number of towboat trips (as currently understood) that occurred in 1992 must mean all commercial towboat use over the past three decades was illegitimate, illegal, should never have happened, and must now be stopped immediately.

That is not reasonable, and it is far from what the law requires. After all, under the APA, courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

---

[14]   One of Wilderness Watch's favorite documents is an inchoate, anonymous, partial draft agency memorandum from 2007 that calls itself at the beginning an "unfinished work-in-progress," and ends with the first action item being "Run all this by Steve, Ann, Norma, and Barb to see if we have it right." USA_00007685-88 (duplicate copy at USA_00007695-98). This document is quite unreliable, for obvious reasons.

463 U.S. 29, 43 (1983). And even if a violation did occur, enjoining or otherwise artificially limiting commercial towboat activity in the Boundary Waters would be inappropriate at this time, for reasons discussed below in connection with remedies. That is particularly the case given that the agency is currently engaged in a searching review of this very activity, which is likely to lead to fundamental changes in the way towboat use is managed in the Boundary Waters for the first time since 1993.

**V.     No need exists for separate remedy briefing.**

Should the Court find a violation, simple remand is the proper remedy. *See* Dkt. 84, at 54-56. The cases the Forest Service originally cited in support of this well-settled principle are not limited to "procedural violations," Dkt. 92, at 30, as Wilderness Watch claims. *See, e.g.*, *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) (remanding for substantive reconsideration); *Dakota, Minn. & Eastern RR Corp. v. U.S. Dep't of Labor Admin. Review Bd.*, 948 F.3d 940, 947 (8th Cir. 2020) (same); *Nebraska ex rel. Bruning v. U.S. Dep't of Interior*, 625 F.3d 501, 511-13 (8th Cir. 2010) (same). Regardless, the principal challenge Wilderness Watch raises in this case is a procedural one; namely, the Forest Service's supposed failure to make specialized extent-necessary findings before authorizing commercial towboats in the Boundary Waters. If the Court agrees with Wilderness Watch, then remand is the appropriate remedy in this situation.

Although Wilderness Watch argues for vacatur, it is entirely unclear what it would have the Court vacate. Consistent with its posture throughout the case, Wilderness Watch's reply addresses remedies by referencing "systemic and ongoing violations . . . ongoing for decades" that are supposedly revealed by the administrative record. Dkt. 92, at 31. It also

presents "many options" for injunctive relief, suggesting alternatively that the Court "set aside the SUPs" and order the Forest Service to "create and implement a [new] permitting process" for towboats.  *Id.*, at 34 and Complaint, Dkt. 1, at 34.  These vague forms of injunctive relief are not warranted under the pertinent legal standard.

The prevailing rule comes from the case of *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993).  *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2021 WL 855938, at *2 (S.D. Ohio Mar. 8, 2021) (environmental case applying *Allied-Signal* and recognizing that "most courts to examine the issue have likewise adopted the *Allied-Signal* test"); *Breaker v. United States*, 977 F. Supp. 2d 921 (D. Minn. 2013) (environmental case citing *Allied-Signal* for the proposition that a rule resulting from an APA violation "need not necessarily be vacated," and for the relevant factors in whether to exercise such discretion).

Following *Allied-Signal*, courts apply "a two-factor balancing test which looks at 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed' to determine whether vacatur is appropriate."  *Ctr. for Biological Diversity*, 2021 WL 855938, at *1 (quoting *Allied-Signal*, 988 F.2d at 150-51); *Breaker*, 977 F. Supp. 2d at 942 ("Relevant factors include the severity of the order's deficiencies and the disruptive consequences of an interim change that may itself be changed" (citing *Allied-Signal*)).

Accordingly, where "deficiencies in an order can be redressed on remand" to the agency, and "the disruptive consequences of vacatur" would be considerable, the appropriate remedy under the APA is remand without vacatur.  *Black Oak Energy, LLC*

*v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quotation omitted); *see, e.g.*, *Central & S.W. Servs, Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where the agency could "justify its decision . . . and it would be disruptive to vacate a rule that applies to other members of the regulated community"); *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur where it was "plausible" agency would provide sufficient explanation and vacatur would be "quite disruptive," shutting down a "currently operational" gas pipeline); *Breaker*, 977 F. Supp. 2d at 942 (remanding without vacatur where agency's "errors [were] not severe enough to set aside the existing decision" and vacatur would "pose disruptive consequences to the wilderness").

Here, any agency activity found to be arbitrary and capricious would *not* render particular SUPs, or the commercial towboat program as a whole, seriously deficient, because the Forest Service has worked hard to comply with all applicable rules and has kept use levels within limits for decades, as explained in this brief and in prior submissions. Moreover, any form of injunctive relief would be severely disruptive to affected outfitters, to their existing and potential clients among Boundary Waters paddle-group visitors, and to the Forest Service itself as it continues to study towboat use levels and patterns while devoting considerable resources toward its current NEPA review of Boundary Waters management, including towboats. *See* Dkt. 46, at 25 (Court's observation that an injunction "would upend the status quo and interrupt the plans of outfitters and BWCAW visitors" as well as "disrupt the Forest Service's work of gathering and analyzing data regarding motorboat and towboat usage"). This case, even were the Court to find a

violation, would therefore not meet the *Allied Signal* criteria for injunctive relief, making remand without vacatur the appropriate remedy.  *See* 988 F.2d at 150-51.

Nonetheless, in the event the Court may be inclined to consider granting vacatur or some form of injunctive relief, the Forest Service would join Wilderness Watch's request for separate remedy briefing to further explain why such relief is not warranted here.

## CONCLUSION

The Forest Service respectfully requests that the Court grant its cross-motion for summary judgment, deny Wilderness Watch's motion, and uphold the challenged program and all Special-Use Permits issued pursuant to it.

Dated: December 17, 2024                    ANDREW M. LUGER
                                            United States Attorney

                                                *s/ David W. Fuller*

                                            By:  DAVID W. FULLER
                                            Attorney ID Number 390922
                                            Email: david.fuller@usdoj.gov
                                            TREVOR BROWN
                                            Attorney ID Number 0396820
                                            Email: trevor.brown@usdoj.gov
                                            Assistant United States Attorneys
                                            600 United States Courthouse
                                            300 South Fourth Street
                                            Minneapolis, MN 55415
                                            Phone:  612-664-5600

                                            Attorneys for Defendants