## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WILDERNESS WATCH, | Case No. 23-CV-284 (NEB/LIB) |
| Plaintiff, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| TOM HALL, Forest Supervisor of the Superior National Forest, and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

Wilderness Watch sued the Supervisor of the Superior National Forest and the United States Forest Service (together, the "Forest Service") over towboat use on certain lakes in the Boundary Waters Canoe Area Wilderness ("Boundary Waters"). In prior orders, the Court denied Wilderness Watch's motion for preliminary injunction and the Forest Service's motion to dismiss. The parties now move for summary judgment based mostly on the administrative record. (ECF Nos. 77, 83.) For the reasons below, the Court grants the Forest Service's motion for summary judgment, and it denies the motion of Wilderness Watch.

## BACKGROUND

The Boundary Waters comprises over one million acres of land and waterways in the Superior National Forest. It contains more than a thousand portage-linked lakes. To

protect this wilderness, Congress limits commercial services and prohibits motorboat use in most of the Boundary Waters. That said, motorboats, including commercial towboats, have been used on a handful of Boundary Waters lakes for over fifty years. Outfitters use towboats to transport "canoes, boats, camping supplies, equipment, and persons across the waterways of the [Boundary Waters]." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1120 n.2 (8th Cir. 1999). Since the mid-1990s, the Forest Service has managed commercial towboat use in the Boundary Waters in part by issuing special-use permits to outfitters. Wilderness Watch challenges the Forest Service's management of towboat operations, arguing that the Forest Service has allowed excessive towboat use.

## I.    The Law at Issue

Wilderness Watch asserts that the Forest Service has allowed excessive towboat use in the Boundary Waters in violation of the wilderness-protection mandates of several statutes: the Wilderness Act of 1964; the Boundary Waters Canoe Area Wilderness Act of 1978 ("BWCAW Act"); and the National Forest Management Act ("NFMA"), as well as the Boundary Waters Canoe Area Wilderness Management Plan and Implementation Schedule ("Wilderness Plan") implemented under the NFMA.

*Wilderness Act*. In 1964, the Wilderness Act established a national system for preserving and protecting federal wilderness areas, including the Boundary Waters. 16 U.S.C. §§ 1131–36 & note. The Act prohibits the "use of motor vehicles, motorized equipment or motorboats" within wilderness areas, unless the vehicles or boats are

2

necessary for the administration of the areas. *Id.* § 1133(c). The Wilderness Act also prohibits commercial enterprises with limited exceptions, allowing commercial services only "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." *Id.* § 1133(d)(5); *see id.* § 1133(c).

*BWCAW Act.* In 1978, in response to "threatened deterioration of the wilderness from excessive use," Congress enacted the BWCAW Act. *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 818–19 (8th Cir. 2006) (citing Pub. L. No. 95-495, 92 Stat. 1649 (Oct. 21, 1978)). "The purpose of the BWCAW Act is to protect the wilderness values of the [Boundary Waters] while maintaining limited motorized access not inconsistent with those values." *Id.* at 823. The BWCAW Act prohibits the use of motorboats within the Boundary Waters except for a handful of lakes. Pub. L. No. 95-495, § 4(c), 92 Stat. 1649, 1650–51. It provides that "motorized uses . . . shall be confined to those types of . . . motorboats . . . which have been in regular use in the [Boundary Waters]" before the BWCAW Act was enacted. *Id.* § 4(h); *see id.* § 4(c)(1) (noting that certain horsepower limitations "shall not apply to towboats registered with the Secretary").

Under the BWCAW Act, the Secretary of Agriculture was to develop and implement a quota system to restrict motorboat use on the lakes on which motorboats were allowed. *Id.* § 4(f). The quota system requires that motorboat use "shall not exceed the average actual annual motorboat use . . . for each lake" that existed during the years

1976 through 1978. *Id.* It also provides that motorboat use on some lakes would be phased out over time. *Id.* §§ 2(6), 4(c)(3)–(4). This calculation of the total annual motorboat quota, or "base period use," on the motorized lakes has also been called the "statutory cap."

In 1981, the Forest Service published the average actual annual motorboat use during 1976, 1977, and 1978 on certain lakes in a BWCAW Act Final Implementation Plan ("1981 Implementation Plan"). (USA-2086.) The table reflected overnight and day-use permits for each motorized lake within the Boundary Waters. The table was revised as motorboat use on certain lakes phased out. The most recent table of "Motorboat Quotas," showing the limits on day-use and overnight permits on each motorized lake, is shown below:

MOTORBOAT QUOTAS
(Maximum Use Allowed by Public Law 95-495)

| Entry Point | Type of Motorboat Use | Annual Quota (Number of Permits) | | |
|---|---|---|---|---|
| | | 1982-83 | 1984-98 | 1999+[1/] |
| Trout Lake | All | 1738 | 1738 | 1738 |
| Fall Lake | Overnight | 658 | 291 | 291 |
| | Day Use on Fall Lk. only | 1457 | 1457 | 1457 |
| | Day Use on Basswood Lake | 1206 | 932 | 932 |
| Fourmile Portage | Overnight | 129 | 97 | 97 |
| | Day Use | 993 | 773 | 773 |
| Moose Lake | Overnight | 730 | 558 | 558 |
| | Day Use on Moose Chain only | 837 | 695 | 695 |
| | Day Use on Basswood Lake | 1813 | 1359 | 1359 |
| Snowbank Lake | Overnight | 81 | 81 | 81 |
| | Day Use | 610 | 610 | 610 |
| Farm Lake | Overnight | 10 | 10 | 10 |
| | Day Use | 345 | 345 | 345 |
| Brule Lake | Overnight | 266 | 266 [2/] | 0 [2/] |
| | Day Use | 226 | 226 [2/] | 0 [2/] |
| Seagull Lake | Overnight | 134 | 133 | 38 |
| | Day Use | 594 | 594 | 137 |
| Saganaga Lake | Overnight | 388 | 370 | 370 |
| | Day Use | 2023 | 2023 | 2023 |
| Clearwater Lake | Overnight | 42 | 42 | 42 |
| | Day Use | 246 | 246 | 246 |
| E. Bearskin Lake | Overnight | 30 | 30 | 30 |
| | Day Use on E. Bearskin Lake Only | 227 | 227 | 227 |
| | Day Use on Alder Lake | 142 | 142 | 142 |

(USA-9629.) After this table was published, motorboat use on Adler Lake was phased out. (USA-9500.) The current base period use in the Boundary Waters is a quota of 12,059 permits per year.

After Congress enacted the BWCAW Act, towboat operators competed for day-use permits with other visitors to the Boundary Waters who sought to use motorboats. (USA-2254.) The Forest Service issued one day-use permit per party or group, and groups were limited to ten persons. (USA-2173 (permits issued by group); USA-2254.) Day-use permits did not limit the number of boats per day-use permit, and did not prohibit exiting and re-entering the Boundary Waters. (USA-2254; USA-2262.) The Forest Service

5

estimates that, in 1992, towboats accounted for about a quarter of motorboat use in the Boundary Waters. (USA-7610, USA-7632.)

*Wilderness Plan.* By 1993, the Forest Service concluded that allowing motorboat use to the maximum extent possible under the base period use was "strain[ing] the wilderness environment and [was] tending to degrade the intended primitive and unconfined recreation experience" of the Boundary Waters. *Bosworth*, 437 F.3d at 820 (alterations in original). In response to this issue and others, the Forest Service adopted the Wilderness Plan. (USA-2151–2237.) The Wilderness Plan was prepared in accordance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, after environmental analysis and public comment. (USA-2238–2455.) During the planning process, the Forest Service considered alternatives that included different levels of towboat use and different methods of permitting towboat operations. (USA-2254–59, USA-2388–90.)

The Wilderness Plan limited towboat use to 1992 levels "for numbers of boats, trips, current operators, and specific lakes." (USA-2172.) "Growth will not be permitted beyond these limits."[1] (*Id.*) The Plan implemented a motorboat day-use quota around

---

[1] Now Forest Service management decisions must conform with the 2004 Superior National Forest Land and Resource Management Plan ("Forest Plan"). (*See* USA-1771–2022; USA-9474–9513.) The Forest Plan carried forward the Wilderness Plan without substantive changes to towboat management in the Boundary Waters.

75 percent of the motorboat quota set under the BWCAW Act. This quota is 7,441 day-use permits and 1,903 overnight permits, for a total of 9,344 permits. (*See* USA-7480–86.)

The Wilderness Plan adopted a special-use permitting process that authorized outfitters to use commercial towboats on certain lakes in the Boundary Waters. (USA-2172.) A special-use permit limits the number of towboats used; it does not limit the number of towboat trips, either per towboat or per permit. (*See, e.g.*, USA-6248.) Towboats subject to special-use permits do not count against the motorboat quotas set under the BWCAW Act. *Dombeck,* 164 F.3d at 1121.

## II.    Towboat Use in the Boundary Waters

Before 2015, the Forest Service did not track towboat trips thoroughly or consistently. In 2015, the Forest Service began requiring towboat operators to report towboat use in terms of "trips." (*See* USA-7504–05 (letter to outfitters providing new forms and instructions).) A "trip" is one use of a towboat on a Boundary Waters lake (across the lake and back). (USA-3046; *see* USA-7498–99.) The table below provides towboat trip data between 2015 and 2022 for the Moose Lake entry point[2] and throughout the Boundary Waters:

---

[2] The Court includes only the data from the Moose Lake entry point because it was the only lake entry point addressed by the parties in any detail.

| Drop-off /Pick-up Locations | Years / Total Tow Trips | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Years (right column)** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** |
| Moose Lake Entry Point Totals | 3,224 | 3,263 | 3,201 | 2,933 | 3,089 | 2,316 | 2,088 | 2,686 |
| . . . | | | | | | | | |
| **Total Trips Per Year Inside Boundary Waters** | 4,093 | 4,217 | 4,295 | 4,011 | 4,164 | 3,425 | 3,556 | 4,127 |

(USA-2477.)

Internal documents suggest that, in the early 2000s, the Forest Service had concerns about growing towboat use in the Boundary Waters. For example, a 2007 draft internal document on towboats raised two issues:

> Excessive towboat use. There is the perception among those who have worked Sag that there is too much towboat activity; that at times a constant stream of towboats travels certain areas, when that didn't used to be the case. We have heard complaints about the volume of commercial motor traffic not only from paddlers but also from people in motorboats who say tow traffic has become excessive. Towboat use has a different quality from the normal recreational uses — a constant droning along the same routes, over and over; not the go and stop to fish, more random normal boat use — so it has more of a negative impact.
> . . .
> Towing for campsite selection. Based on incidents like the following, we know that towboats have taken campers on site finding jaunts. A wilderness ranger was told by a visitor camped on Saganaga "Our towboat operator was so patient! He took us around until we found a site we liked." This certainly adds to the total volume of motor use. Is it OK?

(USA-7687–88.) More recently, a June 2021 internal memorandum presumed that "motorboat use, including towboats, in certain places at certain times, has approached

the motorized boat use cap as authorized under the law. In these areas of the Wilderness, social and physical resource protection standards are not being met." (USA-9631.) A year later, another Forest Service internal memorandum stated that "[m]onitoring shows that the overall motorized use cap is being exceeded in some areas. . . . The Forest recognizes that it is exceeding group encounter and natural resource standards, along with a lack of campsite availability, all leading to wilderness character degradation." (USA-3026; *see* USA-9633 (2020 Forest Service internal email noting that a draft Capacity Analysis "clearly demonstrates that commercial towboat trips have nearly doubled in the past six years" and "found resource concerns associated with motorized use in congested corridors affecting wilderness character"); USA-9635 (2022 Forest Service internal email noting that "[t]owboats contribute to the exceedance of social and physical resource protection standards in specific travel zones within Wilderness").)

*Prior litigation.* In 2015, Wilderness Watch sued the Forest Service, asserting in part that it had authorized excessive towboat and motorboat operations in the Boundary Waters. *Wilderness Watch, Inc. v. Halter*, No. 15-CV-03734 (WMW/LIB), ECF No. 1 (D. Minn. Sept. 25, 2015). The parties settled the matter in 2017. *Id.* at ECF No. 60 (May 9, 2017).

*Needs Assessment and Capacity Analysis.* In 2019, the Forest Service published a Recreational Commercial Services Needs Assessment ("Needs Assessment"). (USA-2914–61.) This assessment addressed commercial services forest-wide, including towboat

9

use within the Boundary Waters. The Needs Assessment found an overall "moderate" need for commercial towboats in the Wilderness. (USA-2932.) It included towboats in a category of "[a]ctivities that should be further considered and analyzed in a capacity analysis and environmental (NEPA) analysis." (USA-2939.)

In 2020, the Forest Service published a Visitor Capacity Analysis that did not include commercial towboats. (USA-2962–98.) This report explained that towboats would "be analyzed in a separate analysis under NEPA in 2021." (USA-2964.) But the 2021 NEPA analysis did not occur.

*Decline of other towboat use metrics*. Despite the concerns outlined above, data shows that the number of towboats in use, outfitters with permits, and motorized lakes in the Boundary Waters have declined over time. In 1992, 31 businesses operated 91 towboats throughout the 17 Boundary Waters lakes on which such activity is allowed. (ECF No. 41 ¶ 19.) Today, 20 businesses operate 63 towboats on 14 lakes in the Boundary Waters. (*Id.*) Since 2017, the Forest Service has issued special-use permits to eleven outfitters. (ECF No. 84 at 21[3] (listing outfitters).)

*NEPA analysis*. In 2024, the Forest Service began the NEPA analysis that was to occur in 2021. The analysis is to consider all aspects of its management of the Boundary Waters, including towboat operations. This analysis will likely result in an amended forest plan. The Forest Service warns that this process will take several years. The general

---

[3] Citations to ECF document pages reflect ECF page numbers unless otherwise noted.

public-comment period concluded in May 2024; the Forest Service anticipates a decision in 2027. (ECF No. 84 at 22.)

### III.    This Litigation

Wilderness Watch brings five causes of action based on the Forest Service's alleged authorization of excessive commercial towboat use and other motorboat use in the Boundary Waters: a violation of the NFMA and the Wilderness Plan (Count 1); a violation of the BWCAW Act (Count 2); and violations of the Wilderness Act (Counts 3–5). These violations were allegedly "arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, constituting a violation of the APA." (*E.g.*, Compl. ¶ 82 (citing 5 U.S.C. § 706(2)(a)).)

Among other relief, Wilderness Watch seeks to enjoin the Forest Service "from permitting any motorized use beyond the statutory cap and the quotas" set by the Wilderness Plan and to "enjoin the Forest Service from authorizing any commercial towboat entries until the agency can demonstrate full compliance" with relevant statutes. (*Id.* ¶ 10; *see id.* ¶ 111.) It also asks the Court to order "the Forest Service to create and implement a permitting process for commercial towboat operations that will ensure clarity, accountability, and compliance with the law." (*Id.* ¶¶ 11, 111(b).)

In prior orders, the Court denied Wilderness Watch's motion for a preliminary injunction to halt all towboat use in the Boundary Waters, and the Forest Service's motion to dismiss for lack of subject-matter jurisdiction. (ECF Nos. 46, 55); *Wilderness Watch v.*

*Hall*, No. 23-CV-284 (NEB/LIB), 2023 WL 11984984 (D. Minn. June 6, 2023) (denying motion for preliminary injunction); *Wilderness Watch v. Hall*, No. 23-CV-284 (NEB/LIB), 2024 WL 4905128, at *1 (D. Minn. Feb. 28, 2024) (denying motion to dismiss). Both parties now move for summary judgment.

## ANALYSIS

### I.      Motion for Judicial Notice and Hearing PowerPoint

To begin, the Court addresses two submissions by Wilderness Watch in connection with the motions for summary judgment. Before the hearing on the parties' motions, Wilderness Watch moved for judicial notice of three documents published on the Forest Service's website for the Superior National Forest. (ECF Nos. 104–05.) The Forest Service does not oppose this motion. The motion is granted.

At oral argument, Wilderness Watch submitted a PowerPoint presentation that included slides about the Moose Lake entry point, including a proposed calculation of "permit equivalents" in the Moose chain of lakes. To the extent that Wilderness Watch's presentation materials and argument were not included in its briefs, they are an unauthorized sur-reply and the Court will not consider them. *See* D. Minn. LR 7.1(i).

### II.     Legal Standard

Both parties move for summary judgment on Wilderness Watch's claims under Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact

and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute like this one—challenging an agency action under the APA—"can usually be resolved on summary judgment because '[t]he entire case on review is a question of law.'" *United Food & Com. Workers Union, Loc. No. 663 v. United States Dep't of Agric.*, 532 F. Supp. 3d 741, 768–69 (D. Minn. 2021) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

## III.    Subject-Matter Jurisdiction

Turning to the parties' substantive arguments, the Forest Service (again) contends that this Court lacks subject-matter jurisdiction over Wilderness Watch's claims, which are brought under the APA. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

"The APA does not create federal subject matter jurisdiction. Rather, a federal court has federal question jurisdiction under 28 U.S.C. § 1331 over challenges to federal agency action." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 860 n.10 (8th Cir. 2013) (internal citation omitted). The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where, as here, no other statute provides a private right of action, the "agency action" at issue must be "final agency action." *Id.* § 704; *see Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 518 (8th Cir. 2024) ("For an agency action to be 'final' under the APA, the action must (1) 'mark the

consummation of the agency's decisionmaking process,' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" (citation omitted)). The APA also provides relief for a failure to act: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). These sections of the APA "insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1))." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

The "principal purpose" of the APA limitations is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66. As such, a plaintiff "cannot seek *wholesale* improvement of [an agency] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "[T]he proper course is to challenge only those 'circumscribed [and] discrete' actions within a program—not the entire program and every decision made under it." *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-CV-00999 (TNM), -- F.3d --, 2025 WL 1568301, at *5 (D.D.C. June 3, 2025) (citing *Norton*, 542 U.S. at 62).

At the motion-to-dismiss stage, the Court rejected the Forest Service's challenge to subject-matter jurisdiction, concluding that the complaint "could be more artfully

14

pleaded, but the allegations are sufficiently focused on the Forest Service's authorization of towboat operations via special-use permits to confer jurisdiction." (ECF No. 55 at 12.) In so ruling, the Court relied on Wilderness Watch's focus on the Forest Service's issuance of special-use permits for towboat operations,[4] and the Ninth Circuit's determination that the Forest Service's issuance of "certain special-use permits" constitutes "final agency action" conferring jurisdiction under the APA. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004).

Now at the summary-judgment stage, the parties do not dispute that special-use permits constitute "final agency action" under the APA. But the Forest Service argues that Wilderness Watch raises a programmatic challenge to the management of towboats in the Boundary Waters, rather than a challenge to any discrete agency action. *See Norton*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan*."). Having reviewed the memoranda and evidence presented by Wilderness Watch, the Court questions its jurisdiction over Wilderness Watch's claims. At least some claims to be appear to be programmatic

---

[4] In its memorandum in opposition to the motion to dismiss, Wilderness Watch represented that it was challenging "final agency action in the form of the issuance and annual renewal of special use permits." (ECF No. 47 at 3; *see id.* at 14–15 ("The [special-use permits] Wilderness Watch challenges here are ongoing in their effect and are re-authorized on an annual basis. Wilderness Watch *is focused specifically on correction of such existing permits* and seeks injunctive relief from this Court to require the agency to conform its ongoing permitting to satisfy legal requirements." (emphasis added)).

challenges, similar to the claims in *Sierra Club v. Peterson,* 228 F.3d 559 (5th Cir. 2000) (en banc).

In *Peterson*, environmental groups objected to a particular Forest Service timber-management program. *Id.* at 562. They "challenged past, ongoing, and future timber sales approved by the Forest Service, and they argued that the Forest Service failed to monitor and inventory properly in conducting these sales." *Id.* at 556. The plaintiffs identified certain allegedly improper timber sales but "made clear that these sales were examples of the larger [] management techniques they were challenging rather than the extent of their challenge." *Id.* at 563; *see id.* at 566 (noting plaintiffs "sought wholesale improvement of the Forest Service's 'program' of timber management in the Texas forests . . . ." (internal citation omitted)). The Fifth Circuit held that the plaintiffs' challenge was not to a final agency action because "[r]ather than limit their challenge to individual sales, [the plaintiffs] merely used these sales as evidence to support their sweeping argument that the Forest Service's 'on-the-ground' management of the Texas forests over the last twenty years violates the NFMA. This is clear from their allegations, . . . from their evidence . . . and from their requested relief." *Id.* at 567.

As suggested in *Peterson*, after discovery and at the end of the summary-judgment stage, Wilderness Watch was to bring "into focus the nature of the [alleged] illegality" of the special-use permits issued for towboat operations in the Boundary Waters. *Id.* at 571 (Higginbotham, J., concurring). Unlike its representations at the motion-to-dismiss stage,

many of Wilderness Watch's arguments at summary judgment do not "focus[]
specifically on correction of such existing permits." (ECF No. 47 at 14.)

Wilderness Watch contends that the lawfulness of each special-use permit "hinges
on, and is inextricably tied to, compliance with [the Wilderness] Plan provisions as well
as the BWCAW Act, the 1981 Implementation Plan, and the Wilderness Act." (ECF No. 92
at 5–6.) According to Wilderness Watch, "[t]he information the Court needs to ensure
individual permits comply with the law cannot be gleaned from the four corners of a
single [special-use permit] authorization . . . . The individual [special-use permits] must
be viewed in light of *the entire regulatory scheme*." (*Id.* at 6 (emphasis added)).

Counts One and Two—which assert that the Forest Service allowed towboat use
to exceed limits set by the Wilderness Plan and the BWCAW Act, respectively—appear
tied to the Forest Service's issuance of special-use permits for commercial towboat
operations. To determine whether towboat use exceeded these limits, the Court must
view the special-use permits in the aggregate. Because Wilderness Watch asserts that the
Forest Service's issuance of special-use permits—in aggregate—violated the limits of the
Wilderness Plan and the BWCAW Act, the Court concludes that it maintains subject-
matter jurisdiction over Counts One and Two. *See Neighbors of Cuddy Mountain v.
Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (holding that the court had power to review
a site-specific authorization and conclude that the Forest Service's approval was unlawful

under the NFMA and governing forest plan "even if doing so would, as a practical matter, require [the court] to consider forest-wide management decisions").

Some of Wilderness Watch's other arguments appear divorced from the Forest Service's issuance of special-use permits. For example, Wilderness Watch argues that under the BWCAW Act, towboats should have been phased out by 1984,[5] (ECF No. 79 at 44–45), that the towboat-services analysis that led to the Wilderness Plan was lacking, (*id.* at 47–50), and that the Forest Service failed to calculate a permit or trip limit under the Plan. (*Id.* at 55–59.) These arguments appear to challenge the Forest Service's management of towboat operations in the Boundary Waters wholesale.[6]

Turning to the remaining claims: Count Three alleges a violation of the Wilderness Act's mandate to preserve and protect the wilderness character of the Boundary Waters. At oral argument, Wilderness Watch maintained that the wilderness character of the Boundary Waters was degraded regardless of whether towboat operations exceeded

---

[5] The Court is unpersuaded by Wilderness Watch's argument that under the BWCAW Act, all commercial towboat operations were to be phased out in 1984. The Eighth Circuit twice addressed towboat operations under the BWCAW Act without any suggestion that such operations were to end after 1984. *See Dombeck*, 164 F.3d 1115; *Bosworth*, 437 F.3d 815.

[6] Some of the relief sought by Wilderness Watch is broad, including ordering the Forest Service to "create and implement a permitting process for commercial towboat operations that will ensure clarity, accountability, and compliance with the law." (Compl. ¶ 111(b).) In contrast, Wilderness Watch seeks a declaration that the Forest Service violated the law by authorizing motorized use beyond levels set by the Wilderness Plan and the BWCAW Act, which relate to Counts One and Two, respectively. (*Id.* ¶ 111(a)(2) & (3).)

limits set by the Wilderness Plan or the BWCAW Act. This claim challenges the Forest Service's overall management of towboats in the Boundary Waters, rather than any final agency actions. *See Neighbors of Cuddy Mountain*, 303 F.3d at 1067 ("Forest-wide monitoring and reporting duties, even when required by a Forest Plan, are not 'final agency actions' under the APA and therefore cannot be challenged on their own."). The Court thus lacks subject-matter jurisdiction over Count Three.

Counts Four and Five assert the Forest Service violated the Wilderness Act's requirement that it authorize commercial services within wilderness areas only "to the *extent necessary* for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5) (emphasis added). The Forest Service argues that the Court lacks jurisdiction because "an 'extent-necessary analysis' is not a final-agency-action through which rights and obligations are determined or from which legal consequences flow." (ECF No. 84 at 26.) Wilderness Watch urges that individual special-use permits for commercial towboat operations "must be viewed in light of the aggregate" to ensure that towboat use is necessary in the Boundary Waters and not exceeding the extent to which towboat use is necessary. (ECF No. 92 at 6.)

As in its prior orders, the Court remains persuaded by the Ninth Circuit's reasoning in *Blackwell* that it has subject-matter jurisdiction over Counts Four and Five. (ECF No. 46 at 16–17; ECF No. 55 at 8–9.) There, the Forest Service had issued special-use permits to commercial packstock operators in wilderness areas. 390 F.3d at 637. The

plaintiffs contended that the Forest Service violated Section 1133(d)(5) by failing to determine that those commercial services were necessary and proper before issuing the permits. *Id.* at 646. The Ninth Circuit rejected the Forest Service's assertion that the plaintiffs raised a programmatic challenge and held that the issuance of special-use permits was the "final agency action that has an actual or immediately threatened effect sufficient to trigger standing." *Id.* at 639. The Ninth Circuit then considered whether the Forest Service's issuance of the special-use permits violated Section 1133(d)(5). *Id.* at 646–47.

Here, Count Four asserts that the Forest Service never made a specialized finding of necessity for towboat operations in the Boundary Waters, nor determined the extent to which such services are necessary, before authorizing towboat use, *i.e.*, issuing special-use permits for commercial towboat operations. (Compl. ¶¶ 102–03.) In the alternative, Count Five asserts that the Forest Service authorized towboat use based on an inadequate extent-necessary determination. (*Id.* ¶¶ 106–10.) Both counts assert that the Forest Service violated Section 1133(d)(5) by issuing and renewing special-use permits for commercial towboat operations before determining the extent to which such operations are necessary in the Boundary Waters. The Court concludes that the Forest Service's issuance of the special-use permits was the final agency action that has an actual or immediately threatened effect sufficient to trigger standing for Counts Four and Five.

20

For these reasons, the Court concludes that it has subject-matter jurisdiction over Counts One, Two, Four, and Five.

## IV.    Merits

Even assuming subject-matter jurisdiction, however, the above claims fail on the merits because the Forest Service's actions pass muster under the APA's standard review.

Under the APA, a court may set aside an agency's action if it finds the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Different standards of review apply, depending on whether the action is challenged as arbitrary and capricious, or "not in accordance with law."

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The court only "ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* This highly deferential standard provides a narrow standard of review of the agency action. *Firearms Regul. Accountability Coal.*, 112 F.4th at 519. Agency action is arbitrary and capricious if the agency (1) relied on factors that Congress did not intend for it to consider, (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) offered an explanation that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 519 (citing

*McClung v. Paul*, 788 F.3d 822, 828 (8th Cir. 2015)). Nor will the Court "uphold agency action that is internally inconsistent or not reasonable and reasonably explained." *Id.* at 520. To comply with the arbitrary-and-capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Wilderness Watch bears the burden to prove that the Forest Service's action is arbitrary and capricious. *S. Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005).

As for agency action alleged to be "not in accordance with law," the reviewing court "must exercise [its] independent judgment" in determining "whether an agency has acted within its statutory authority." *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)); *see* 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.").

### A.    *Wilderness Act Claims*

Three of the claims in this action assert that the Forest Service's authorization of commercial towboat operations in the Boundary Waters was arbitrary and capricious under the APA and violates the Wilderness Act. Count Three asserts that the Forest

22

Service failed to preserve the "wilderness character" of the Boundary Waters under the Wilderness Act. 16 U.S.C. § 1133(b). Counts Four and Five are based on the commercial-use "extent necessary" provision of the Wilderness Act. 16 U.S.C. § 1133(d)(5).

1.    *Wilderness Character*

The Wilderness Act requires the Forest Service to preserve and protect the wilderness character of the Boundary Waters. *See* 16 U.S.C. § 1133(b) (The Forest Service "shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.").

Throughout its briefing, Wilderness Watch references the degradation of the wilderness character of the Boundary Waters, but it does not address Count Three separately. Its argument for summary judgment on Count Three simply blends in with its arguments on its other claims. (*See, e.g.*, ECF No. 79 at 42 (subheading addressing another Wilderness Act claim "and failure to preserve wilderness character"), 54 (similar, regarding BWCAW Act claim), 56 (similar, regarding Wilderness Plan claim).)

Wilderness Watch points to towboat trip data from 2012 to 2022 to argue that towboat use has been steadily increasing for "decades." (*Id.* at 35–36 (citing USA-2477).) But the administrative record shows that towboat trip data was unreliable before 2015 because the Forest Service did not standardize towboat-trip reporting until 2015. (USA 3023–24 (Feb. 12, 2015 Forest Service letter to towboat operators explaining new method

for collection of towboat trip data); USA-3039–48 (Mar. 4, 2016 Summary of Management Direction for Towboats and Statutory Cap and Quota Comparison ("Duffy Memo")) at USA-3045–47.) As shown in the table of towboat trip data above, towboat trips fluctuated, rather than steadily increased, between 2015 and 2022 in the Boundary Waters as a whole and at the Moose Lake entry point. (USA-2477.)

At oral argument, Wilderness Watch claimed that the wilderness character was degraded regardless of whether towboat use exceeded limits set by the Wilderness Plan or the BWCAW Act. In support, Wilderness Watch presented maps of degradation in the Boundary Waters from a 2017 Department of Agriculture report entitled, "Mapping Wilderness Character in the [Boundary Waters]."[7] (ECF No. 105-1 at 25–116.) The report includes maps depicting degraded conditions in areas where motorboats operate and notes that "[t]he lowest quality categories are highly correlated with lakes that allow motorized use, especially those that are wilderness entry points." (*Id.* at 107; *see id.* at 109 (map).) But the report also notes that "the majority of the wilderness has high quality wilderness character that has not been substantially impacted by threats." (*Id.* at 107.) It explains that "[t]he maps produced through this project are only an estimate of selected measures of wilderness character and their spatial variability and pattern; they are not a

---

[7] In the report, the term "degraded" "reflects common vocabulary used in laws, policies, and interagency wilderness character monitoring documents," and "do[es] not imply an analysis of impacts or determination of significant effects, such as required by the [NEPA] or other agency decisionmaking processes." (ECF No. 105-1 at 43 n.2.)

final determination of wilderness character in the [Boundary Waters]." (*Id.* at 111–12.) But this report is inconclusive about whether the Forest Service has failed to preserve the wilderness character of the Boundary Waters. Having reviewed the record, the Court concludes that Wilderness Watch's evidence of the Forest Service's failure to preserve the wilderness character of the Boundary Waters—standing alone—is anecdotal.

Wilderness Watch's evidence does not show as a matter of law that the Forest Service failed to preserve the wilderness character of the Boundary Waters within the six-year statute of limitations. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). Its evidence is comprised mostly of internal documents reflecting generalities about the effect of motorboat use in the Boundary Waters. Wilderness Watch cites a June 2021 internal memorandum in which the Forest Service concluded that "[d]ecades of research, monitoring, and surveys show gradual physical and social resource degradation of the [Boundary Waters]," (USA-9630), and supposed that "motorboat use, including towboats, in certain places at certain times, has approached the motorized boat use cap as authorized under the law. In these areas of the Wilderness, social and physical resource protection standards are not being met." (USA-9631.) A year later, another Forest Service internal memorandum reported that "[m]onitoring shows that the overall motorized use cap is being exceeded in some areas. . . . The Forest recognizes that it is exceeding group encounter and natural resource

standards, along with a lack of campsite availability, all leading to wilderness character degradation." (USA-3026; *see* USA-9633 (2020 Forest Service internal email noting that a draft Capacity Analysis "clearly demonstrates that commercial towboat trips have nearly doubled in the past six years" and "found resource concerns associated with motorized use in congested corridors affecting wilderness character"); USA-9635 (2022 Forest Service internal email noting that "[t]owboats contribute to the exceedance of social and physical resource protection standards in specific travel zones within Wilderness").)

Wilderness Watch has not met its burden to prove that the Forest Service has acted arbitrarily and capriciously by allowing commercial towboat operations, because its evidence does not show that commercial towboat use caused the degradation of the Boundary Waters. The Court grants summary judgment on Count Three for the Forest Service.

2.    *Extent Commercial Use Is Necessary*

Counts Four and Five are premised in part on the Wilderness Act's general prohibition of commercial enterprise within any wilderness area. 16 U.S.C. § 1133(e). Section 1133(d)(5) allows commercial services within wilderness areas, but only "to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5). Wilderness Watch asserts that the Forest Service failed to conduct an "extent necessary" analysis under Section 1133(d)(5) (Count Four), or did not do the analysis sufficiently (Count Five),

26

before authorizing commercial towboat operations in the Boundary Waters—which, it claims, are otherwise prohibited under Section 1133(e). This failure, according to Wilderness Watch, was arbitrary and capricious in violation of the APA.

The parties dispute what, if anything, Section 1133(d)(5) requires of the Forest Service before authorizing commercial towboat operations in the Boundary Waters. When interpreting a statute, the court "begin[s] with the statute's plain language, giving words the meaning that proper grammar and usage would assign them. If the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *Union Pac. R.R.*, 113 F.4th at 833 (citation omitted). When confronted with a statutory ambiguity, the court must "independently interpret the statute." *Loper Bright*, 603 U.S. at 395. In "exercis[ing] independent judgment," the court may "seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id.* at 394 (citation omitted). The court is to "use every tool at [its] disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400. With these standards in mind, the Court considers how the Wilderness Act's commercial-services provisions apply to towboat operations in the Boundary Waters.

The Forest Service first argues that the Wilderness Act's commercial-services provisions do not apply to towboat operations in the Boundary Waters because the later-

enacted BWCAW Act allows motorboat use on certain lakes in the Boundary Waters, and specifically mentions towboats. *See* Pub. L. No. 95-495, §§ 4(c), (c)(1), 4(h). The Forest Service claims that these provisions "obviat[ed] any separate requirement to determine the extent to which towboat operations are necessary to achieve Wilderness purposes as a condition to their being allowed as a commercial use" in the Boundary Waters. (ECF No. 84 at 39; *see* ECF No. 98 at 6 n.1 (suggesting that the Wilderness Act "must be read as a whole, to include the amendment recognizing preexisting use of commercial towboats in the Boundary Waters" in the BWCAW Act).) The Forest Service cites no legislative history or other sources of authority supporting its position.

Looking at the plain language of the BWCAW Act, the Court cannot interpret its provisions as obviating the Forest Service's obligation under the Wilderness Act to consider the extent to which commercial towboat operations are necessary in the Boundary Waters. The BWCAW Act provides that "the use of motorboats is prohibited within the wilderness designated by this Act, and that portion within the wilderness of all lakes which are partly within the wilderness, except for" certain Boundary Waters lakes. Pub. L. No. 95-495, § 4(c). It explains that "[t]he motorized uses . . . shall be confined to those types of . . . motorboats . . . which have been in regular use in the Boundary Waters . . . prior to the date of enactment of this Act." *Id.* § 4(h). The parties do not dispute that towboats "ha[d] been in regular use in the Boundary Waters" before the BWCAW Act. The BWCAW Act directs the Secretary to develop and implement "entry point

quotas for use of motorboats within the wilderness portions of [certain] lakes" based on certain criteria and not to exceed the base period use (described above). *Id.* § 4(f). Addressing towboats specifically, the BWCAW Act provides that certain horsepower limitations "shall not apply to towboats registered with the Secretary." *Id.* § 4(c)(1). From this plain language, Congress appears to have concluded that motorboats are necessary for realizing the recreational or other wilderness purposes in the Boundary Waters. But the Court cannot conclude that Congress determined *the extent to which* commercial towboat operations were necessary in the Boundary Waters. And so the Court will consider Wilderness Watch's claims that the Forest Service violated Section 1133(d)(5).

In doing so, the Court must determine what *action* Section 1133(d)(5) requires before the Forest Service may authorize commercial services in wilderness areas. *See Norton*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*."). Section 1133(d)(5) states that "[c]ommercial services may be performed within the wilderness areas . . . to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." 16 U.S.C. § 1133(d)(5). The plain language of this provision does not require that an extent-necessary analysis take a particular form, or require the Forest Service to make an extent-necessary "determination." In contrast, the preceding provision, Section 1133(d)(4), explicitly requires the President of the United States to make a "determination" for certain water projects in wilderness areas. *Compare* 16 U.S.C. § 1133(d)(5) *with id.*

§ 1133(d)(4)(1) (authorizing the President to approve certain water projects "upon his *determination* that such use or uses in the specific area will better serve the interests of the United States and the people thereof than will its denial." (emphasis added)). "[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Wilderness Watch contends that the Forest Service should have made "specialized" findings about the extent that commercial towboat operations are necessary in the Boundary Waters before issuing special-use permits. (ECF No. 79 at 42.) But the statute does not require specialized findings in the form Wilderness Watch seeks. "[A]lthough formal findings may be required in some cases in the absence of statutory directives when the nature of the agency action is ambiguous, those situations are rare." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "*Overton [Park]* makes it clear that [APA Section] 706(2)(A) does not require that the agency make any formal findings of fact." *Madison Cnty. Bldg. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 622 F.2d 393, 396 (8th Cir. 1980); *id.* at 396, 397 (holding that an agency decision that "merely state[d] that the regulatory criteria were met" did not prevent judicial review because it provided a reason for the decision that allowed the court "to decide if the [agency] considered the relevant

factors in making this decision, and to examine the record to see if it . . . provides a rational basis for the agency's choice."). "Section [1133(d)(5)] is mandatory as to the object to be achieved, but it leaves [the Forest Service] a great deal of discretion in deciding how to achieve it." *Norton*, 542 U.S. at 65 (addressing the mandate to "continue to manage [wilderness study areas] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness" under 43 U.S.C. § 1782(c)).

To support a requirement of "specialized" findings, Wilderness Watch relies on *Blackwell*. There, the Ninth Circuit explained that "[t]he Wilderness Act is framed in general terms and does not specify any particular form or content for such an assessment; therefore the finding of 'necessity' requires this court to defer to the agency's decision under the broad terms of the Act." *Blackwell*, 390 F.3d at 646–47. The Ninth Circuit then concluded that

> under the terms of the Wilderness Act, a finding of necessity is a necessary, but not sufficient, ground for permitting commercial activity in a wilderness area. The finding of necessity required by the Act is a *specialized* one. The Forest Service may authorize commercial services only "to the *extent* necessary." 16 U.S.C. § 1133(d)(5) (emphasis added). Thus, the Forest Service must show that the number of permits granted was no more than was necessary to achieve the goals of the Act.

*Id.* at 647 (first emphasis added). Since the Ninth Circuit issued *Blackwell* in 2004, courts "generally defer to the agency's chosen 'form or content' for conducting the specialized finding, ensuring only that the agency has adequately considered the potential

consequences of the commercial activity." *High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, 848 F. Supp. 2d 1036, 1046 (N.D. Cal. 2012) (citing *Blackwell*, 390 F.3d at 645, 648).

Even considering *Blackwell* and its progeny, the Wilderness Act does not require an extent-necessary analysis in the form that Wilderness Watch appears to want. Section 1133(d)(5) does not provide *how* the Forest Service is to analyze whether and how much commercial services are necessary, or what form that finding must take. The "crucial inquiry" is "whether the agency has conducted a sufficient comparative and qualitative analysis" of the commercial activity. *High Sierra Hikers Ass'n*, 848 F. Supp. 2d at 1047; *see id.* at 1047–48 (finding a Section 1133(d)(5) violation where the agency admitted promulgating a management plan that permitted the use of horses and mules in wilderness areas "without this requisite balancing" and did not argue "that its analysis was adequate or that its evaluation concluded that the preexisting commercial activity was necessary").

Wilderness Watch maintains that the record lacks evidence that the Forest Service made a specialized finding of necessity or analyzed relevant factors justifying the level of commercial towboat services in the Boundary Waters. It notes that the 2019 Needs Assessment and 2020 Visitor Capacity Analysis both deferred analysis of commercial towboat use to an upcoming NEPA review. (USA-2939; USA-2964.) The Forest Service does not rely on either of these documents as satisfying Section 1133(d)(5). The Forest

Service instead points to the Wilderness Plan,[8] asserting that its "findings in 1993 resulted from a comprehensive and searching analysis of the extent to which towboat services were necessary" that complied with the legal requirements of the time. (ECF No. 84 at 44.)

The Court has studied the 1993 Wilderness Plan and associated planning documents, keeping in mind the deferential standard of review. The Court is satisfied that, as part of that planning process, the Forest Service considered whether commercial towboat operations are necessary, and the extent to which they are necessary, in the Boundary Waters.[9]

In preparing the 1993 Wilderness Plan, the Forest Service conducted a NEPA analysis, including a Final Environmental Impact Statement ("Final EIS") and Record of Decision. The Forest Service included towboat operations as part of one of 32 items to be

---

[8] The Forest Service notes that review of the 1993 Wilderness Plan is outside the six-year statute of limitations. (ECF No. 84 at 27, 47.) Wilderness Watch maintains that it does not challenge the Wilderness Plan; it challenges the Forest Service's issuance of special-use permits without the extent-necessary analysis required by Section 1133(d)(5). Because the Court concludes that the Wilderness Plan satisfies Section 1133(d)(5), it does not address the statute-of-limitations issue.

[9] Wilderness Watch also points to documents relating the 2019 Needs Assessment and 2020 Capacity Analysis as admissions that the Forest Service has not yet completed an extent-necessary analysis. (ECF No. 79 at 49–52.) The Forest Service acknowledges that "the 1993 Wilderness Plan and its supporting EIS were performed prior to the adoption of the protocols that the Forest Service uses today when making extent-necessary findings." (ECF No. 84 at 44.) It will analyze the commercial towboat use again in its now-ongoing NEPA review, presumably under these updated extent-necessary protocols.

addressed. (USA-2411; *see* USA-2405–2418 (identifying 32 "public issues and management concerns" identified through scoping).) These items were combined into "four major issues" for analysis, all of which arguably relate to commercial towboat use in the Boundary Waters:

1.   What is the appropriate level of human use in the Boundary Waters, including the type of recreational experience and the amount of use?

2.   What kind of management is appropriate for Boundary Waters ecosystems?

3.   What facilities and uses are appropriate in the Boundary Waters?

4.   What are the costs and benefits associated with Boundary Waters management?

(USA-2246–47.) The Forest Service considered ten alternatives for managing visitor levels in the Boundary Waters that included varying approaches to managing towboat use.[10] (USA-2253–62.) It selected the alternative that, among other things, authorized towboats under special-use permits, limiting them to the number of towboats and businesses in operation in 1992 (Alternative 6A). (USA-2244.) The Forest Service determined that

---

[10] The alternatives proposed: having towboats "compete for and use day-use motor quotas" (Alternative 1); authorizing towboats under special-use permits, limiting them to 39 or 29 boats (Alternatives 2, 2A, 3, 4, 6); authorizing towboats under special-use permits with no boat limit (Alternative 4A); not permitting towboats at all (Alternatives 5, 5A); and authorizing towboats under special-use permits, limiting them to the number of towboats and business operating in 1992 (Alternative 6A). (USA-2253–58; *see* USA-2259–62 (comparing various alternatives).) Members of the public also offered suggestions in response to the question, "Towboats: Should they be allowed; if so, how many?" (USA-2388.) Those suggestions included limiting the time of day towboats operated and only using towboats as rescue vehicles. (USA-2393.)

"Alternative 6A meets the intent of the establishment of wilderness" under the Wilderness Act and the BWCAW Act. (*Id.* (noting Congress's policy to "secure for the American people of present and future generations the benefits of an enduring wilderness" and that "these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness").)

In the Final EIS, the Forest Service found that a significant factor affecting wilderness recreation opportunities in the Boundary Waters was the amount of land dedicated to various management areas. (USA-2302 ("Since the quality of most users' wilderness experience is, in part, related to the number of other parties encountered . . . , regulation of the number of users will have a direct impact on visitor's [*sic*] satisfaction.").) The Forest Service thus identified a need to balance providing opportunities for "[e]ncounters with other users (solitude), freedom, risk, [and] challenge" against ensuring recreational opportunities were available for all visitors. (*Id.*) The Forest Service created four management areas, each with its own "characteristic expectancy of encounters with other users." (*Id.*; *see* USA-2159; USA-2301 ("The management areas . . . are[:] 5.1, pristine; 5.2a, primitive, 5.2b, semi-primitive non-motorized; 5.3, semi-primitive motorized."), USA-2244 (similar).) The Forest Service provided different directives for motor use in each area based on the recreational opportunities the area was designed to offer. (USA-2301–03; USA-2159-63.) Only one

management area—"semi-primitive motorized"—allows motorboat use, including towboats. (USA-2301; USA-2163; USA-2172.)

The Record of Decision states that the Forest Service's commitment to serve the Boundary Waters "encompasses a strategy that provides appropriate protection of the resources within the BWCAW, while balancing the needs and desires of people to use this one-of-a-kind resource." (USA-2461.)As for commercial use, the Record of Decision notes that by implementing special-use permits, it will follow national policy more closely, enabling the Forest Service to meet the BWCAW Act which requires "the orderly management of public use and enjoyment of that area as wilderness, and of certain contiguous waters while at the same time protecting special qualities of the area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational, and educational value to the Nation." (USA-2466 (quoting Pub. L. No. 95-495 § 1, 92 Stat. 1649, 1649).) It also states that commercial "[u]se levels are retained at approximately current levels. Use is distributed over an extended time period, and utilizes adjusted entry point quotas. . . . Therefore, the requirement for services by visitors should remain relatively constant . . . ." (*Id*.)

In addition, the Record of Decision explains that the decisions about land allocation for the management areas "incorporates attention to legislation and policy," "recognizes the information available via research efforts and inventories," "gives careful consideration to the experience expected or anticipated from a wilderness visit,"

"recognizes the economic factors and their implications on management, communities, and businesses," and "considers the input from interested publics" and "information shared by wilderness managers and other resource specialists." (USA-2467.)

The Wilderness Plan states that "[c]ommercial operations may provide services that are in keeping with wilderness values," as part of its goal of providing for unconfined primitive recreation opportunities. (USA-2158.) As noted above, the Plan provides specific management direction for towboats, limiting them to "1992 levels for numbers of boats, trips, current operators, and specific lakes." (USA-2172.)

Wilderness Watch argues that the planning documents lack "a quantitative and qualitative analysis where relevant factors are weighed in relation to one another." (ECF No. 92 at 17–18.) But the plain language of Section 1133(d)(5) does not require such an analysis, and to the extent that the Ninth Circuit requires one, it did not do so until it issued its *Blackwell* decision in 2004 (more than a decade after the 1993 Wilderness Plan).

Taking the planning documents together, the Forest Service appears to have considered *whether* towboats were necessary, *and* the *extent* to which commercial towboat operations were necessary, and concluded that those commercial services were necessary to some extent. The Forest Service considered alternatives for commercial towboat operations, balanced goals, and limited commercial towboat use in the Boundary Waters to 1992 levels. The Court concludes that the Forest Service "acted within a zone of reasonableness and, in particular, . . . reasonably considered the relevant issues and

reasonably explained the decision."[11] *Firearms Regul. Accountability Coal.*, 112 F.4th at 519 (citation omitted); *see Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) ("If an agency's determination is supportable on any rational basis, [the reviewing court] must uphold it. This is especially true when an agency is acting within its own sphere of expertise." (internal citation omitted)).

3.     *Other Arguments*

Wilderness Watch makes several other arguments, asserting that in authorizing towboat services, the Forest Service ignored some factors and relied impermissibly on others. *See Firearms Regul. Accountability Coal.*, 112 F.4th at 519 (noting that relying on factors that Congress did not intend for an agency to consider is an arbitrary and capricious action). It lists seven such factors, many of which it gleaned from *High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065 (N.D. Cal. 2007). As set forth below, having

---

[11] The Eighth Circuit considered these same planning documents almost 30 years ago, and found that they provide "sufficient information to allow the decision-maker to consider alternatives and make a reasoned decision after balancing the risks of harm to the environment against the benefits of the proposed action." *Dombeck*, 164 F.3d at 1128 (citation omitted) (reviewing the sufficiency of the Wilderness Plan's EIS under NEPA). It explained: "The Record of Decision . . . indicates that the Forest Service established these motorboat quotas after considering the pertinent legislation, Forest Service policy, the needs of the environment, the historic uses of the area, and the recreational needs of the visitors." *Id.* at 1120. The Eighth Circuit also concluded that the "Final EIS adequately considers the environmental, recreational, social, and economic impacts of the Wilderness Plan, and that the Forest Service's use of methodologies, studies, and data was not arbitrary or capricious." *Id.* at 1131.

considered each factor, the Court concludes that they do not preclude a finding that the

Forest Service satisfied its obligation under Section 1133(d)(5).

1. Opportunities for scenic motorized travel and tows are available outside
   of the Wilderness. (ECF No. 79 at 47.)

This factor does not appear to apply to commercial towboat services, as the record

does not suggest that the Forest Service authorized towboats in the Boundary Waters to

allow visitors opportunities for "scenic motorized travel." Rather, the planning

documents for the 1993 Wilderness Plan show that the Forest Service authorized and

managed towboats under Alternative 6A after assessing, among other factors, visitor

needs and expectations for recreation opportunities and experiences. (*See, e.g.*, USA-2302

(management areas and visitor needs and expectancies); USA-2343 (Alternative 6A),

USA-2466 (ROD towboat limits).)

2. Crowding and motorized bottlenecks, particularly at Wilderness entry-
   points and on the Moose Lake chain, are the biggest issues degrading
   wilderness character. (ECF No. 79 at 47.)

Contrary to Wilderness Watch's assertion, the 1993 planning documents show that

the Forest Service considered crowding. (USA-2247–49 (visitor use levels); *see also* USA-

2466 (ROD stating that commercial use "is distributed over an extended time period, and

utilizes adjusted entry point quotas.").)

3. Non-motorized visitors are disadvantaged finding campsites when
   competing with visitors paying for commercial tow services, and their
   enjoyment of the Wilderness is impacted by the disruption of motors—
   an intrusion that most Wilderness visitors head to the Wilderness to
   avoid. (ECF No. 79 at 48.)

Again the record belies this argument. The record shows that the Forest Service considered campsite competition. (USA-2247–50 (visitor use levels); USA-2253–62 (alternatives); USA-2288–89 (campsite selection).) The Forest Service created four management areas within the Boundary Waters to allow visitors to pursue their preferred level of solitude. (*E.g.*, USA-2301–02, USA-2244.)

4.  Camping gear is relatively easy to transport in a canoe without the aid of commercial tow services. (ECF No. 79 at 48.)

The Forest Service admits citing camping gear as a reason to authorize towboat use. (ECF No. 84 at 46.) But Wilderness Watch cites no evidence about whether camping gear is "relatively easy to transport" without towboats. *But see Dombeck*, 164 F.3d at 1120 n.2 (noting that towboats transport "canoes, boats, camping supplies, equipment, and persons across the waterways of the [Boundary Waters]"). Moreover, this factor by itself certainly does not render the Forest Service's decision-making process arbitrary and capricious.

5.  Most commercial towboat users see the service as a matter of convenience and ease rather than a necessity, and towboat operators advertise the services as such. (ECF No. 79 at 48.)

The Forest Service acknowledges that it received comments that towboat benefits include "safety, convenience, and income to local economies," (ECF No. 84 at 46 (citing USA-2389)), but, as noted above, the Forest Service's authorization of the level of towboat

operations was based its assessment of visitor needs and expectations for recreation

opportunities and experiences.

6. The farthest towboat drop-off point is only a half-day paddle or less and accessible via non-motorized means by most visitors of varying physical abilities. (ECF No. 79 at 49.)

In support, Wilderness Watch points to an attachment to its own 2019 comments

to the draft Needs Assessment: a Boundary Waters online visitor forum remarking that

"Moose lake landing to Prairie Portage takes about two hours." (USA-9745.) This

anecdotal evidence does not suggest that the Forest Service overlooked a relevant factor.

7. There is growing public discontent concerning the degrading impact of motorized uses, particularly commercial towboat use, on wilderness character. (ECF No. 79 at 49.)

As recounted above, the planning documents reflect that the Forest Service

considered the effect of motorized uses (among other things) on the wilderness character.

(USA-2298–2345 (Final EIS chapter on environmental consequences)). The Forest Service

also considered negative public comments about towboat use in the Boundary Waters.

(*See, e.g.*, USA-2388–90.)

In sum, the Court concludes that the Forest Service's actions as part of the 1993

Wilderness Plan satisfied the extent-necessary analysis required under Section 1133(d)(5)

and were not arbitrary and capricious. For these reasons, the Court grants summary

judgment for the Forest Service on Counts Four and Five.

B.    *The BWCAW Act and Wilderness Plan Claims*

Wilderness Watch's remaining claims assert that the Forest Service has allowed towboat use to exceed limits set by the BWCAW Act (Count Two) and the 1999 Wilderness Plan (Count One). If so, Wilderness Watch asserts, the Court should set aside the Forest Service's actions as "not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations." (ECF No. 79 at 55 (citing 5 U.S.C. § 706(2)(A), (C)).) Before considering whether the Forest Service has violated the BWCAW Act and the Wilderness Plan, the Court reviews the Forest Service's obligations and management of commercial towboat operations over time.

As explained above, the BWCAW Act limits all motorboat permits in the Boundary Waters to 12,059 permits. (USA-9629 (table of day-use & overnight motorboat quotas, less phased-out Adler Lake).) It also limits motorboat permits for specific entry points, *e.g.*, 2,612 motorboat permits for Moose Lake. (*Id.*) Before implementing the Wilderness Plan, the Forest Service monitored all motorboat use using day-use permits and overnight permits. This method did not single out towboat use; towboats competed with other recreational motorboat users for day-use permits. The Forest Service estimates that around 25 percent of day-use permits were issued to towboat operators. (USA-7610; USA-7632.) In 1992, the overall day-use motor quota was 10,169 permits; 25 percent of this number is 2,542 permits. (USA-2254; USA-7610; USA-7632.)

The 1993 Wilderness Plan switched from requiring day-use permits for commercial towboat use to special-use permits, which "do not count against the quotas established for motorboat use on those lakes where towboats are permitted to operate." *Dombeck*, 164 F.3d at 1121; *see Bosworth*, 437 F.3d at 828 ("Currently, the towboat quota occupies the space between the maximum homeowner and resort quota and the base period quota maximum.").

In *Dombeck*, several parties challenged the Wilderness Plan's adoption of special-use permits for commercial towboat operations, which were consolidated before the Eighth Circuit. 164 F.3d at 1119, 1121. The Eighth Circuit explained that the Plan "sets the general motorboat [day-]use quota at 7,902 *trips*," and limits commercial towboats to their 1992 levels, "which amounts to 1,342 towboat *trips* per season." *Id.* at 1122 (emphasis added). "The combined number of motorized boat trips that the Plan allows (1,342 + 7,902) totals 9,244 *trips*, which does not exceed the 10,539 motorboat *trips* cap mandated by the BWCA[W] Act." *Id.* (emphasis added). Noting that the special-use permit system was "born out of a concern that absent a separate system, commercial towboat use would grow and take up an increasingly greater percentage of the available motorboat use quota, leaving fewer *quota permits* available to visitors," the Eighth Circuit concluded the special-use permit system was a "reasonable and permissible construction of the [BWCAW Act]." *Id.* (emphasis added).

Using the term "trips" in *Dombeck* has caused confusion in this litigation. The Forest Service maintains that using the term "trips" instead of "permits" was a mistake, and that the motorboat "trips" that the Eighth Circuit added to towboat "trips" actually added motorboat permits and towboat "permit-equivalents." Wilderness Watch counters that an "unexplained inconsistency" exists between what the Forest Service represented to the Eighth Circuit and to this Court, and thus the Forest Service's actions are arbitrary and capricious. (ECF No. 79 at 57 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). Having reviewed the record, the Court concludes that the Forest Service offers a reasonable explanation for the inconsistency in *Dombeck's* terminology, and that its actions in response to this inconsistency are not arbitrary and capricious.

*Dombeck's* description of the BWCAW Act's motorboat quotas (base period use) as "trips" rather than "permits" appears to be an unintentional error. As noted above, the motorboat quotas set under the BWCAW Act are based on permits rather than trips. (*See* USA-9629); *cf. Dombeck*, 164 F.3d at 1122 (referencing visitor "quota permits"); *see also Bosworth*, 437 F.3d at 820 (describing the "motorboat day-use *permit* quota" (emphasis added)). As for towboat use, the Final EIS and Record of Decision for the Wilderness Plan did not include "trips" as a metric for determining towboat levels and set no limit for the

number of towboat trips.[12] (*See generally* USA-2253–58; USA-2456–76.) As the Forest Service acknowledges, the terminology in *Dombeck* can be traced back to the Forest Service's interchanging of the terms "permits" and "trips" in its appellate briefing for that case. (*Compare* USA-5826 ("Towboat motor use for the 1992 season was approximately 1,342 *permits.*"[13] (emphasis added)), *with* USA-5835 ("The towboat usage for the 1992 season was less than the level shows approximately 1,342 *trips.*" (emphasis added)), *and id.* at n.11 ("Towboat usage is limited to the 1992 level of 1,342 *trips.*" (emphasis added)).) When *Dombeck* was issued, the Forest Service measured towboat use levels by number of operators, boats, and lakes, but not by towboat trips. (ECF No. 84 at 14 (citing USA-3040, USA-3044–47); *see id.* at 11 (citing USA-3025–27; USA-3044), 53.) The Forest Service did not begin to collect trip data from towboat operators consistently until 2015. So the towboat "trips" in *Dombeck* could not have meant "trips" as they are now reported to the Forest Service, but rather meant permits.

---

[12] The Forest Service does not know why the "trips" limitation was included in the Wilderness Plan, when neither the Final EIS nor Record of Decision reference towboat trips and the Plan itself does not define "trips." (*See* ECF No. 84 at 53 & n.21; ECF No. 98 at 27; USA-3040.)

[13] The Forest Service also contends that the 1,342 number of permits it presented to the Eighth Circuit in *Dombeck* "may have been mistakenly low." (ECF No. 84 at 51; *see* USA-3045–46; USA-7900–01.) The Forest Service does not argue for a departure from this number, and so the Court does not address Wilderness Watch's argument that the Forest Service must "provide a reasoned explanation for changing course and adopting a position contradicted by its previous findings." (ECF No. 79 at 58 (citing, among others, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).)

Now the Forest Service "considers one use of a towboat on a Boundary Waters lake (across the lake and back) as a 'trip.'" (*Id.* at 14 (citing USA-2477, USA-3046, USA-7498–99).)

With this history in mind, the Court turns to Wilderness Watch's challenges under the BWCAW Act and Wilderness Plan.

### 1.    BWCAW Act Claim

Count Two asserts that the Forest Service has allowed motorboat use to exceed the BWCAW Act's base period use for all Boundary Waters lakes and for particular entry points. (ECF No. 79 at 54 (citing USA-9629).) Because the Forest Service has changed how it monitors towboat use over time, determining whether the Forest Services has allowed excessive motorboat use requires some reverse-engineering of motorboat-use metrics.

Under the APA, courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (citation omitted). "If an agency's decision to which deference is afforded may be supported on any rational basis, [the Court] must uphold it." *Bosworth*, 437 F.3d at 822. "Therefore, even if the agency's underlying data are flawed, substantial deference requires the ruling be reversed only if 'there is a significant chance that but for the errors the agency might have reached a different result.'" *Id.* (citations omitted).

The Court thus sees its role under the APA as twofold: (1) determine whether the Forest Service's methodology for measuring motorboat use under the BWCAW Act is

arbitrary and capricious; and (2) determine whether motorboat use has exceeded the base period use, and thus was "not in accordance with law." 5 U.S.C. § 706(2)(a); *see Bosworth*, 437 F.3d at 822 ("Because an agency's choice of methodology is typically borne out of the agency's expertise, we defer to an agency's choice of methodology so long as it is not arbitrary or without foundation.").

As for methodology, the base period use (motorboat quota) is based on day-use permits and overnight permits per quota season. (USA-9629.) The Forest Service suggests calculating total motorboat use for a quota season by adding the day-use permits issued in a quota season to the towboat "permit-equivalents."[14] The towboat permit-equivalents are similar to day-use motor permits issued in 1992 (the last year towboat operators received day-use permits). At that time, day-use permits did not limit the number of boats per permit and allowed permit-holders to exit and re-enter the Boundary Waters repeatedly. (USA-2173; USA-2262; USA-7480–86.)

Applying these rules to motorboat use in the 2017 quota season—the year with the highest reported towboat use in the Boundary Waters since 2015—suggests that the Forest Service has not violated the BWCAW Act. If each towboat operator had obtained one day-use motor permit for each day that the operator's boats entered the Boundary Waters, the total reported towboat use would convert to 1,259 day-use permits ("permit-

---

[14] The Forest Service acknowledges that other methods exist for determining whether the base period use has been exceeded. (*See* ECF No. 84 at 49 n.19; ECF No 98 at 20 n.6.)

equivalents"). (ECF No. 84 at 16 & n.9 (citing USA-2477).) The Forest Service also issued 4,475 day-use permits during the 2017 quota season. (USA-9641.) Adding the 4,475 day-use permits and the 1,259 permit-equivalents yields 5,734 for the 2017 quota season.[15] (*Id.*) This total is far fewer than the base period use of 12,059 permits. The numbers for 2018–2022 are similarly well below the base period use.[16]

Wilderness Watch contends that the Forest Service makes a *post hoc* argument about a single permit allowing multiple visits, boats, and visitors. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action. . . . [A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."). It challenges the Forest Service's permit-equivalents methodology in two ways.

---

[15] The Forest Service provides a table of day-use motor permits, towboat permit-equivalents, and their totals in 2017–2021. (ECF No. 98 at 22 (citing USA-9641, USA-2477).) Due to greater numbers of day-use permits in 2018 and 2020, the sum of day-use motor permits and towboat permit-equivalents for those years exceeded the total for 2017. (*Id.*) Even so, for each year between 2017 and 2022, the sum of day-use permits and permit-equivalents was below 6,100. (*Id.*)

[16] As in *Dombeck*, the Forest Service did not include overnight permits in its calculation of day-use motor permits and permit-equivalents, although the Forest Service notes that "[i]ncluding overnight motor permits does not change the result." (ECF No. 98 at 19 n.5; *see id.* at 22 n.7.) The Court agrees. For example, during the 2017 quota season, the Forest Service issued 1,229 overnight motor permits to the public. (USA-9641.) Adding the 1,229 overnight permits, 4,475 day-use permits, and 1,259 permit-equivalents yields at total of 6,963. This amount is well below the motorboat quota (base period use) of 12,059. (*See also* ECF No. 98 at 22 n.7 (listing the numbers of overnight motor permits issued in 2017–2021, all of which were below 1260 (citing USA-9641)).)

First, Wilderness Watch argues that the permit-equivalents are inaccurate because before 1993, permits were limited to "one permit per group / party and no more than 10 persons in a group." (ECF No. 92 at 27.) In contrast, with special-use permits, some towboat operators have reported single trips that included large numbers of boats and clients. (*E.g.*, USA-6756 (in 2010, an outfitter reported 18 boats and 72 clients in one towboat trip and 4 boats and 60 clients in another trip); USA-6747 (in 2009, the same outfitter reported 10 boats and 42 clients in one trip); USA-2477 ("Some reports starting in 2018 reported large numbers of visitors under one tow trip. These were broken out in additional trips to document the maximum number of visitors a boat can handle so the proper number of trips is documented.").) The Forest Service's permit-equivalents do not account for such large group sizes. Second, rather than using the Forest Service's permit-equivalents, Wilderness Watch advocates for defining a towboat trip as "a single out-and-back journey by an individual towboat," which is similar to how the Forest Service now defines a towboat trip. (ECF No. 92 at 27 (citing USA-7504–05).)

The Forest Service disputes the assertion that its engaging on *post hoc* rationalization and highlights problems with Wilderness Watch's criticism of permit-equivalents and suggestion of using towboat trips instead. That said, it acknowledges that "trip levels . . . have become a key data point informing the agency's overall assessment of towboat use, including for purposes of the full-fledged reconsideration of the Wilderness Plan under NEPA that is currently underway." (ECF No. 98 at 21.) The

Forest Service calculated the sum of day-use motor permits and towboat trips for the Boundary Waters for each year between 2017 and 2022. For each year, the total of day-use permits and towboat trips was well below the base period use of 12, 059.[17] (*See* ECF No. 98 at 23 (Table 2 showing the day-use permit + towboat trip total for each year at least 3,280 below the base period use); USA-9641 (day-use and overnight permits), USA-2447 (towboat trips)). So even under this day-use permit + towboat trip approach, the Forest Service did not violate the BWCAW Act's base period use.

As between these methodologies, the Forest Service's approach seems more similar to the one the Eighth Circuit applied in *Dombeck.* To determine whether the base period use was exceeded, the Eighth Circuit added day-use motorboat permits to towboat "trips." The Forest Service has established that those "trips" were not trips as measured since 2015, but more like permit-equivalents.

Finally, Wilderness Watch also maintains that the Forest Service failed to address lake-specific entry point quotas, such as Moose Lake. In response, the Forest Service noted Wilderness Watch's failure "to demonstrate any violation on a per-lake basis," and instead, relied on mere anecdotal evidence. (ECF No. 98 at 26.) At the hearing, Wilderness

---

[17] As with the Forest Service's methodology, including overnight permits would not change the result for Wilderness Watch's methodology. Because the numbers of overnight motor permits issued in the 2017–2021 quota seasons were each below 1260, including them in the permit + towboat trip calculation would not reach the base period use of 12,059. (*See* ECF No. 98 at 23; USA-9641 (day-use and overnight permits), USA-2447 (towboat trips).)

Watch presented—for the first time—alternative metrics for determining whether the Forest Service had allowed motorboats to exceed the Moose Lake entry-point quotas. As explained above, the Court considers this argument to be an unauthorized sur-reply and does not consider it.

For the reasons above, the Court concludes that the Forest Service has articulated a reasonable methodology for measuring motorboat use under the BWCAW Act. Using that methodology, the Court concludes that motorboat use has not exceeded the base period use during the statute of limitations period. As explained above, the combination of permits and permit-equivalents fall well below the base period use set by the BWCAW Act. Because the record does not show that the Forest Service violated the BWCAW Act, the Court grants summary judgment on Count Two for the Forest Service.

2.    *NFMA and 1993 Wilderness Plan Claim*

Finally, Count One asserts that the Forest Service has allowed towboat use to exceed limits set by 1993 Wilderness Plan. The Wilderness Plan limits motorboat use to 75 percent of the BWCAW Act's base period use, and limits the "numbers of boats, trips, current operators, and specific lakes" to numbers recorded in 1992. (USA-2172.) Wilderness Watch contends that the Forest Service has allowed commercial towboat trips to exceed 1992 levels.

As explained above, the "trip" limit in the Wilderness Plan has caused confusion here. In *Dombeck*, the Forest Service represented to the Court that the Wilderness Plan

limits to 1,342 towboat trips per season. 164 F.3d at 1122; (*see* USA-5835 ("1,342 trips");

*but see* USA-5826 (also representing that towboat use was "approximately 1,342 *permits*"

for the 1992 season (emphasis added)).) But the Forest Service did not monitor towboat

trips in 1992; it managed towboat operations using permits.[18] *See also Bosworth*, 437 F.3d

at 820 (explaining that the Wilderness Plan set the "motorboat day-use *permit* quota . . .

at 7,902 permits for the entire BWCAW" (emphasis added)).

Under the towboat permit-equivalent methodology described above, the Forest

Service has not issued more than 1,291 towboat permit-equivalents per season between

2015 and 2021. (ECF No. 98 at 22 (citing USA-2477, with filters).) Thus, under this

methodology, each fall below 1,342 towboat permits per season.

As for the other metrics set by the Wilderness Plan, it is undisputed that the

numbers of boats, operators, and motorized lakes have decreased over time. In addition,

the number of paddle groups allowed to enter on motorized lakes have decreased over

time. The Forest Service argues that, given that these other metrics have declined, "[i]t is

therefore eminently reasonable to believe the number of trips has not exceeded 1992

levels." (ECF No. 98 at 27.) Wilderness Watch challenges whether these "indirect means

of limiting the number of towboat trips have been effective." (ECF No. 92 at 29 (citing

---

[18] In 2004, the Forest Service revisited towboat management in the current Forest Plan, and incorporated identical language for towboat management. (USA-9489 (limiting towboat use to "the 1992 levels for numbers of boats, trips, current operators, and specific lakes").) It is unclear why the Forest Service did not revise its towboat limitations at that time.

ECF No. 84 at 53).) It points to the Forest Supervisor's observations in February 2020 that "the draft Capacity Analysis clearly demonstrates that commercial towboat trips have nearly doubled in the past six years," (USA-9633), and growing public discontent with the degradation of Boundary Waters' wilderness character due to motorboat use. (*E.g.*, USA-9630–31, USA-3025–26.) But Count One asserts that the Forest Service allowed towboat use to exceed the Wilderness Plan's limits, not that towboat use caused injury despite staying within the Plan's limits.

The Court concludes that the Forest Service has not violated the Wilderness Plan, and so grants summary judgment on Count One for the Forest Service.

## CONCLUSION

Based on the above and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Wilderness Watch's motion for judicial notice (ECF No. 104) is GRANTED;

2.    Wilderness Watch's motion for summary judgment (ECF No. 77) is DENIED; and

3.    The Forest Service's motion for summary judgment (ECF No. 83) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 29, 2025                    BY THE COURT:

                                             s/Nancy E. Brasel
                                             Nancy E. Brasel
                                             United States District Judge